# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ASSOCIATION OF ADMINISTRATIVE LAW      )
JUDGES, an unincorporated association;      )
Henry Reuss Federal Plaza      )
Suite 300      )
310 Wisconsin Ave      )
Milwaukee, WI 53203      )
      )
DAVID AGATSTEIN;      )
Suite 500      )
800 E. Colorado Avenue      )
Pasadena, CA 91101      )
      )
KARL ALEXANDER;      )    Case No. 07-0711 (RMC)
6 Suburban Court      )
Morgantown, WV 26505      )
      )
JON R. HUNT;      )
Suite 200      )
1305 Navaho Drive      )
Raleigh, NC 27609-25 13      )
      )
JOHN K. KRAYBILL;      )
2301 West 22nd Street, Suite 201      )
Oak Brook, IL 60523      )
      )
JAMES NORRIS;      )
Market Square Center, Suite 400      )
Indianapolis, IN 46204-25 10      )
      )
CHERYL RINI;      )    COMPLAINT FOR
U.S. Bank Centre      )    DECLARATORY AND
1350 Euclid Avenue, Suite 700      )    INJUNCTIVE RELIEF
Cleveland, Ohio 44115      )
      )
EDWIN SHINITZKY,      )
Equity Office Building, Suite 900      )
200 West Adams Street      )
Chicago, IL 60606      )
      )
MARY RITA LUECKE      )
3330 Lake Street      )
Evanston, Illinois 60203      )
      )
RUSSELL DOTY      )
3878 N Tanager Ln      )
Billings, MT 59102-5916      )

and NED RICHARDSON                                      )
P.O. Box 128                                            )
51 Columbian Street                                     )
South Weymouth, Massachusetts 02190                    )
                                                       )
Plaintiffs,                                             )
                                                       )
v.                                                     )
                                                       )
UNITED STATES OFFICE OF PERSONNEL                       )
MANAGEMENT,                                             )
1900 E Street, NW                                      )
Washington, D.C. 20415-9700                            )
                                                       )
and LINDA M. SPRINGER,                                  )
Director of the United States Office of Personnel       )
Management,                                            )
Room 6551                                              )
1900 E Street, NW                                      )
Washington, D.C. 20415-9700                            )
                                                       )
Defendants.                                            )
_____)

## THIRD AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.      Plaintiffs, the Association of Administrative Law Judges ("AALJ") and individual

federal Administrative Law Judges, bring this action for declaratory and injunctive relief

challenging certain final regulations issued by the Office of Personnel Management ("OPM") on

March 20, 2007, and effective on April 19, 2007.  In an unprecedented and unwarranted action,

the rule, to be codified in 5 C.F.R. § 930.204 ("Final Rule"), effectively establishes a requirement

that incumbent Administrative Law Judges maintain active bar status.  The Final Rule constitutes

an improper and unlawful attempt to amend, indirectly, the Administrative Procedure Act's

("APA") guarantees, checks and balances that for 60 years have well-governed the federal

administrative process.  As there is no statutory basis for the Final Rule, OPM exceeded its

authority by issuing it.  The Final Rule also is arbitrary, capricious, and not otherwise in

accordance with the law.  Furthermore, the Final Rule is not rational in light of the record before

OPM when it promulgated the Rule.  Moreover, because the public was not given notice and

an opportunity to comment on studies and surveys relied upon by OPM in promulgating the

Final Rule, the rule-making process was legally defective.  Accordingly, Plaintiffs request that

the Court set aside the Final Rule and declare it null and void.

2.      In addition, pursuant to the Final Rule, OPM issued a Vacancy Announcement

and Notice of Examination regarding the Administrative Law Judge positions.  The Vacancy

Announcement and Notice of Examination are facially invalid and arbitrary and capricious as

applied.  Accordingly, the Vacancy Announcement and Notice of Examination should be set

aside.

## Jurisdiction

3.      This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §

701 *et. seq.*  APA Section 704 provides a right to judicial review of all "final agency action for

which there is no other adequate remedy in court."  5 U.S.C. § 704.  The issuance of the Final

Rule satisfies this jurisdictional threshold.

4.      The Court also has jurisdiction over the agency's actions pursuant to 28 U.S.C. §

1331, which grants the district courts "original jurisdiction of all civil actions arising under the ...

laws ... of the United States."  The Court may issue a declaratory judgment in this case pursuant

to the provisions of the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

**Parties**

6.     Plaintiff Association of Administrative Law Judges ("AALJ"), an unincorporated association affiliated with the International Federation of Professional and Technical Engineers ("IFPTE"), AFL-CIO, is the certified bargaining representative of more than 1,000 federal Administrative Law Judges ("ALJs" or "Judges") who adjudicate cases involving the Social Security Administration ("SSA") and the United States Department of Health and Human Services ("HHS").  Any ALJ appointed pursuant to the statutory provisions contained in 5 U.S.C. § 3105 and employed by the federal government as an ALJ in a bargaining unit represented by the AALJ is eligible for membership in the AALJ.  The AALJ also grants associate membership to ALJs not in bargaining units represented by AALJ.

7.     The ALJs represented by the AALJ maintain offices and adjudicate cases throughout the United States and several ALJs maintain offices and adjudicate cases in this judicial district.

8.     The purposes of the AALJ are to (a) preserve, promote, and improve the guarantees and protections provided by the United States Constitution, the Administrative Procedure Act, the Social Security Act and all other Federal laws; (b) to preserve, promote, and improve the working conditions of Administrative Law Judges; (c) to preserve promote, and improve the professionalism and competence of Administrative Law Judges by insuring opportunities for continuing professional education and training; and (d) to preserve, promote, and improve the rights of its members through collective bargaining, political action and all other lawful concerted activities.

9.     Plaintiff David Agatstein is a current ALJ employed by SSA and a member of the

AALJ.  Judge Agatstein was appointed an ALJ in 1991 and has served as an ALJ continually since his appointment.

10.    Judge Agatstein was not an active member of any state bar when the Final Rule became effective on April 19, 2007.  Therefore, Judge Agatstein was not in compliance with OPM's Final Rule when it came into effect.  As a consequence of his non-compliance with OPM's Final Rule, Judge Agatstein was in jeopardy of being subject to possible removal or other discipline by either OPM or by SSA.

11.    Plaintiff Karl Alexander is a current ALJ employed by SSA and a member of the AALJ.  Judge Alexander was appointed an ALJ in 1997 and has served as an ALJ continually since his appointment.

12.    Judge Alexander was an inactive member of the Pennsylvania Bar when the Final Rule became effective on April 19, 2007.  Therefore, Judge Alexander was not in compliance with OPM's Final Rule at the time it came into effect.  As a consequence of his non-compliance with OPM's Final Rule, Judge Alexander is in jeopardy of being subject to possible removal or other discipline by either OPM or by SSA.

13.    Since learning of OPM's Final Rule on or about March 20, 2007, Judge Alexander has taken steps to be reinstated to the Pennsylvania Bar.  However, he was still not able to comply with OPM's Final Rule by the time it went into effect because the reinstatement process typically takes four to six months.  He requested that the process be expedited, but even the expedited process can take up to three months.  Additionally, Judge Alexander must complete thirty-six hours of continuing legal education (CLE) before he may be reinstated.

14.    Plaintiff Edwin Shinitzky is a current ALJ employed by SSA and a member of the

AALJ.  Judge Shinitzky was appointed an ALJ in 1995 and has served as an ALJ continually since his appointment.

15.    Judge Shinitzky was an inactive member of the Illinois State Bar when the Final Rule became effective on April 19, 2007.  Therefore, Judge Shinitzky was not in compliance with OPM's Final Rule at the time it came into effect.  As a consequence of his non-compliance with OPM's Final Rule, Judge Shinitzky is in jeopardy of being subject to possible removal or other discipline by either OPM or by SSA.

16.    Judge Shinitzky currently holds "inactive" status in Illinois.  He has been licensed in Illinois since 1955.  He has never been disciplined and remains in good standing.  In order to convert from "inactive" status to "active" status, Judge Shinitzky would have to comply with Illinois' mandatory continuing legal education requirements.  Compliance would be a considerable expense to Judge Shinitzky, in terms of both time and money.  SSA does not pay for an ALJ's continuing education courses.

17.    Plaintiff Jon R. Hunt is a current ALJ employed by SSA and a member of the AALJ. Judge Hunt was appointed an ALJ in 1990 and has served as an ALJ continually since his appointment.

18.    Judge Hunt was an inactive member of the Washington State Bar when the Final Rule became effective on April 19, 2007.  Therefore, Judge Hunt was not in compliance with OPM's Final Rule at the time it came into effect.  As a consequence of his non-compliance with OPM's Final Rule, Judge Hunt was in jeopardy of being subject to possible removal or other discipline by either OPM or by SSA.

19.    As a result of OPM's Final Rule, Judge Hunt has incurred an additional $464.00

for 2007 fees and late payment penalties to be placed on "active" status.  Additionally, Judge

Hunt was required to attend thirty hours of CLE credit that was in arrears at the time he elected

"inactive" status.  Typically each credit hour costs between $30 to $50, in addition to the cost of

transportation, meals, lodging, etc.  SSA does not pay for an ALJ's continuing education courses.

Judge Hunt was able to complete the CLE credit hours by June 2007, two months after the

effective date of the final Rules.

20.     Plaintiff John K. Kraybill is a current ALJ employed by SSA and a member of the

AALJ.  Judge Kraybill was appointed an ALJ in 1994 and has served as an ALJ continually since

his appointment.

21.     Judge Kraybill was an inactive member of the Pennsylvania Bar when the Final

Rule became effective on April 19, 2007.  Therefore, Judge Kraybill was not in compliance with

OPM's Final Rule at the time it came into effect.  As a consequence of his non-compliance with

OPM's Final Rule, Judge Kraybill was in jeopardy of being subject to possible removal or other

discipline by either OPM or by SSA.

22.     Since learning of OPM's Final Rule on or about March 20, 2007, Judge Kraybill

has taken steps to be reinstated to the Pennsylvania Bar.  He missed at least eight days of work,

for which he was given administrative leave, and incurred personal expenses in excess of

$1,900.00 in order to complete the thirty-six hours of CLE required in order to be reinstated.

Despite his efforts, Judge Kraybill was unable to comply with OPM's Final Rule by April 19,

2007, due to the lengthiness of the reinstatement process.  Judge Kraybill was able to complete

the reinstatement process in January 2008, after he satisfied the CLE requirement and paid a

disciplinary fee of $175.00.  The reinstatement process took approximately nine months to

complete, even after approval for expedited reinstatement.

23.     Plaintiff James Norris is a current ALJ employed by SSA and a member of the AALJ. Judge Norris was appointed an ALJ in 1990 and has served as an ALJ continually since his appointment.

24.     Judge Norris is a retired member of the Iowa State Bar and the Illinois State Bar. Therefore, Judge Norris was not in compliance with OPM's Final Rule when it became effective on April 19, 2007.  As a consequence of his non-compliance with OPM's final ALJ rules, Judge Norris is in jeopardy of being subject to possible removal or other discipline by either OPM or by SSA.

25.     Judge Norris was unable to timely comply with OPM's Final Rule because the requirements in order to do so would be unduly burdensome, in terms of both time and money. In order to obtain "active" status in the state of Iowa, he would have been required to complete CLE of fifteen hours per year since 1990.  In order to obtain "active" status in the state of Illinois, he would be required to pay the total of the back dues since 1990.  Alternatively, Judge Norris was seeking admission by motion to the District of Columbia Bar, however this process is lengthy and thus he was unable to comply with OPM's Final Rule in a timely manner.

26.     Plaintiff Cheryl Rini, is a current ALJ employed by SSA and a member of the AALJ. Judge Rini was appointed an ALJ in 1995 and has served as an ALJ continually since her appointment.

27.     Judge Rini is a member of the Ohio State Bar and the Colorado State Bar.  Due to the final rule, she elected "active" status in the State of Colorado, but was thus required to pay an additional fee and penalty to change her status.  Moreover, Judge Rini is now also subject to

CLE requirements in the State of Colorado, though she currently resides in Ohio. Judge Rini received her "active" status card at the end of April 2007, but she is still in the process of completing the CLE requirement.

28.     Judge Rini attempted to obtain "active" status in the State of Ohio, but was unable to do so. Her license in the State of Ohio was suspended in 2005, without notification, for non-payment of dues. In order to go from "suspended" status to "active" status, Judge Rini would have had to complete CLE requirements, and pay additional fees and penalties. It was not possible for her to complete these CLE requirements before the effective date of the Final Rule. Furthermore, it would have been a further financial hardship to pay the fees and penalties in addition to those she was required to pay to the Colorado State Bar. Therefore, Judge Rini remains in "suspended" status in the State of Ohio.

29.     Plaintiff Mary Rita Luecke is an attorney in the private practice of law in Evanston, Illinois. Ms. Luecke is qualified to be an applicant for the federal administrative law judge position. Ms. Luecke did not receive advance notice of the Vacancy Announcement issued on May 4, 2007. Due to the early closing of the application submission period, Ms. Luecke was not able to submit an application prior to the closing of the Vacancy Announcement on or about May 8, 2007.

30.     If the application period were reopened, Ms. Luecke would renew her attempt to apply for a position as a federal administrative law judge.

31.     Plaintiff Russell Doty is an attorney in the private practice of law in Billings, Montana. Mr. Doty is qualified to be an applicant for the federal administrative law judge position. Mr. Doty did not receive notice of the Vacancy Announcement issued on May 4, 2007

until May 7, 2007.  Mr. Doty was traveling away from home when he received the notice.  Due

to the early closing of the application submission period, Mr. Doty was not able to submit an

application prior to the closing of the Vacancy Announcement on or about May 8, 2007.

32.     If the application period were reopened, Mr. Doty would renew his attempt to

apply for a position as a federal administrative law judge.

33.     Plaintiff Ned Richardson is an attorney in the private practice of law in South

Weymouth, Massachusetts.  Mr. Richardson is qualified to be an applicant for the federal

administrative law judge position.  Mr. Richardson did not receive advance notice of the

Vacancy Announcement issued on May 4, 2007.  Due to the early closing of the application

submission period, Mr. Richardson was not able to submit an application prior to the closing of

the Vacancy Announcement on or about May 8, 2007.

34.     If the application period were reopened, Mr. Richardson would renew his attempt

to apply for a position as a federal administrative law judge.

35.     Defendant Linda M. Springer is the Director of the United States Office of

Personnel Management.

36.     Defendant United States Office of Personnel Management ("OPM") is an

Independent Agency of the United States Government that sets eligibility standards for the civil

service of the federal government.  OPM's headquarters and the administrative officers

responsible for the issuance of the final rule are located in this judicial district.

**History of the ALJ Program**

37.     As part of the statutory scheme designed to improve and professionalize the federal administrative processes, federal ALJs are appointed and serve pursuant to the Administrative Procedure Act (APA), 60 Stat. 237 (June 11, 1946).  The original Act was repealed by Pub. L. No. 89-554, 80 Stat. 381 (September 6, 1966) and its provisions were codified and incorporated into the following sections of Title 5 of the United States Code: 5 U.S.C. §§ 551-559, 701-706, 1305, 3105, 3344, 5372 and 7521.

38.     Regulations appearing in 5 CFR Part 930, governing the appointment, pay and removal of ALJs serving the federal departments and agencies, were first published by the former Civil Service Commission ("CSC") in 1947 subsequent to enactment of the APA of 1946 (60 Stat. 237).  12 Fed. Reg. 6321 (September 23, 1947).

39.     The Civil Service Reform Act ("CSRA") of 1978 amended the APA to delegate to OPM the responsibility for the prescription of pay rates of ALJs, and for the examination and qualification attorney applicants for placement on the ALJ selection register, from which agencies appoint applicants to federal ALJ positions.  5 U.S.C. §§ 1104(a)(1), 1305.  In order to ensure and protect the decisional independence of the ALJs, it also exempted ALJs from specific agency performance appraisal processes and transferred to the Merit Systems Protection Board ("MSPB") responsibility for any removal or reduction in pay of ALJs.  5 U.S.C. §§ 1305, 7521.

40.     5 U.S.C. § 3105 provides:

Each agency shall appoint as many administrative law judges as are necessary for proceedings required to be conducted in accordance with sections 556 and 557 of this title. Administrative law judges shall be assigned to cases in rotation so far as practicable, and may not perform duties inconsistent with their duties and responsibilities as administrative law judges.

41.    ALJs appointed under Section 3105 enjoy a unique and protected status in the federal administrative system because they are the only federal administrative adjudicators appointed after a rigorous merit selection process and the only ones with statutorily-protected decisional independence and tenure.  Pursuant to 5 U.S.C. § 7521, ALJs appointed pursuant to 5 U.S.C. § 3105 are accorded APA protections so as to ensure judicial independence.  Under this provision, ALJs may be removed, suspended, reduced in pay or grade, or furloughed by an agency only after "good cause" is established and determined by the MSPB after a hearing on the record.

42.    "Good cause" generally requires conduct or actions by an ALJ that undermine the confidence in the administrative adjudicatory process.  *SSA v. Davis,* 19 M.S.P.R. 279, 282 (1984), *aff'd,* 758 F.2d 661 (Fed. Cir. 1984).  Other categories of "good cause" include misconduct or incompetence, insubordination, physical incapacity, violation of statute or regulation, performance during adjudicatory proceeding, and low productivity.  *See*, M. Asimow, *A Guide to Federal Agency Adjudication* (2003), Chpt. 10.  If a disciplinary action by an agency is arbitrary, politically motivated, or based on a reason that constitutes an improper interference with the performance by an ALJ of his or her judicial functions, there is no good cause.  A charge based on "efficiency of the service" will also not satisfy the requisite burden.  *Id.*

43.    In *Butz v. Economou,* 438 U.S. 478, 513-14 (1978), the U.S. Supreme Court defined the role of federal ALJs as follows:

> There can be little doubt that the role of the modern federal hearing examiner or administrative law judge within this framework is "functionally comparable" to that of a judge. His powers are often, if not generally, comparable to those of a trial judge: He may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions. See § 556 (c). More importantly, the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency. ... [t]he Administrative Procedure Act contains a number of provisions designed to

12

guarantee the independence of hearing examiners. They may not perform duties inconsistent with their duties as hearing examiners. 5 U.S.C. § 3105 (1976 ed.). When conducting a hearing under § 5 of the APA, 5 U.S.C. § 554 (1976 ed.), a hearing examiner is not responsible to, or subject to the supervision or direction of, employees or agents engaged in the performance of investigative or prosecution functions for the agency. 5 U.S.C. § 554 (d)(2) (1976 ed.). Nor may a hearing examiner consult any person or party, including other agency officials, concerning a fact at issue in the hearing, unless on notice and opportunity for all parties to participate. § 554 (d)(1). Hearing examiners must be assigned to cases in rotation so far as is practicable. § 3105. They may be removed only for good cause established and determined by the Civil Service Commission after a hearing on the record. § 7521. Their pay is also controlled by the Civil Service Commission.

44.     In order to achieve its statutory purpose, the APA creates a "comprehensive bulwark" to protect ALJs from agency interference.  The independence granted to federal ALJs was designed by Congress to maintain public confidence in the essential fairness of the process through which claims by individuals aggrieved by agency action are adjudicated.  *Nash v. Califano,* 613 F.2d 10, 20 (2 Cir. 1980).  The statutory framework mandates that ALJs are to function as independent and impartial adjudicators in the federal administrative process.  The ALJ is the only independent and impartial adjudicator available to an aggrieved party in the federal administrative process. As such, the ALJ is potentially the only person who stands between the claimant and agency administrative whim or bias.

45.     In general, standards of conduct for federal employees are established by the Office of Government Ethics ("OGE").  Individual agencies may supplement standards of conduct for their employees and specify training for ALJs.  SSA outlined an ALJ's duties and responsibilities in the *ALJ Administrative Handbook.*  The *ALJ Administrative Handbook* addresses "Standards of Conduct" and "Outside Activities" including an explicit restriction on the practice of law.  SSA's ALJ *Administrative Handbook* specifically states:

> The SSA Guide on Employee Conduct contains restrictions against the practice of law, or other activities where an Administrative Law Judge may be involved as an advocate or participant in controverted legal matters. Part VII, section I. By analogy, Canon 4 of the American Bar Association's Code of Judicial Conduct states that a judge should regulate his or her extra-judicial activities to minimize the rise of conflict with Judicial duties. The ABA Code of Judicial Conduct also restricts fiduciary interpersonal relationships and absolutely prohibits the practice of law by judges. Canon 4 sections E. And G., respectively.

*ALJ Administrative Handbook,* SSA, OHA, SSA Pub. No. 70-045 (May 1994), pp. 29-30.

(Attached to the original Complaint as Exhibit 1).

46.    Canon 4(G) of the Code of Judicial Conduct, adopted by the American Bar Association ("ABA") in 1990, also provides that a "judge shall not practice law." The ABA's Code of Judicial Conduct is the most acknowledged source of judicial ethics and has been applied by the Office of Personnel Management to federal administrative law judges. *See In the Matter of Chocallo,* 1 M.S.P.R. 605 (1978), *aff'd,* 1 M.S.P.R. 612 (1980). The most recent ABA Code of Judicial Conduct specifically includes ALJs and prohibits the practice of law by Judges.

**ALJs Were Never Required to Maintain Active Bar Status**

47.    The APA and the CSRA contain no requirements, explicit or implicit, that require incumbent ALJs to maintain active bar membership status. Prior to the promulgation of the Final Rule on March 20, 2007, none of the regulations under the APA required active bar membership status for ALJs. SSA's *ALJ Administrative Handbook* contains no requirement that ALJs maintain active bar membership.

48.    On January 9, 1989, James R. Rucker, Jr., then SSA's Chief Administrative Law Judge, speaking for SSA, issued a Memorandum specifically informing ALJs that OPM did not require active bar membership after appointment as an ALJ. The Memorandum noted that while

14

many states allow Judges, including SSA ALJs, to enter into inactive status, not all states have an inactive category. Acting in reliance on this Memorandum, many SSA ALJs allowed their bar memberships to convert to inactive or other status. (Attached to the original Complaint as Exhibit 2).

49.    On or about August 11, 1994, OPM approved the current Position Description ("PD") for ALJs appointed by the SSA and it has not been substantively modified since that date. The SSA PD does not contain any requirement, implicitly or explicitly, that an ALJ maintain active bar membership after appointment as an ALJ. (Attached to the original Complaint Exhibit 3).

50.    In 1998, Rhoda Lawrence, then OPM Assistant General Counsel, contrary to the accepted understanding of ALJ requirements, suggested that it was OPM policy that all government attorneys must be currently authorized to engage in the practice of law and that such requirement applies not only as a qualification requirement for appointment to an attorney position but is a continuing requirement necessary to perform the ongoing duties of an attorney. As for Administrative Law Judges, Ms. Lawrence opined that ALJs must meet the same professional licensing requirements as attorneys, and that the requirement for bar membership and eligibility to practice law "as an attorney" should remain in effect as a continuing requirement after an applicant is appointed to an ALJ position. Ms. Lawrence noted that "judicial" status may satisfy this requirement. (Attached to the original Complaint as Exhibit 4).

51.    In 2000, OPM conceded that Ms. Lawrence's opinion that bar membership and eligibility to practice law remained a continuing requirement for ALJs was "in error." On May 12, 2000, in response to a specific request from ALJ Bruce L. Birchman, OPM representative

15

Armando Rodriguez confirmed to ALJ Birchman that ALJs were not required to maintain active bar membership after appointment.  (Attached to the original Complaint as Exhibit 5).

52.    In a July 12, 2000 letter drafted to the State of Texas Board of Law Examiners, OPM Deputy Director Espinosa-Ross reiterated the accepted understanding of ALJ requirements and stated: "[p]rior to appointment as an Administrative Law Judge, applicants are required to be duly licensed to practice law and be in 'active' status with their State Bar.  However, the provisions of 5 CFR 930.20 1 *et seq* do not specifically state that current Administrative Law Judges must maintain their 'active' status after their appointment as Federal Administrative Law Judges."  (Attached to the original Complaint as Exhibit 6).

53.    On January 18, 2001, the SSA's Office of the Chief Administrative Law Judge ("OCALJ"), removed a Reminder from the OCALJ website concerning ALJ active bar membership pending "further clarification on Bar Membership requirements from OPM.  Once we get the necessary clarification we will include it in our Chief Judge Reminders."  No such clarification was posted.  Upon information and belief, OPM never informed the OCALJ that ALJs were required to maintain active bar membership after appointment.

### Rule-Making Process

54.    On December 13, 2005, OPM published its initial Notice of Proposed Rule-Making ("NPRM").  70 Fed. Reg. 73646 (Vol. 70, No. 238).  On December 21, 2005, OPM republished its NPRM "due to information that was inadvertently omitted" from the December 13, 2005 NPRM.  70 Fed. Reg. 75745 (Vol. 70, No. 244)

55.    The December 21, 2005 NPRM proposed to revise the Administrative Law Judge Program ("ALJ Program") with the stated objective of regulatory streamlining and reorganization,

removing obsolete pay system instructions, and clarifying OPM and agency responsibilities. Substantively, the proposed regulations purported to (1) modify the ALJ Examining System and (2) impose a mandatory bar licensing requirement on incumbent ALJs as a condition of continuing employment.

56.    In response to the NPRM, the AALJ, and other groups that represent ALJs, submitted comments in opposition to the proposed regulations. The commenters demonstrated that OPM was incorrect in stating that active bar status was a long-standing requirement applicable to incumbent Administrative Law Judges. The commenters showed that active bar status was never a requirement in any OPM published rule or regulation; is not set forth in a Policy Statement and is not a requirement of the Administrative Procedure Act. The commenters also established that OPM lacked statutory authority to promulgate such a policy under the APA and that implementation of the Final Rule would conflict with the American Bar Association Judicial Code of Conduct and may conflict with state licensing requirements.

57.    On March 20, 2007, OPM issued the Final Rule. 72 Fed. Reg. 12947 (Vol. 72, No. 053). The Final Rule purports to "clarify" that active bar membership status (defined as being duly licensed and currently authorized to practice law) is a continuing "condition of employment" for any person serving as a federal ALJ (whether as an incumbent ALJ or as a prior ALJ applying for reinstatement). In other words, ALJs could be removed from their positions by OPM under the guise of the "condition of employment" standard rather than through the specific MSPB requirements established by Congress in the 1978 revisions to the Administrative Procedure Act.

17

58.     The Final Rule at 5 C.F.R. § 930.204(b) provides:

Licensure. At the time of application and any new appointment and while serving as an administrative law judge, the individual must possess a professional license to practice law and be authorized to practice law under the laws of a State, the District of Columbia, the Commonwealth of Puerto Rico, or any territorial court established under the United States Constitution. Judicial Status is acceptable in lieu of "active" status in States that prohibit sitting judges from maintaining "active" status to practice law. Being in "good standing" is also acceptable in lieu of "active" status in States where licensing authority considers "good standing" as having a current license to practice law.

59.     The final regulation also provides that:

[t]he failure at any time (applicant or incumbent)to meet a minimum qualification requirement means the individual is not qualified to perform the duties of the position.

72 Fed. Reg. 12947, 12948.

60.     The final regulations state that "as it is not a new requirement, a transition period is not needed."  Accordingly, all ALJs must satisfy the requirements of the Final Rule as of the effective date, April 19, 2007, pursuant to this provision.  72 Fed. Reg. 12947, 12949.

61.     The Final Rule at C.F.R. §930.211(c)(1), purports to exempt OPM actions under 5 C.F.R. Part 731 from the provisions of 5 U.S.C. § 7521, which would circumvent the longstanding requirement that an agency establish good cause on the record during a hearing with the MSPB prior to the removal of, or other adverse action against, an ALJ.

**Impact of the Final Rule on Judges**

62.     The requirement that incumbent federal ALJs maintain active bar membership status subsequent to appointment to an ALJ position with a federal agency is a radical departure from previous regulations.  Since the enactment of the APA in 1946, neither OPM nor the federal

18

agencies appointing ALJs have required incumbent federal ALJs to maintain active bar membership status subsequent to appointment.

63.    Categories of bar membership vary widely from state to state.  Most states allow ALJs to select "active," "inactive" or "judicial" status.  Certain states, however, such as the Commonwealth of Virginia, bar judges from maintaining active status.  In these jurisdictions, Judges usually must select either "inactive" or "judicial" status.

64.    In all jurisdictions, an active bar status member is in good standing and authorized to practice law.  Individuals in "inactive" or "judicial" status are also in good standing with the bar, but generally are not authorized to practice law.

65.    The requirements to maintain active bar membership vary widely from state to state.  Most states, however, require active bar members to complete continuing legal education ("CLE") credit, maintain client security trust funds, and pay specified bar dues.  Some states impose other requirements on active status members, such as compulsory *pro bono* requirements.  For inactive or judicial members, these requirements are normally waived or reduced.

66.    ALJs are often assigned to, and adjudicate cases in, states other than the jurisdiction in which they are licensed.  In some instances, CLE courses must be completed in the state of licensure rather than the state of residence.  Application of such rules would create substantial hardship for affected ALJs by requiring them to travel to their state of licensure to satisfy CLE requirements.

67.    Based on earlier guidance from OPM and SSA, dating back to at least 1989, numerous incumbent ALJs ceased maintaining "active" bar status.  Prior to the issuance of the Final Rule, these ALJs were never required to change their status.  Many of these ALJs were

19

unable to come into "active" status prior to the effective date of the Final Rule because of CLE

requirements, payment of dues, in some instances back dues for each year the ALJ was not active,

or other obstacles to changing status, including bureaucratic processes of state bar associations

that may take months to complete. In the most extreme cases, ALJs may have to retake the bar

examination to convert to active status.

68.    Timely compliance with the Final Rule before its effective date would have been

unduly burdensome both in terms of time and money, if not impossible in some states. Moreover,

this burden endures beyond the effective date of the Final Rule. Once they become active

members of state bars, ALJs are subject to CLE requirements, which would be an ongoing

personal expense for each judge. SSA does not reimburse an ALJ for the cost of CLE programs.

Therefore, ALJs would have to attend these mandatory courses at their own expense. This would

be quite costly and time-consuming, given that most ALJs, including all of the ALJs who are

named as plaintiffs, do not reside in the state in which they are based.

69.    Incumbent ALJs who were unable to become "active" by the effective date of the

Final Rule are at risk of not meeting a purported "continuing requirement" of their position. This

risk is heightened by OPM's statement that ALJs failing to satisfy this continuing requirement are

not qualified for their positions. The ALJs are left in a position of not knowing whether they have

an obligation to resign based on their failure to meet the Final Rule's requirements or whether

OPM or an agency will take action to remove them from their positions.

70.    The Final Rule casts doubt on such Judge's ability to schedule hearings, continue

to adjudicate pending cases and issue opinions. In addition, implementation of the Final Rule

may put ALJs, who elected "inactive" or "judicial" status based on prior guidance, in jeopardy of

being in conflict with the Final Rule.  The removal or forced resignation of an ALJ for the failure

to comply with the Final Rule will cause irreparable harm to the ALJ, the impacted agencies and

the general public.

## CAUSES OF ACTION

### Count I

### OPM Does Not Have the Authority to Promulgate the Final Rule

71.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 70

of this complaint as though contained herein.

72.     Section 706 of the APA authorizes a court to "set aside agency action, found to be

... (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory rights."  5

U.S.C. § 706(2)(C).

73.     OPM has delegated the authority regarding the examination and qualification of

attorney applicants on the ALJ selection register, including conducting competitive examinations

for federal administrative law judge positions.

74.     Congress, however, never granted OPM the authority to regulate ALJ

post-appointment conditions of employment of Administrative Law Judges in the manner

contemplated by Rule 930.204(b).  Nothing in the plain language of 5 U.S.C. § 3105,

"Appointment of administrative law judges," reasonably can be read to require ALJ active bar

status for the duration of federal employment and to vest in OPM the responsibility to ensure that

this requirement is realized.

75.     There is no statutory basis for OPM's promulgation of Final Rule 930.211(c).  This

Rule is inconsistent with the statutory provisions of 5 U.S.C. § 7521 to the extent that it allows

OPM to remove or otherwise take adverse actions against ALJs without establishing good cause during a hearing before the MSPB.

76.    The Final Rule is inconsistent with the APA and beyond the authority Congress granted to OPM to administer the selection and appointment function.  As Congress did not authorize OPM to regulate incumbent ALJs in the manner asserted, the assertion of such authority by OPM is ultra vires.

## Count II

### The Final Rule is Arbitrary, Capricious and Not Rational in Light of the Record

77.    Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 76 of this complaint as though contained herein.

78.    Section 706 of the APA authorizes a court to "set aside agency action, found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

79.    In issuing the Final Rule, OPM asserted that the Final Rule promotes efficiency, will ensure that ALJs remain subject to a code of professional responsibility, and is rationally related to the ALJ position.

80.    OPM failed to provide any example or basis that supports its assertion that the Final Rule "promotes efficiency."  Indeed, many ALJs do not currently satisfy the provisions of the Final Rule and there is absolutely no evidence that the lack of an "authorization to practice law" hinders the efficiency of such judges.

81.    OPM's assertion that the Final Rule will ensure that ALJs remain subject to a code of professional responsibility is devoid of merit.  ALJs are currently subject to the Code of

Judicial Conduct adopted by the American Bar Association pursuant to a ruling by the MSPB.
Furthermore, state bar associations generally may not discipline ALJs for actions in their capacity
as ALJs. To the extent that ethics rules of state bar associations apply to ALJs, these rules are as
applicable to "inactive" and "judicial" bar status individuals as they are to active bar status
individuals.

82.    The requirement that incumbent ALJs remain "duly licensed and authorized to
practice law" is not rationally related to the duties of an ALJ. Nothing in an ALJs' duties requires
an ALJ to be authorized to practice law. Indeed, ALJs are specifically prohibited from engaging
in the practice of law.

83.    The Final Rule concedes that some jurisdictions prohibit ALJs from maintaining
"active" status to practice. The Final Rule allows ALJs licensed in such jurisdictions to merely be
in "good standing" rather than "active" status. It is arbitrary and capricious to mandate that some
ALJs must maintain active bar status while allowing other ALJs to simply be in "good standing."

84.    Licensing of attorneys has long remained a province of the states. The Final Rule
essentially dictates that states must either permit ALJs to maintain active law licenses, or classify
them as judges and afford them "judicial" status, thus precluding states from permitting ALJs to
hold "inactive" status. The Final Rule thereby restricts each state's discretion to determine the
status that judges licensed in its jurisdiction should hold. The Final Rule commandeers the
machinery of the state bar associations in an effort to accomplish the agency's distinct, yet
unspecified regulatory goals. OPM has not clearly articulated how restricting a state's authority to
determine the licensing status of ALJs is necessary to promote efficiency or to ensure that ALJs
are subject to a code of professional responsibility, and how such a restriction on a state's

discretion is rationally related to the ALJ position.  By encroaching on federalism concerns, therefore, OPM's rules should be set aside as arbitrary and capricious.

85.    The Final Rule is arbitrary, capricious and an abuse of discretion.  Lacking any rational relationship with the duties, functions, decisional independence and special status of incumbent ALJs under the APA, the Final Rule will have a deleterious impact on ALJs and the subject agencies.

## Count III

## The OPM's Rule Making Was Defective

86.    Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 85 of this complaint as though contained herein.

87.    Section 706 of the APA authorizes a court to "set aside agency action, found to be ... (D) without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

88.    Section 553 of the APA mandates that agencies provide notice of a proposed rule setting forth "either the terms or substance of the proposed rule or a description of the subjects and issues involved" and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(b) & (c).

89.    "Studies and data" upon which the agency relies for its proposed rule must be submitted to the public for evaluation in order to ensure the opportunity for evaluation.  *Chamber of Commerce of the United States v. SEC,* 443 F.3d 890 (D.C. Cir. 2006); *Prometheus Radio Project v. FCC,* 373 F.2d 372, 412 (3d Cir. 2004).  In other words, the APA prevents agencies

from "relying on materials not in the rule-making record without affording an opportunity for public comment." *Chamber of Commerce,* 443 F.3d at 894.

90.    In the Final Rule, OPM for the first time asserted that the active status requirement was "professionally developed, is supported by a job analysis, and is rationally related to performance in the position to be filled." 72 Fed. Reg. 12948. Nowhere in its proposed notice of rule-making did the agency defend the proposed rule on the basis of any job analysis or explain how an ALJ in active bar status would perform his or her job more competently or efficiently.

91.    To support its new position, OPM relied upon three job analyses conducted by OPM's Personnel Research Psychologists in 1990, 1999, 2002. According to the agency, these reports were critical to the agency in showing that "Integrity/Honesty is fundamental for performing the duties of an administrative law judge." More importantly, OPM, for the first time, stated that the 2002 study "documents the usefulness and job-relatedness of requiring, as minimum qualifications, bar membership. . ." *Id.* The 1990, 1999, and 2002 studies are not generally available and cannot be found on OPM's website or at any other readily available source.

92.    In relying on studies not mentioned in the proposed regulations and absent from public scrutiny, OPM deprived the commenters of the ability to assess the methodology and salience of the reports. The commenters could not determine whether the reports actually equated "active status" to "bar membership" or whether agency officials simply made this inference. Commenters were deprived of the opportunity to assess any link the reports forged between "Integrity/Honesty" for ALJs and active bar status, and how that link was established. OPM's reliance on such materials undermined the integrity of the rule-making process.

25

## Count IV

### The Vacancy Announcement and the Notice of Examination
### for ALJ Applicants are Arbitrary and Capricious.

93.    Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 92 of this complaint as though contained herein.

94.    Section 706 of the APA authorizes a court to "set aside agency action, found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

95.    Prior to the issuance of the Final Rule, the ALJ Examination Announcement was established through the notice and comment rule-making procedures.  The Final Rule removes ALJ Announcement No. 318 and the ALJ examination and selection process from the rule-making process.  Pursuant to the Final Rule, the ALJ qualification standards and examination process will be established on an *ad hoc* basis by issuance of a Notice of Examination.

96.    This change deprives the public of transparency, reasons and facts related to any change in standards and the opportunity to comment prior to any change.  A Notice-based examination and selection process, which is subject to *ad hoc*, ungrounded, unannounced changes in qualification standards and selection methodologies, eliminates vital checks designed to ensure that the system is fair and results in the appointment, as ALJs, of individuals who possess superior qualifications.

97.    OPM did not find or make public any factual basis or professionally validated studies demonstrating that a Notice-based process was superior to a rule-based process in ensuring that applicants for the ALJ position would possess superior qualifications, diverse experience and independence of judgment.

26

98.     OPM did not find or make public any factual basis or professionally validated studies demonstrating that a Notice-based process would avoid the unequal treatment federal attorneys and qualified private practice attorneys.

99.     Pursuant to the Final Rule, OPM issued a Qualification Standard for the ALJ Position on April 20, 2007.  There is no evidence that the new Qualification Standard announced in April was professionally developed as required under 5 C.F.R. § 300.103.  On or about May 4, 2007, OPM issued an ALJ Vacancy Announcement and solicited qualified individuals to apply to take the new ALJ exam.  The Vacancy Announcement stated that applications would be accepted until the earlier of May 18, 2007, or OPM's receipt of 1250 applications.

100.    Pursuant to OPM's stated application methodology, applicants would be screened for meeting minimum qualifications.  Those applicants meeting minimum qualifications would be invited to take a written examination and undergo an in-person evaluation.  Based on rates of the several factors to be considered, applicants who score at or above a minimum composite score will then be placed on the register ["new register"] for qualified applicants.  From the new register, agencies needing ALJs will then interview and offer positions to those they deem best suited for ALJ position openings within that agency.

101.    At the same time it issued its new ALJ vacancy announcement, OPM informed agencies in need of ALJs that such agencies were free to continue hiring ALJs off the old register.  When a new register would be established, in approximately November 2007, OPM would then close the old register.  OPM notified those individuals on the old register that they should consider filing an application to take the new exam and become qualified on the new register.

27

102.    On information and belief, OPM gave advance notice to one or more agencies during the period January through April 2007 that OPM would be issuing an ALJ position Vacancy Announcement shortly after it issued new ALJ rules.  On information and belief, these Agencies received notice of the new examination and qualification standards in advance of OPM placing the Notice on its web-site.

103.    On information and belief, agencies who received pre-website notice of the Vacancy Announcement and new ALJ examination process shared this information with attorneys employed by those agencies in advance of notice to the general public.  As a result of this advance notice, these agency attorneys received preferential treatment.

104.    On information and belief, on the same day that OPM posted the new ALJ exam on its web site, hundreds of federal agency attorneys with advanced notice of the Vacancy Announcement, took the day off work in order to commence the time-consuming application process.

105.    Within three (3) business days following the day the ALJ Vacancy Announcement was posted on OPM web site, OPM closed the Vacancy Announcement as the total number of applications had reached the 1250 mark.

106.    On information and belief, seventy-percent (70%) or more of the applicants who timely filed an application before the closing of the announcement are individuals who are employed by federal government agencies and whose legal experience qualification to become an ALJ rests solely on seven (7) or more years of administrative law experience as a federal agency employee and not based on the private practice of law as a general litigation attorney or as a practitioner representing parties before a federal or state administrative agency.

107.     On information and belief, only thirty-percent (30%) or less of the applicants who timely filed an application within the seventy-two (72) hour window of opportunity prior to closure have legal experience qualification to become an ALJ resting on seven (7) or more years of litigation experience or experience as a practitioner representing parties before a federal or state administrative agency.

108.     The new ALJ examination application process was administered in an unfair, discriminatory, arbitrary, and capricious manner.  As a result, the new process did not treat attorney applicants equally, disproportionately favored individuals currently working for federal government agencies who received advanced or early notice of the Vacancy Announcement, and disproportionately disfavored all other potentially qualified applicants not currently employed as attorneys with a federal agency.

109.     As a result, the new register of qualified attorney applicants will permit agencies to withhold offers of employment as ALJs to individuals with qualifying legal experience as litigators or administrative law practitioners in the private sector, and thereby not treat all attorney applicants equally.

110.     As applied, OPM's new examination process undermines and is inconsistent with Congress' intent to establish an independent federal administrative judiciary whose members possess superior qualifications, diversity of experience and independence of judgement.

## Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)    Enter a preliminary injunction staying implementation of the Final Rule mandating active Bar membership for ALJs;

(b)    Declare the Final Rule null and void;

(c)    Permanently enjoin OPM from requiring ALJs to maintain active bar membership;

(d)    Declare the ALJ Vacancy Announcement and Notice of Examination null and void;

(e)    Permanently enjoin OPM from providing federal agencies with advance notice of the publishing of a new ALJ Vacancy Announcement and Notice of Examination;

(f)    Re-establish notice and comment rule-making as the method for publishing a new ALJ Vacancy Announcement and Notice of Examination;

(g)    Award Plaintiff attorneys' fees and costs in this matter under the Equal Access to Justice Act or any other applicable statute; and

(h)    Grant such other and further relief as the Court deems just and equitable.

Respectfully submitted,

 _/S/_ Robert H. Stropp, Jr.
Robert H. Stropp, Jr. D.C Bar #429737
Richard C. Welch, D.C Bar #485756
Mooney, Green, Baker & Saindon, P.C.
1920 L Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 783-0010
Facsimile: (202) 783-6088

Attorneys for the Plaintiffs

February 21, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 21, 2008, a true and correct copy of the foregoing

Third Amended Complaint was served via the Court's ECF system/electronic mail and by

U.S. Mail, first class postage prepaid, on the following:

Christopher Hall
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
christoper.hall@usdoj.gov


                                        /s/ Richard C. Welch
                                        Richard C. Welch
                                        Attorney for the Plaintiffs