**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSOCIATION OF ADMINISTRATIVE LAW JUDGES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil No. 07-CV-711 (RMC) |
| v. | ) | |
| | ) | |
| UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**NOTICE OF FILING**

Attached to this Notice of Filing is a Supplemental Administrative Record which pertains to the decision to accept administrative law judge applications until the earlier of the passage of two weeks or the end of the day on which the 1,250th application was received.[1]  Additionally, defendants supplement the original record as to plaintiffs' claim that OPM provided certain applicants with improper advance notice of the vacancy announcement.  Due to logistical issues, defendants are not able to file a certification at this time, but will do so next week.

Dated: September 5, 2008                Respectfully submitted,

                                        GREGORY G. KATSAS
                                        Assistant Attorney General

                                        JEFFREY A. TAYLOR

---

[1] To be clear, as defendants noted during the July 29th telephone conference, they do not understand plaintiffs' complaint to challenge the decision to accept applications for two weeks or until the end of the day on which the 1,250th application was received.  Defendants reserve the right to argue that this allegation, which was raised for the first time in the July 29th telephone conference, does not constitute a well-pleaded claim and, thus, is not before the Court.

United States Attorney

JENNIFER R. RIVERA
Branch Director

SUSAN K. RUDY
Assistant Branch Director

 /s/ Justin M. Sandberg
CHRISTOPHER R. HALL
JUSTIN SANDBERG
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C.  20530
(202) 514-4778

Counsel for Defendants

2

<u>SUPPLEMENTAL ADMINISTRATIVE RECORD INDEX</u>

1.    OPM, Projected Timeline for 2007 ALJ Examination/Assessment Process, to Subcommittee on Social Security Committee on Ways and Means, U.S. House of Representatives (May 1, 2007).  (Bates No. AALJ000061).

2.    Letter from Michael J. Astrue, Commissioner, Social Security Administration, to Linda Springer, Director, OPM (Mar. 23, 2007).  (Bates Nos. AALJ000062-63).

3.    Email from Marc Hillson, ALJ, U.S. Department of Agriculture, to Alan Nelson, Acting Eastern Group Manager, OPM, forwarding email from Marc Hillson to Juanita Love, Program Manger, OPM, regarding ALJ hiring estimates (Mar. 5, 2007).  (Bates No. AALJ000064).

4.    Email from Earl Waits, Chief Administrative Law Judge, U.S. Department of the Interior, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding Dept of Interior Estimates (Mar. 4, 2007).  (Bates No. AALJ000065).

5.    Email from James McDonald, Environmental Protection Agency, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding ALJ hiring estimates for EPA (Mar. 2, 2007).  (Bates Nos. AALJ000066-67).

6.    Louis Purdey, HR Specialist, ALJ Examining Office, OPM, memorandum entitled "Anticipated ALJ Hiring," (draft has a handwritten date Mar. 1, 2007).  (Bates No. AALJ000068).

7.    Email from Veronica Dickey, Sr. Paralegal Specialist to Chief Judge Joseph N. Ingolia, U.S. Coast Guard, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding OPM's Request for ALJ Hiring Estimates (Feb. 28, 2007).  (Bates No. AALJ000069).

8.    Email from Mary Gosse, AO, Federal Communications Commission, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding Response to Inquiry (Feb. 28, 2007). (Bates No. AALJ000070).

9.    Email from Frank Cristaudo, Social Security Administration, to Alan Nelson, Acting Eastern Group Manager, OPM, and J. Love, Program Manger, OPM, regarding ALJ hiring estimates (Feb. 28, 2007).  (Bates Nos. AALJ000071-72).

10.   Email from Juanita Love, Program Manager, Administrative Law Judge Program, OPM to Alan Nelson, Acting Eastern Group Manager, OPM, forwarding email from Daniel Davidson, U.S. Food and Drug Administration to Alan Nelson, Acting Eastern Group Manager, OPM, regarding ALJ hiring estimates (Feb. 28, 2007).  (Bates Nos. AALJ000073-74).

11.   Email from Richard Arkow, ALJ, U.S. Small Business Administration, to Alan Nelson,

Acting Eastern Group Manager, OPM, regarding ALJ Hiring Estimates-U.S. Small Business Administration (Feb. 28, 2007). (Bates No. AALJ000075).

12.    Email from Joyce Harrell, Administrative Law Judge Examining, OPM to Alan Nelson, Acting Eastern Group Manager, OPM, attaching draft, "Anticipated ALJ Hiring," and forwarding email from George Painter, ALJ, Commodities Futures Trading Commission, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding new ALJ hires (Feb. 27, 2007). (Bates Nos. AALJ000076-78).

13.    Email from George Painter, ALJ, Commodities Futures Trading Commission, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding new ALJ hires (Feb. 27, 2007). (Bates No. AALJ000079).

14.    Email from Perry Rhew, U.S. Department of Health and Human Services, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding ALJ hiring estimates (Feb. 27, 2007). (Bates Nos. AALJ000080-81).

15.    Email from Brenda Murray, U.S. Securities and Exchange Commission, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding ALJ Hiring (Feb. 27, 2007). (Bates No. AALJ000082).

16.    Email from Arthur Liberty, Chief Judge, Office of Administrative Law Judges, U.S. Department of Housing and Urban Development, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding ALJ Hiring Estimates (Feb. 27, 2007). (Bates No. AALJ000083).

17.    Email from Ronnie Yoder, U.S. Department of Transportation, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding ALJ Hiring Estimates (Feb. 27, 2007). (Bates No. AALJ000084).

18.    Email from Ann Cook, Office of Thrift Supervision, U.S. Department of the Treasury, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding Anticipated ALJ Hiring (Feb. 27, 2007). (Bates No. AALJ000085).

19.    Email from Robert Lesnick, Chief Judge, Federal Mine Safety and Health Review Commission, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding Estimated Hires (Feb. 27, 2007). (Bates No. AALJ000086).

20.    Email from Juanita Love, Program Manager, Administrative Law Judge Program, OPM to Alan Nelson, Acting Eastern Group Manager, OPM, forwarding email from Curtis Wagner, Jr., regarding ALJ hiring estimates (Feb. 27, 2007). (Bates Nos. AALJ000087-88).

21.    Email from Juanita Love, Program Manager, Administrative Law Judge Program, OPM to Alan Nelson, Acting Eastern Group Manager, OPM, forwarding email from Robert Giannasi, National Labor Relations Board, regarding ALJ hiring estimates (Feb. 27, 2007).  (Bates Nos. AALJ000089-90).

22.    Email from Bruce Houston, Chief Administrative Law Judge, U.S. Postal Service, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding ALJ hires (Feb. 27, 2007). (Bates No. AALJ000091).

23.    Email from Allan Lewis, Chief Administrative Law Judge, U.S. Department of Education, to Alan Nelson, Acting Eastern Group Manager, OPM, regarding DOE hires 2007-09 (Feb. 27, 2007).  (Bates No. AALJ000092).

24.    Email from Juanita Love, Program Manager, Administrative Law Judge Program, OPM to Chief ALJs and Designees regarding the ALJ hiring estimates (Feb. 27, 2007).  (Bates Nos. AALJ000093).

25.    Email from Juanita Love, Program Manager, Administrative Law Judge Program, OPM to Judge Robert Giannasi regarding ALJ Information (Jan. 18, 2007).  (Bates Nos. AALJ000094-95).

26.    Statement of Nancy Kichak, Associate Director, Strategic Human Resources Policy, OPM, Before the Subcommittee on the Federal Workforce and Agency Organization Committee on Government Reform, U.S. House of Representatives (May 16, 2006). (Bates Nos. AALJ000096-105).

27.    Society for Industrial and Organizational Psychology, Inc., PRINCIPLES FOR THE VALIDATION AND USE OF PERSONNEL SELECTION PROCEDURES, (4th ed. 2003), available online, http://www.siop.org/_Principles/principles.pdf.  (Bates Nos. AALJ000106-89).

28.    OPM, Delegated Examining Operations Handbook, http://www.opm.gov/deu/Handbook_2003/DEOH-Section-12.asp.  (Bates Nos. AALJ000190-97).

# Projected Timeline for 2007 ALJ Examination/Assessment Process

| Activity | Approximate Dates |
|---|---|
| Announcement open and minimum qualifications reviews completed | Early May |
| Accomplishment Records submitted, reviewed and scored | Late May to Mid-July |
| Written Demonstrations scheduled, completed and scored * | Mid-July to Early September |
| Structured Interviews scheduled, completed and scored * | Mid-July to Mid-October |
| Final scoring completed and new register established | Late October |

* The Written Demonstration and Structured Interview portions of the exam are where OPM will need help from the ALJ community to conduct the exercise.

AALJ000061

MAR-26-2007 13:48    OC/OEO    4109653443 P.01



# SOCIAL SECURITY
## Office of the Commissioner

---

### FACSIMILE TRANSMITTAL SHEET

| TO: LINDA M. SPRINGER | FROM: ANGIL ESCOBAR |
|---|---|
| LOCATION/ORGANIZATION: OPM, OFFICE OF THE DIRECTOR | LOCATION/ORGANIZATION: SSA OFFICE EXECUTIVE OPERATION |
| TELEPHONE NUMBER: (202) 606-1000 | TELEPHONE NUMBER: (410) 965-7213 |
| FAX NUMBER: (202) 606-2575 | FAX NUMBER: (410) 965-3443 |
| RE: ADMINISTRATIVE LAW JUDGE ROSTER. | TOTAL NO. OF PAGES INCLUDING COVER: 2 |

| URGENT | FOR REVIEW | PLEASE COMMENT | PLEASE RECYCLE |
|---|---|---|---|

NOTES/COMMENTS:

---

SOCIAL SECURITY ADMINISTRATION   BALTIMORE MD 21235-0001

03/26/2007 MON 14:38 [TX/RX NO 0180] ☑001

AALJ000062



SOCIAL SECURITY
The Commissioner

March 23, 2007

The Honorable Linda M. Springer
Office of the Director
U.S. Office of Personnel Management
1900 E Street NW, Suite 5H09
Washington, DC 20415

Dear Ms. Springer:

I would like to congratulate you on the release last Friday of the notice necessary for the development of a new administrative law judge roster. The existence of a new list after so many years should greatly improve the quality and diversity of the judges who are selected.

At the Social Security Administration we are facing a pending level of cases that has doubled from about 350,000 to 700,000 in the past five years and is expected to increase by another 90,000 cases over the next two years if we are unable to bring on any additional judges. It is vital that we move with urgency to add new judges to avoid unconscionable delays of more than 1,000 days.

We also need to be smart about deploying new judges, and we are studying the option of reserving about 5 percent of our ALJ's to a central office that relies on electronic hearings to address the worst backlogs around the nation.

We very much need your support for this effort, and I will welcome a brief meeting to discuss this subject with you.

Again, congratulations on the release of the new notice.

Sincerely,

Michael J. Astrue

SOCIAL SECURITY ADMINISTRATION    BALTIMORE MD 21235-0001

TOTAL P.02

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Marc.Hillson@usda.gov |
| **Sent:** | Monday, March 05, 2007 11:06 AM |
| **To:** | Nelson, F. Alan |
| **Subject:** | FW: ALJ hiring estimates |

-----Original Message-----
From: Hillson, Marc
Sent: Monday, March 05, 2007 11:04 AM
To: 'Juanita.Love@opm.gov'
Subject: RE: ALJ hiring estimates


At this point, we have no plans to hire any new ALJ's, whether from the register or
otherwise.  While all three judges at USDA are eligible to retire, none of us has any
specific announced plans to do so.


Marc Hillson


-----Original Message-----
From: Juanita.Love@opm.gov [mailto:Juanita.Love@opm.gov]
Sent: Tuesday, February 27, 2007 9:35 AM
To: Hillson, Marc; fowlerw@ntsb.gov%inter2; allan.lewis@ed.gov%inter2;
ann.cook@ots.treas.gov%inter2; arthur_a._liberty@hud.gov%inter2; murrayb@sec.gov%inter2;
bruce.r.houston@usps.gov%inter2; ccenter@flra.gov%inter2; cguthridge@fmc.gov%inter2;
curtis.wagner@ferc.gov%inter2; ddavidso@oc.fda.gov%inter2; frank.cristaudo@ssa.gov%inter2;
gpainter@cftc.gov%inter2; judgeis@oshrc.gov%inter2; Vittone.john@dol.gov%inter2;
jingolia@comdt.uscg.mil%inter2; judith.ballard@hhs.gov%inter2;
maryellenbittner@mindspring.com%inter2; michael.creppy@usdoj.gov%inter2;
pluckern@usitc.gov%inter2; perry.rhew@hhs.gov%inter2; richard.sippel@fcc.gov%inter2;
richard.arkow@sba.gov%inter2; robert.giannasi@nlrb.gov%inter2; rlesnick@fmshrc.gov%inter2;
ronnie.yoder@dot.gov%inter2; smcguire@ftc.gov%inter2; biro.susan@epa.gov%inter2
Subject: ALJ hiring estimates

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | EJ Waits [ejwaits@usa.net] |
| **Sent:** | Sunday, March 04, 2007 8:55 AM |
| **To:** | Nelson, F. Alan |
| **Subject:** | Dept of Interior Estimates |

For the U.S. Department of the Interior, Office of Hearings and Appeals, Probate Hearings Division, I estimate that we will seek to hire the following numbers of ALJs from the new register:

```
Rest of FY07:   None
FY08:           3
FY09:           5
```

I look forward to working with OPM on this matter.

Thank you,

Earl J. Waits
Chief Administrative Law Judge
USDOI/OHA/PHD
801 N Quincy Street, Suite 300
Arlington, VA 22203
703-235-3800
703-235-0184 (fax)

AALJ000065

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | McDonald.James@epamail.epa.gov |
| **Sent:** | Friday, March 02, 2007 4:29 PM |
| **To:** | Nelson, F. Alan |
| **Subject:** | ALJ hiring estimates for EPA |

Alan:

In response to Juanita Love's message below, EPA's Office of Administrative Law Judges anticipates on hiring from the ALJ register:

1 ALJ in FY 2008; and
1 ALJ in FY 2009

Should you have any questions or concerns, please contact me at (202) 564-6255.


"Love, Juanita
Howard"
<Juanita.Love@op                                          To
m.gov>
                        "William E. Fowler, Jr."
                        <fowlerw@ntsb.gov>, Allan Lewis
02/27/2007 09:35        <allan.lewis@ed.gov>, "Ann Z.
AM                      Cook" <ann.cook@ots.treas.gov>,
                        "Arthur A. Liberty"
                        <arthur_a._liberty@hud.gov>,
                        Brenda Murray <murrayb@sec.gov>,
                        Bruce Houston
                        <bruce.r.houston@usps.gov>,
                        "Charles R. Center"
                        <ccenter@flra.gov>, "Clay G.
                        Guthridge" <cguthridge@fmc.gov>,
                        "Curtis L. Wagner"
                        <curtis.wagner@ferc.gov>, "Daniel
                        J. Davidson"
                        <ddavidso@oc.fda.gov>, "Frank A.
                        Cristaudo"
                        <frank.cristaudo@ssa.gov>,
                        "George H. Painter"
                        <gpainter@cftc.gov>, Irving
                        Sommer <judgeis@oshrc.gov>, John
                        Vittone <Vittone.john@dol.gov>,
                        "Joseph N. Ingolia"
                        <jingolia@comdt.uscg.mil>, Judith
                        Ballard <judith.ballard@hhs.gov>,
                        "Marc R. Hillson"
                        <marc.hillson@usda.gov>, Mary
                        Ellen Bittner
                        <maryellenbittner@mindspring.com>
                        , Michael Creppy
                        <michael.creppy@usdoj.gov>, Paul
                        Luckern <pluckern@usitc.gov>,
                        Perry Rhew <perry.rhew@hhs.gov>,
                        "Richard L. Sippel"
                        <richard.sippel@fcc.gov>,
                        "Richard S. Arkow"
                        <richard.arkow@sba.gov>, "Robert
                        A. Giannasi"
                        <robert.giannasi@nlrb.gov>,
                        "Robert J. Lesnick"

1
AALJ000066

<rlesnick@fmshrc.gov>, "Ronnie A.
Yoder" <ronnie.yoder@dot.gov>,
"Stephen J. McGuire"
<smcguire@ftc.gov>, Susan
Biro/DC/USEPA/US@EPA

            cc

            Subject

ALJ hiring estimates

Dear Chief ALJ/Designee-

As you know from the message we sent you on 2/21/07
requesting Subject Matter Experts, we are working to
finalize the new ALJ exam to be rolled out after the
revision to the ALJ regulations have been posted as a final
rule and become effective.

In addition to the exam itself, we want to make an
assessment of the potential applicant pool in relation to
the size that the new register will need to be to meet the
total projected hiring needs.  To assist us in this regard,
we are requesting that you provide us with the following
information by COB, Friday, March 2, 2007:

> · The estimated number of hires you expect to make
> from the new register once it is established for the
> following time frames:

> o The remainder of FY 2007: _____

> o FY 2008: _____

> o FY 2009: _____

Please keep in mind that these estimates are for planning
purposes only and do not obligate you or otherwise commit
you to having to follow through with hiring from the
register according to your estimated numbers.  However, at
the same time, we appreciate your best effort at making
these estimates so that we can plan accordingly.

Please submit your estimates to Alan Nelson, at
alan.nelson@opm.gov .  If you have any questions, Alan may
be reached at 202-606-0805 or 757-441-3384

Thanks again for your continued support.

Juanita H. Love
      Human Capital Implementation and Assessment
Office of Personnel Management
(202) 606-3822

# ANTICIPATED ALJ HIRING

| AGENCY | FY 2007 | FY 2008 | FY 2009 | TOTAL |
|---|---|---|---|---|
| USDA | | | | 0 |
| CFTC | 0 | 0 | 0 | 0 |
| DOED | 0 | 0 | 0 | 0 |
| EPA | | | | 0 |
| FCC | 0 | 0 | 0 | 0 |
| DOE/FERC | 0 | 3 | 3 | 6 |
| FLRA | | | | 0 |
| FMC | | | | 0 |
| FMSHRC | 0 | 1 | 1 | 2 |
| FTC | | | | 0 |
| DHHS/DAB | 0 | 1 | 2 | 3 |
| DHHS/FDA | 0 | 0 | 0 | 0 |
| DHHS/OMHA | 6 | 4 | 6 | 16 |
| DHUD | 0 | 2 | 1 | 3 |
| DOI | | | | 0 |
| ITC | | | | 0 |
| DOJ/DEA | | | | 0 |
| DOJ/EOIR | | | | 0 |
| DOL | | | | 0 |
| NLRB | 0 | 1 | 0 | 1 |
| NTSB | | | | 0 |
| OSHRC | | | | 0 |
| SEC | 1 | 0 | 2 | 3 |
| SBA | 0 | 1 | 0 | 1 |
| SSA | 0* | 0* | 0* | 0 |
| DOT/OS | 0 | 1 | 1 | 2 |
| DHS/DOT/USCG | 2 | 1 | 1 | 4 |
| DOTR/OFIA | 0 | 1 | 0 | 1 |
| USPS | 0 | 1 | 0 | 1 |
| **TOTAL** | 9 | 17 | 17 | 43 |

* See attached email from SSA.

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Veronica.A.Dickey@uscg.mil on behalf of Dickey, Veronica [Veronica.A.Dickey@uscg.mil] |
| **Sent:** | Wednesday, February 28, 2007 10:09 AM |
| **To:** | Nelson, F. Alan |
| **Cc:** | Jordan, George |
| **Subject:** | OPM'S REQUEST FOR ALJ HIRING ESTIMATES |

Mr. Nelson:

On behalf of Chief Judge Ingolia and as instructed by Juanita Love's e-mail of yesterday, I am supplying to you the estimates for the US Coast Guard's ALJ Program estimates for new ALJs over the next couple of years.

*    The estimated number of hires you expect to make from the new register once it is established for the following time frames:

o        The remainder of FY 2007: ____ 2_____

o        FY 2008: _____1_____

o        FY 2009: _____1_____


If you need any additional information from our ALJ Program, please feel free to contact either Mr. George Jordan, Director of Judicial Administration for our ALJ Program at 202-372-4440 or by e-mail at:  George.J.Jordan@uscg.mil or myself.


Veronica A. Dickey
Sr. Paralegal Specialist to
Chief Judge Joseph N. Ingolia
(Phone:  202-372-4444)
(Fax:     202-372-4964)
(E-Mail:  Veronica.A.Dickey@uscg.mil)

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Mary Gosse [Mary.Gosse@fcc.gov] |
| **Sent:** | Wednesday, February 28, 2007 9:32 AM |
| **To:** | Nelson, F. Alan |
| **Cc:** | Love, Juanita Howard; Richard Sippel |
| **Subject:** | Response to Inquiry |

Mr. Nelson. . .

The FCC/OALJ Chief Administrative Law has reviewed Ms. Love's e-mail request dated 2/27/07 regarding ALJ projected hiring estimates for FY 07, 08 and 09.

Question:  The estimated number of hires expected to be made from the new register once established for the following time frames are:

(1) Remainder of FY 2007:  **0**

(2) FY 2008:   **0**

(3) FY 2009:  **0**


Mary Gosse, AO
FCC/OALJ
1C831
(202) 418-2299
FAX: (202) 418-0195
E-mail:  mary.gosse@fcc.gov


*** Non-Public: For Internal Use Only ***

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Cristaudo, Frank [Frank.Cristaudo@ssa.gov] |
| **Sent:** | Wednesday, February 28, 2007 6:22 AM |
| **To:** | Love, Juanita Howard; Nelson, F. Alan |
| **Cc:** | Griswold, Nancy J. |
| **Subject:** | RE: ALJ hiring estimates |

We have no definite plans to hire additional judges for the years you list; however, we are reviewing the current staffing and workload situations and may decide to do so. We could hire as few as no judges during the next few years or as many as 200-300. We will let you know as soon as possible if more definite plans are made. Hope this is helpful.

---

**From:** Love, Juanita Howard [mailto:Juanita.Love@opm.gov]
**Sent:** Tue 2/27/2007 9:35 AM
**To:** William E. Fowler, Jr.; Allan Lewis; Ann Z. Cook; Arthur A. Liberty; Brenda Murray; Bruce Houston; Charles R. Center; Clay G. Guthridge; Curtis L. Wagner; Daniel J. Davidson; Cristaudo, Frank; George H. Painter; Irving Sommer; John Vittone; Joseph N. Ingolia; Judith Ballard; Marc R. Hillson; Mary Ellen Bittner; Michael Creppy; Paul Luckern; Perry Rhew; Richard L. Sippel; Richard S. Arkow; Robert A. Giannasi; Robert J. Lesnick; Ronnie A. Yoder; Stephen J. McGuire; Susan Biro
**Subject:** ALJ hiring estimates

Dear Chief ALJ/Designee-

As you know from the message we sent you on 2/21/07 requesting Subject Matter Experts, we are working to finalize the new ALJ exam to be rolled out after the revision to the ALJ regulations have been posted as a final rule and become effective.

In addition to the exam itself, we want to make an assessment of the potential applicant pool in relation to the size that the new register will need to be to meet the total projected hiring needs. To assist us in this regard, we are requesting that you provide us with the following information by **COB, Friday, March 2, 2007**:

· The estimated number of hires you expect to make from the new register once it is established for the following time frames:

    o    The remainder of FY 2007: _____

    o    FY 2008: _____

    o    FY 2009: _____

Please keep in mind that these estimates are for planning purposes only and do not obligate you or otherwise commit you to having to follow through with hiring from the register according to your estimated numbers. However, at the same time, we appreciate your best effort at making these estimates so that we can plan accordingly.

Please submit your estimates to Alan Nelson, at alan.nelson@opm.gov . If you have any questions, Alan may be reached at 202-606-0805 or 757-441-3384

AALJ000071

9/3/2008

Thanks again for your continued support.

*Juanita H. Love*
Human Capital Implementation and Assessment
Office of Personnel Management
(202) 606-3822

9/3/2008

# Ankrah, Theresa N.

| | |
|---|---|
| **From:** | Love, Juanita Howard |
| **Sent:** | Wednesday, February 28, 2007 8:03 AM |
| **To:** | Nelson, F. Alan |
| **Subject:** | FW: ALJ hiring estimates |

Thanks!

*Juanita H. Love*
-----Original Message-----
**From:** Davidson, Daniel J [mailto:daniel.davidson@fda.hhs.gov]
**Sent:** Tuesday, February 27, 2007 1:19 PM
**To:** Love, Juanita Howard
**Subject:** RE: ALJ hiring estimates

The FDA does not anticipate any new ALJ hires for the foreseeable future.
  Daniel J. Davidson, FDA

---

**From:** Love, Juanita Howard [mailto:Juanita.Love@opm.gov]
**Sent:** Tuesday, February 27, 2007 9:35 AM
**To:** William E. Fowler, Jr.; Allan Lewis; Ann Z. Cook; Arthur A. Liberty; Brenda Murray; Bruce Houston; Charles R. Center; Clay G. Guthridge; Curtis L. Wagner; Davidson, Daniel J; Frank A. Cristaudo; George H. Painter; Irving Sommer; John Vittone; Joseph N. Ingolia; Ballard, Judith (OS); Marc R. Hillson; Mary Ellen Bittner; Michael Creppy; Paul Luckern; Rhew, Perry (OS); Richard L. Sippel; Richard S. Arkow; Robert A. Giannasi; Robert J. Lesnick; Ronnie A. Yoder; Stephen J. McGuire; Susan Biro
**Subject:** ALJ hiring estimates

Dear Chief ALJ/Designee-

As you know from the message we sent you on 2/21/07 requesting Subject Matter Experts, we are working to finalize the new ALJ exam to be rolled out after the revision to the ALJ regulations have been posted as a final rule and become effective.

In addition to the exam itself, we want to make an assessment of the potential applicant pool in relation to the size that the new register will need to be to meet the total projected hiring needs.  To assist us in this regard, we are requesting that you provide us with the following information by **COB, Friday, March 2, 2007**:

- The estimated number of hires you expect to make from the new register once it is established for the following time frames:

    o    The remainder of FY 2007: _____

    o    FY 2008: _____

o    FY 2009: _____

Please keep in mind that these estimates are for planning purposes only and do not obligate you or otherwise commit you to having to follow through with hiring from the register according to your estimated numbers.  However, at the same time, we appreciate your best effort at making these estimates so that we can plan accordingly.

Please submit your estimates to Alan Nelson, at alan.nelson@opm.gov .  If you have any questions, Alan may be reached at 202-606-0805 or 757-441-3384

Thanks again for your continued support.

*Juanita H. Love*
Human Capital Implementation and Assessment
Office of Personnel Management
(202) 606-3822

AALJ000074

## Ankrah, Theresa N.

**From:** Arkow, Richard S. [richard.arkow@sba.gov]
**Sent:** Tuesday, February 27, 2007 2:15 PM
**To:** Nelson, F. Alan
**Cc:** Love, Juanita Howard
**Subject:** ALJ Hiring Estimates-U.S. Small Business Administration

The following is the estimated number of hires the Small Business Administration (SBA) expects to make from the new ALJ register once it is established for the following time frames:

o The remainder of FY 2007: _____0_____
o FY 2008: ___1_____
o FY 2009: _____0_____

Please note that the SBA has one ALJ.

Richard S. Arkow
ALJ
U.S. Small Business Administration

9/3/2008

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Harrell, Joyce E |
| **Sent:** | Tuesday, February 27, 2007 1:27 PM |
| **To:** | Nelson, F. Alan |
| **Cc:** | Purdey, Louis E; McKelvey, Jennifer C |
| **Subject:** | RE: in re new ALJ hires |

Alan,

Is the attachment ok?  Let me know if you need any changes.

# Joyce Harrell
Administrative Law Judge Examining
Human Resources Consulting Program
Center for Talent Services
Human Resources Products & Services Division
Phone:  202-606-2386
Fax: 202-606-0584
-----Original Message-----
**From:** Nelson, F. Alan
**Sent:** Tuesday, February 27, 2007 1:15 PM
**To:** Harrell, Joyce E
**Subject:** FW: in re new ALJ hires


*F. Alan Nelson*
Acting Eastern Group Manager
Human Resources Consulting Program
U.S. Office of Personnel Management
Phone in DC: 202-606-0805
Phone in Norfolk: 757-441-3384
Cell Phone: 202-369-2837
alan.nelson@opm.gov

-----Original Message-----
**From:** Painter, George H. [mailto:gpainter@CFTC.gov]
**Sent:** Tuesday, February 27, 2007 12:50 PM
**To:** Nelson, F. Alan
**Cc:** JuanitaLove@0pm.gov
**Subject:** in re new ALJ hires

February 27, 2007


ALJ HIRING ESTIMATES , CFTC

2007    Zero

2008    Zero

9/3/2008

2009    Zero


Dear Mr. Nelson:

    This agency has reduced its judicial slots from 7 judges to two judges.    We remain in the deregulatory mode.  In the 70's and 80's I handled a docket of 150 to   200 cases.    I now have a total of 5 cases on my docket.  Contacts with chief judges suggest similar circumstances in other agencies.

    If you are in need of additional information please call me at 202-418-5245.


                  Sincerely,


                  George H. Painter, ALJ, CFTC

AALJ000077

9/3/2008

## ANTICIPATED ALJ HIRING

| AGENCY | FY 2007 | FY 2008 | FY 2009 | TOTAL |
|---|---|---|---|---|
| USDA | | | | 0 |
| CFTC | | | | 0 |
| DOED | 0 | 0 | 0 | 0 |
| EPA | | | | 0 |
| FCC | | | | 0 |
| DOE/FERC | 0 | 3 | 3 | 6 |
| FLRA | | | | 0 |
| FMC | | | | 0 |
| FMSHRC | 0 | 1 | 1 | 2 |
| FTC | | | | 0 |
| DHHS/DAB | | | | 0 |
| DHHS/FDA | | | | 0 |
| DHHS/OMHA | 6 | 4 | 6 | 16 |
| DHUD | 0 | 2 | 1 | 3 |
| DOI | | | | 0 |
| ITC | | | | 0 |
| DOJ/DEA | | | | 0 |
| DOJ/EOIR | | | | 0 |
| DOL | | | | 0 |
| NLRB | 0 | 1 | 0 | 1 |
| NTSB | | | | 0 |
| OSHRC | | | | 0 |
| SEC | 1 | 0 | 2 | 3 |
| SBA | | | | 0 |
| SSA | | | | 0 |
| DOT/OS | 0 | 1 | 1 | 2 |
| DHS/DOT/USCG | | | | 0 |
| DOTR/OFIA | 0 | 1 | 0 | 1 |
| USPS | 0 | 1 | 0 | 1 |
| TOTAL | 7 | 14 | 14 | 35 |

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Painter, George H. [gpainter@CFTC.gov] |
| **Sent:** | Tuesday, February 27, 2007 12:50 PM |
| **To:** | Nelson, F. Alan |
| **Cc:** | JuanitaLove@0pm.gov |
| **Subject:** | in re new ALJ hires |

February 27, 2007

ALJ HIRING ESTIMATES , CFTC

2007    Zero

2008    Zero

2009    Zero

Dear Mr. Nelson:

This agency has reduced its judicial slots from 7 judges to two judges.    We remain in the deregulatory mode.  In the 70's and 80's I handled a docket of 150 to  200 cases.    I now have a total of 5 cases on my docket.  Contacts with chief judges suggest similar circumstances in other agencies.

If you are in need of additional information please call me at 202-418-5245.

Sincerely,

George H. Painter, ALJ, CFTC

9/3/2008

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Rhew, Perry (HHS/OMHA) [perry.rhew@hhs.gov] |
| **Sent:** | Tuesday, February 27, 2007 9:41 AM |
| **To:** | Nelson, F. Alan |
| **Cc:** | Love, Juanita Howard |
| **Subject:** | RE: ALJ hiring estimates |

*Estimated* answers below.

---

**From:** Love, Juanita Howard [mailto:Juanita.Love@opm.gov]
**Sent:** Tuesday, February 27, 2007 9:35 AM
**To:** William E. Fowler, Jr.; Allan Lewis; Ann Z. Cook; Arthur A. Liberty; Brenda Murray; Bruce Houston; Charles R. Center; Clay G. Guthridge; Curtis L. Wagner; Davidson, Daniel J. (FDA); Frank A. Cristaudo; George H. Painter; Irving Sommer; John Vittone; Joseph N. Ingolia; Ballard, Judith (HHS/OS); Marc R. Hillson; Mary Ellen Bittner; Michael Creppy; Paul Luckern; Rhew, Perry (HHS/OMHA); Richard L. Sippel; Richard S. Arkow; Robert A. Giannasi; Robert J. Lesnick; Ronnie A. Yoder; Stephen J. McGuire; Susan Biro
**Subject:** ALJ hiring estimates

Dear Chief ALJ/Designee-

As you know from the message we sent you on 2/21/07 requesting Subject Matter Experts, we are working to finalize the new ALJ exam to be rolled out after the revision to the ALJ regulations have been posted as a final rule and become effective.

In addition to the exam itself, we want to make an assessment of the potential applicant pool in relation to the size that the new register will need to be to meet the total projected hiring needs. To assist us in this regard, we are requesting that you provide us with the following information by **COB, Friday, March 2, 2007**:

> The estimated number of hires you expect to make from the new register once it is established for the following time frames:
>
> o    The remainder of FY 2007:    **6**
>
> o    FY 2008:    **4**
>
> o    FY 2009:    **6**

Please keep in mind that these estimates are for planning purposes only and do not obligate you or otherwise commit you to having to follow through with hiring from the register according to your estimated numbers. However, at the same time, we appreciate your best effort at making these estimates so that we can plan accordingly.

Please submit your estimates to Alan Nelson, at alan.nelson@opm.gov . If you have any questions, Alan may be reached at 202-606-0805 or 757-441-3384

Thanks again for your continued support.

9/3/2008

*Juanita H. Love*
Human Capital Implementation and Assessment
Office of Personnel Management
(202) 606-3822

AALJ000081

9/3/2008

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Murray, Brenda P. [MurrayB@SEC.GOV] |
| **Sent:** | Tuesday, February 27, 2007 10:58 AM |
| **To:** | Nelson, F. Alan |
| **Cc:** | Love, Juanita Howard |
| **Subject:** | ALJ Hiring |

Mr. Nelson:

We have 4 ALJs.  One ALJ retired on January 3, 2007, and I am not going to fill the position until/unless the work increases.  It is quite possible that we will fill the position in 2007.

At least three of the four ALJs are eligible for retirement.  When you get out to 2009, it seems reasonable to believe we will have one or two retirements and those position will need to be filled.

Brenda Murray

Securities and Exchange Commission

9/3/2008

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | arthur_a._liberty@hud.gov |
| **Sent:** | Tuesday, February 27, 2007 10:43 AM |
| **To:** | Nelson, F. Alan |
| **Subject:** | ALJ Hiring Estimates |

0 ALJs in 2007, 2 ALJs in FY2008, 1 in FY2009.

Arthur A. Liberty
Chief Judge
Office of Administrative Law Judges
Dept. of Housing and Urban Development
(202) 254-0004 ext. 107

9/3/2008

**Ankrah, Theresa N.**

**From:** Ronnie.Yoder@dot.gov
**Sent:** Tuesday, February 27, 2007 10:41 AM
**To:** Nelson, F. Alan
**Cc:** Ronnie.Yoder@dot.gov

The estimated number of hires you expect to make from the new register once it is established for the following time frames:

o   The remainder of FY 2007: _____0_____

o   FY 2008: _____1_____

o   FY 2009: _____1_____

9/3/2008

## Ankrah, Theresa N.

**From:** Cook, Ann Z [ann.cook@ots.treas.gov]
**Sent:** Tuesday, February 27, 2007 10:56 AM
**To:** Nelson, F. Alan
**Subject:** Anticipated ALJ Hiring

The office of Financial Institution Adjudications anticipates hiring one administrative law judge in FY 2008.  No other hires are now anticipated.

9/3/2008

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Robert Lesnick [rlesnick@fmshrc.gov] |
| **Sent:** | Tuesday, February 27, 2007 11:38 AM |
| **To:** | Nelson, F. Alan |
| **Subject:** | Estimated Hires |

· The estimated number of hires I expect to make from the new register once it is established for the following time frames are:

o The remainder of FY 2007:_____0_____
o FY 2008:_____1_____
o FY 2009: ____1_____

*Robert J. Lesnick*
Chief Judge,
Federal Mine Safety and Health Review Commission
601 New Jersey Avenue, Suite 9500
Washington, D.C. 20001

202 434 9958
202 434 9949 fax

AALJ000086

9/3/2008

## Ankrah, Theresa N.

**From:**  Love, Juanita Howard
**Sent:**  Tuesday, February 27, 2007 9:57 AM
**To:**  Nelson, F. Alan
**Subject:** FW: ALJ hiring estimates

-----Original Message-----
**From:** Curtis Wagner Jr. [mailto:Curtis.Wagner@ferc.gov]
**Sent:** Tuesday, February 27, 2007 9:52 AM
**To:** Love, Juanita Howard
**Subject:** RE: ALJ hiring estimates

I do not anticipate any ALJ hires during the remainder of 2007.

Most of my ALJs are retirement eligible.  Therefore it is possible that there will be 3 or more hires during 2008 and
the same in 2009.


Curtis L. Wagner, Jr.
Chief Judge
Federal Energy Regulatory Commission
Suite 11-F
Washington, DC 20426
202-502-8500

-----Original Message-----
**From:** Love, Juanita Howard [mailto:Juanita.Love@opm.gov]
**Sent:** Tuesday, February 27, 2007 9:35 AM
**To:** William E. Fowler, Jr.; Allan Lewis; Ann Z. Cook; Arthur A. Liberty; Brenda Murray; Bruce Houston;
Charles R. Center; Clay G. Guthridge; Curtis Wagner Jr.; Daniel J. Davidson; Frank A. Cristaudo; George
H. Painter; Irving Sommer; John Vittone; Joseph N. Ingolia; Judith Ballard; Marc R. Hillson; Mary Ellen
Bittner; Michael Creppy; Paul Luckern; Perry Rhew; Richard L. Sippel; Richard S. Arkow; Robert A.
Giannasi; Robert J. Lesnick; Ronnie A. Yoder; Stephen J. McGuire; Susan Biro
**Subject:** ALJ hiring estimates

Dear Chief ALJ/Designee-

As you know from the message we sent you on 2/21/07 requesting Subject Matter
Experts, we are working to finalize the new ALJ exam to be rolled out after the
revision to the ALJ regulations have been posted as a final rule and become
effective.

In addition to the exam itself, we want to make an assessment of the potential
applicant pool in relation to the size that the new register will need to be to meet
the total projected hiring needs.  To assist us in this regard, we are requesting that
you provide us with the following information by **COB, Friday, March 2, 2007**:

9/3/2008

The estimated number of hires you expect to make from the new register once it is established for the following time frames:

o    The remainder of FY 2007: _____

o    FY 2008: _____

o    FY 2009: _____

Please keep in mind that these estimates are for planning purposes only and do not obligate you or otherwise commit you to having to follow through with hiring from the register according to your estimated numbers.  However, at the same time, we appreciate your best effort at making these estimates so that we can plan accordingly.

Please submit your estimates to Alan Nelson, at alan.nelson@opm.gov .  If you have any questions, Alan may be reached at 202-606-0805 or 757-441-3384

Thanks again for your continued support.

*Juanita H. Love*
Human Capital Implementation and Assessment
Office of Personnel Management
(202) 606-3822

9/3/2008

## Ankrah, Theresa N.

| | |
|---|---|
| **From:** | Love, Juanita Howard |
| **Sent:** | Tuesday, February 27, 2007 9:46 AM |
| **To:** | Nelson, F. Alan |
| **Subject:** | FW: ALJ hiring estimates |

-----Original Message-----
**From:** Giannasi, Robert (ALJ) [mailto:Robert.Giannasi@nlrb.gov]
**Sent:** Tuesday, February 27, 2007 9:40 AM
**To:** Love, Juanita Howard
**Subject:** RE: ALJ hiring estimates

At this time, the NLRB does not anticipate hiring any ALJ applicants from OPM's general register for the rest of FY 2007 or for FY 2008 and 2009.

**From:** Love, Juanita Howard [mailto:Juanita.Love@opm.gov]
**Sent:** Tuesday, February 27, 2007 9:35 AM
**To:** William E. Fowler, Jr.; Allan Lewis; Ann Z. Cook; Arthur A. Liberty; Brenda Murray; Bruce Houston; Charles R. Center; Clay G. Guthridge; Curtis L. Wagner; Daniel J. Davidson; Frank A. Cristaudo; George H. Painter; Irving Sommer; John Vittone; Joseph N. Ingolia; Judith Ballard; Marc R. Hillson; Mary Ellen Bittner; Michael Creppy; Paul Luckern; Perry Rhew; Richard L. Sippel; Richard S. Arkow; Giannasi, Robert (ALJ); Robert J. Lesnick; Ronnie A. Yoder; Stephen J. McGuire; Susan Biro
**Subject:** ALJ hiring estimates

Dear Chief ALJ/Designee-

As you know from the message we sent you on 2/21/07 requesting Subject Matter Experts, we are working to finalize the new ALJ exam to be rolled out after the revision to the ALJ regulations have been posted as a final rule and become effective.

In addition to the exam itself, we want to make an assessment of the potential applicant pool in relation to the size that the new register will need to be to meet the total projected hiring needs. To assist us in this regard, we are requesting that you provide us with the following information by **COB, Friday, March 2, 2007:**

·    The estimated number of hires you expect to make from the new register once it is established for the following time frames:

    o    The remainder of FY 2007: _____

    o    FY 2008: _____

    o    FY 2009: _____

Please keep in mind that these estimates are for planning purposes only and do not obligate you or otherwise commit you to having to follow through with hiring from the

9/3/2008

register according to your estimated numbers.  However, at the same time, we appreciate your best effort at making these estimates so that we can plan accordingly.

Please submit your estimates to Alan Nelson, at alan.nelson@opm.gov .  If you have any questions, Alan may be reached at 202-606-0805 or 757-441-3384

Thanks again for your continued support.

*Juanita H. Love*
Human Capital Implementation and Assessment
Office of Personnel Management
(202) 606-3822

9/3/2008

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Houston, Bruce R - Arlington, VA [bruce.r.houston@usps.gov] |
| **Sent:** | Tuesday, February 27, 2007 9:45 AM |
| **To:** | Nelson, F. Alan |
| **Subject:** | ALJ hires |

In response to Juanita Love message, the Postal Service expects to hire 1 ALJ in either late 07 or early 08.


Bruce Houston
Chief Administrative Law Judge

9/3/2008

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Lewis, Allan [Allan.Lewis@ed.gov] |
| **Sent:** | Tuesday, February 27, 2007 10:35 AM |
| **To:** | Nelson, F. Alan |
| **Subject:** | doe hires 2007-09 |

please be advised that the dept of education does not anticipate any additional hires in 2007 through 2009

chief administrative law judge allan lewis

9/3/2008

**Ankrah, Theresa N.**

| | |
|---|---|
| **From:** | Love, Juanita Howard |
| **Sent:** | Tuesday, February 27, 2007 9:35 AM |
| **To:** | William E. Fowler, Jr.; Allan Lewis; Ann Z. Cook; Arthur A. Liberty; Brenda Murray; Bruce Houston; Charles R. Center; Clay G. Guthridge; Curtis L. Wagner; Daniel J. Davidson; Frank A. Cristaudo; George H. Painter; Irving Sommer; John Vittone; Joseph N. Ingolia; Judith Ballard; Marc R. Hillson; Mary Ellen Bittner; Michael Creppy; Paul Luckern; Perry Rhew; Richard L. Sippel; Richard S. Arkow; Robert A. Giannasi; Robert J. Lesnick; Ronnie A. Yoder; Stephen J. McGuire; Susan Biro |

**Subject:** ALJ hiring estimates

Dear Chief ALJ/Designee-

As you know from the message we sent you on 2/21/07 requesting Subject Matter Experts, we are working to finalize the new ALJ exam to be rolled out after the revision to the ALJ regulations have been posted as a final rule and become effective.

In addition to the exam itself, we want to make an assessment of the potential applicant pool in relation to the size that the new register will need to be to meet the total projected hiring needs. To assist us in this regard, we are requesting that you provide us with the following information by **COB, Friday, March 2, 2007**:

· The estimated number of hires you expect to make from the new register once it is established for the following time frames:

    o    The remainder of FY 2007: _____

    o    FY 2008: _____

    o    FY 2009: _____

Please keep in mind that these estimates are for planning purposes only and do not obligate you or otherwise commit you to having to follow through with hiring from the register according to your estimated numbers. However, at the same time, we appreciate your best effort at making these estimates so that we can plan accordingly.

Please submit your estimates to Alan Nelson, at alan.nelson@opm.gov . If you have any questions, Alan may be reached at 202-606-0805 or 757-441-3384

Thanks again for your continued support.

*Juanita H. Love*
Human Capital Implementation and Assessment
Office of Personnel Management
(202) 606-3822

9/3/2008

## Love, Juanita Howard

| | |
|---|---|
| **From:** | Love, Juanita Howard |
| **Sent:** | Thursday, January 18, 2007 1:41 PM |
| **To:** | 'Giannasi, Robert (ALJ)' |
| **Subject:** | RE: ALJ Information |

Hi Judge Giannasi-

The regs are under review by OMB. The new examination cannot be finalized until after the regs and a new qualification standard are finalized. You are correct in that the current ALJ examination is closed to the receipt of new applications, with the exception of 10-pt veterans.

Thanks!

*Juanita H. Love*

-----Original Message-----
**From:** Giannasi, Robert (ALJ) [mailto:Robert.Giannasi@nlrb.gov]
**Sent:** Wednesday, January 17, 2007 8:56 AM
**To:** Love, Juanita Howard
**Subject:** RE: ALJ Information

Juanita—Whatever happened to the proposed ALJ rules that were issued in December of 2005? When is OPM going to roll out the new exam? Is it still true that OPM is not taking applications for ALJ positions?

**From:** Love, Juanita Howard [mailto:Juanita.Love@opm.gov]
**Sent:** Tuesday, January 16, 2007 3:19 PM
**To:** William E. Fowler, Jr.; Allan Lewis; Ann Z. Cook; Arthur A. Liberty; Brenda Murray; Bruce Houston; Charles R. Center; Clay G. Guthridge; Curtis L. Wagner; Daniel J. Davidson; Frank A. Cristaudo; George H. Painter; Irving Sommer; John Vittone; Joseph N. Ingolia; Judith Ballard; Marc R. Hillson; Mary Ellen Bittner; Michael Creppy; Paul Luckern; Perry Rhew; Richard L. Sippel; Richard S. Arkow; Giannasi, Robert (ALJ); Robert J. Lesnick; Ronnie A. Yoder; Stephen J. McGuire; Susan Biro
**Cc:** Ferguson Queen, Julie L.; Watson, Linda M; Nelson, F. Alan; Harrell, Joyce E; McKelvey, Jennifer C; Lusby, Karyn D; Smith-Heimbrock, Sydney; Girouard, Robert J
**Subject:** ALJ Information

Dear Chief ALJ/Designee - (FYI)

Attached is updated information that I would like to share with you. I have attached a PDF document that contains a chart showing the total number of ALJs by agency/level as of September 2006. I have also attached an updated Chief ALJ Listing. If you are unable to open the PDFs, please let me know and I can fax the documents to you.

Please let me know if you have any changes to the Agency Chief ALJ Listing.

Thanks!

*Juanita H. Love*
Program Manager
Administrative Law Judge Program
Center for Human Capital Implementation & Assessment
U.S. Office of Personnel Management
(202) 606-3822
jhlove@opm.gov

STATEMENT OF NANCY KICHAK
ASSOCIATE DIRECTOR
STRATEGIC HUMAN RESOURCES POLICY
OFFICE OF PERSONNEL MANAGEMENT

before the

SUBCOMMITTEE ON THE FEDERAL WORKFORCE
AND AGENCY ORGANIZATION
COMMITTEE ON GOVERNMENT REFORM
UNITED STATES HOUSE OF REPRESENTATIVES

on

ADMINISTRATIVE LAW JUDGE PAY AND RETIREMENT

MAY 16, 2006

Mr. Chairman and Members of the Subcommittee:

Thank you for this opportunity to discuss human resources management of Federal

administrative law judges (ALJs) and to respond to calls for changes in their pay and retirement

benefits.  For the past 60 years, ALJs have provided a vital service in the administration of

Federal programs.  We are committed to ensuring they can continue to recruit and retain a high

caliber of personnel while respecting their independence of operation.

**Background**

The position of ALJ, originally called hearing examiner, was created by the

Administrative Procedure Act (APA) of 1946, Public Law 79-404.  The APA ensures fairness

and due process in Federal agency rulemaking and adjudication proceedings and provides

aggrieved parties an opportunity for a formal hearing on the record before an impartial hearing

officer.  It also provides for a merit system of selection administered by the Office of Personnel

Management (OPM) and statutory protection of the ALJ's decisional independence from undue

1

agency influence.

As of last December, the Federal Government was served by 1,428 ALJs in 26 Departments and agencies.  Of these, the vast majority (1,176, or 82 percent) were employed by the Social Security Administration.  Other organizations with a significant number of ALJs include the DHHS Office of Medicare Hearing and Appeals (53), the National Labor Relations Board (50), and the Department of Labor (40).

On average, ALJs are age 61.2 with 21.0 years of service, both higher than the Government-wide averages for all employees of age 46.4 with 15.2 years of service.  ALJs remain in their positions longer than most Federal employees.  Over the last 4 years (FYs 2002-2005), ALJs retired on average at age 69.6 with 31.7 years of service, compared with age 58.7 with 27.7 years of service for employees generally.  ALJs may be removed only for cause and almost never resign from their positions; a total of only 12 have done so over the last 4 years.

RECRUITING IMPROVEMENTS ARE UNDER WAY

The Office of Personnel Management is actively engaged in improving the system of human resources management for ALJs.  We are doing this by developing regulations to update their personnel system, modifying the ALJ entrance examination to make it more reflective of actual work experience, and establishing an independent ALJ qualifications standard, as is the case for other occupations, rather than incorporating the standards only as a part of the vacancy announcement.

In order to assure the requirement for a merit selection system is met, OPM (and its predecessor agency, the Civil Service Commission) has administered an ALJ examination and maintained a list (or register) of qualified ALJ candidates.  To maintain the relevance and validity of the examinations, OPM has periodically conducted studies to revise and update

2

elements of the exam.  In 1999, the exam and register were suspended pending the outcome of

litigation in *Azdell/Fishman*.  In that case, non-preference eligibles challenged the 1996 scoring

formula used in the examination because, they alleged, that the revised formula gave too much

weight to veterans' preference.  The Merit Systems Protection Board ruled that the scoring

system was an unlawful employment practice and imposed various stays.  OPM challenged the

Board's ruling before the Federal Circuit, which ruled in OPM's favor and vacated the Board's

orders.  After the Federal Circuit mandate issued in July 2003, OPM reactivated the suspended

register.  Still, OPM opted to close the exam (except for 10-point veterans), because (1) work

was already underway to develop a new exam, and (2) the present register contained sufficient

numbers of high-quality candidates to meet projected agency needs.

 We have been able to respond to agency requirements for qualified ALJ candidates, and

will be able to continue to do so.  Currently, the existing register contains 1,197 qualified

candidates for ALJ positions.  Although the register has been closed to all but 10-point veterans

since 1999, we have verified that those candidates are still actively interested in an ALJ position,

and have invited them to provide updated information.  From January 1, 2005, through the 8th of

this month, over 140 selections were made from certificates issued from the register.  This is 10

percent of the ALJ workforce, and clearly demonstrates our continuing ability to fill ALJ

positions.

 OPM is presently completing work on the new ALJ exam.  Although the opening date

will depend entirely upon the issuance of newly proposed ALJ regulations, OPM is committed to

rolling out the new exam expeditiously once the revised regulations become effective.  When a

new register is generated from the new exam, the current register will be terminated.  When the

3

new exam comes out, OPM also plans to take advantage of our state-of-the-art examining

technology, USA Staffing, which allows applicants to apply on-line.

We are making great progress in developing the revised regulations referenced above. In

December 2005, OPM posted a proposed rule to revise the ALJ program. The proposed rule

removed redundant procedures and outdated information, clarified bar membership

requirements, and provided for the ALJ examination process to be established in a manner

similar to other OPM examinations. The proposed rule was open for public comment for 60

days. In conjunction with publishing these proposed regulations, OPM also posted a new ALJ

qualification standard on its Web site. The ALJ qualification standard was also open for public

comment for a 60-day period. At this time, OPM is carefully considering the comments

submitted on both the proposed rule and ALJ qualification standard

**PAY**

Let me begin a discussion of pay issues affecting ALJs today by briefly reviewing the

history of pay for these officials. From the start, the APA excluded ALJs from performance or

"efficiency" ratings in order to protect their independence. This exclusion is now codified in

chapter 43 of title 5, U.S. Code, at section 4301(2)(D). Until 1991, ALJs were classified and

paid as General Schedule employees. As required by the Federal Employees Pay Comparability

Act of 1990, a new pay system was established for ALJs in 1991. At that time, most ALJs were

classified and paid at grade GS-15 of the General Schedule, though some ALJs—especially those

in higher level managerial positions—were classified at grades GS-16, 17, and 18.

As in the case for members of the Senior Executive Service (SES), members of Boards of

Contract Appeals, and employees in other senior-level positions, the maximum rate of pay for

AALJ000099

ALJs is linked to the Executive Schedule.  The law caps total pay (including locality pay) for

ALJs at the rate for Executive Level III—currently $152,000.  While it is true that about 43

percent of all ALJs currently are paid at the capped rate, we have seen no evidence that this

phenomenon has resulted in significant recruitment or retention problems.

Groups representing ALJs have taken note of the fact that the pay cap for SES members

was increased from level III to level II of the Executive Schedule under legislation enacted by

Congress in late 2003.  In 2006, the rate for level II is $165,200.  However, the 2003 legislation

did not authorize automatic pay increases for SES members.  Indeed, the higher SES pay cap

applies only to SES members covered by performance appraisal systems that are certified by

OPM, with the concurrence of the Office of Management and Budget, as making meaningful

distinctions based on relative performance.   And SES members also lost their entitlement to

locality payments under the 2003 legislation.

The question as to whether ALJ pay levels should be adjusted upward to match the pay

levels of SES members who now have access to higher rates involves two separate

determinations.  First, we must evaluate the level of duties and responsibilities assigned to ALJs

to determine whether they are comparable to those of SES members or employees in other

similar positions.  At this time, it is not clear whether that is the case.  However, a comparison of

pay levels for judges across Federal, State, and local governments may be instructive.

The Bureau of Labor Statistics' Occupational Outlook Handbook, 2006-07 Edition,

reflects judicial pay as of 2004, when ALJs had a top salary of $145,600.  The Handbook

indicates that judges, magistrate judges, and magistrates had median annual earnings of $93,070

in May of 2004. The middle 50 percent earned between $54,140 and $124,400. The top 10

5

percent earned more than $141,750, while the bottom 10 percent earned less than $29,920. Median annual earnings of judges, magistrate judges, and magistrates were $111,810 in State government and $65,800 in local government. Administrative law judges, adjudicators, and hearing officers earned a median of $68,930.

The Handbook also includes the results of a 2004 survey by the National Center for State Courts showing that salaries of chief justices of State high courts averaged $130,461 and ranged from $95,000 to $191,483, salaries of State intermediate appellate court judges averaged $122,682 and ranged from $94,212 to $164,604, while salaries of State judges of general jurisdiction trial courts averaged $113,504 and ranged from $88,164 to $158,100.

In the Federal court system currently, the Chief Justice of the U.S. Supreme Court earns $212,100, and the Associate Justices earn $203,000. Federal court of appeals judges earn $175,100 a year, while district court judges have salaries of $165,200 (equal to the rate for Executive Level II), as do judges in the Court of Federal Claims. Federal judges with limited jurisdiction, such as magistrates and bankruptcy court judges, have salaries of $151,984, which is slightly less than the top rate for ALJs ($152,000).

Second, this Administration believes that higher pay levels, if otherwise justified, must be accompanied by the development of robust performance management systems. OPM believes that care must be taken to ensure that we maintain the integrity and independence of the administrative judiciary. However, we also believe that this can be accomplished at the same time as the goal of ensuring that differences in pay levels are driven by performance factors.

One performance management option that bears consideration is a system of peer review within the ALJ community that maintains strict separation from influence by officials of the

6

employing agency whose policies and decisions are subject to adjudication. Such a system could be designed to make meaningful distinctions in performance and pay based on such factors as case management or the thoroughness of any legal research conducted in connection with reaching a decision—without regard to the substance or outcome of the decision. We have previously offered to work with the ALJ community to develop robust performance appraisal systems that are consistent with preserving the integrity and independence of the administrative judiciary.

We already have substantial experience with performance appraisals in organizations that have responsibility for independent review of agency actions. Furthermore, we have been able to create structures for such review without harm to the independence of the organizations employing the individuals being evaluated. In particular, these actions have been accomplished in a number of Offices of Inspectors General (IGs). As with IGs, we are not suggesting that the review be accomplished by parts of the organization whose work is being reviewed, or by other outside entities. Instead, these reviews are being accomplished within the IG offices internally.

Most ALJs are employed in organizations of significant size, in which an internal review of work can be performed without outside interference. We do understand that such processes may not be universally applicable and that different situations may require different methodologies. However, we believe that robust performance appraisal systems are essential and more than worth the effort to get right.

ADMINISTRATION

The invitation asks us to address OPM's management of the ALJ program. Groups representing ALJs have suggested that we establish a special office within OPM to deal with

7

ALJ issues.  Director Linda M. Springer is personally committed to seeing that all ALJ issues are appropriately addressed.  However, other groups are making the same request for dedicated personnel to address their issues, and the Director needs to retain flexibility in her staff to work in multiple areas.  The Director will respond to all demonstrated needs, but how that is accomplished will be her determination.  OPM's General Counsel has been serving as the initial contact for ALJ issues with support from a working group of staff drawn from the various offices within OPM with responsibility for issues affecting ALJs.  If at any time the Director determines that this arrangement is not effective, she will make other arrangements

## RETIREMENT

As indicated earlier, on average, ALJs are older with more service than most Federal employees at retirement.  In our view, their retirement benefits are appropriately proportionate with their careers.

However, taking into account both eligibility and computation, H.R. 1864, the "Administrative Law Judges Retirement Act of 2005," would give ALJs a more liberal retirement benefit structure than available to any other retirement-covered group, including law enforcement officers, firefighters, and Members of Congress.  The ongoing costs of providing this enhanced benefit would be costly, and providing these benefits to current ALJ's would create a substantial unfunded liability.  Further, in its present form, it contains significant technical drafting issues.

If the Administrative Law Judges Retirement Act is enacted, then, under the Civil Service Retirement System (CSRS) and the Federal Employees' Retirement System (FERS), ALJs would be able to voluntarily retire with an unreduced annuity at age 55 with 10 years of service, and

8

with a reduced annuity at any age with 10 years of service. If there was a Voluntary Early

Retirement Authority, or an ALJ was involuntarily separated, he or she could retire at any age

with only 5 years of service. In the annuity calculation, a retiring ALJ would receive 2.5 percent

credit per year under CSRS, and 1.7 percent credit per year under FERS, for all ALJ service, plus

up to 5 years of military service, while law enforcement officers and firefighters are limited to 20

years of civilian service at those rates.

  To create such a generous structure for this group would greatly complicate the situation

*vis-a-vis* other groups who have or want special retirement benefits. Other special retirement

programs applicable in the executive branch, such as for law enforcement officers and

firefighters, are based upon the human capital management issues resulting from the physical

demands of the specific position  and prematurely terminated careers requiring mandatory

retirement at a relatively early age. On the other hand, ALJs are permitted to continue to work

without age limit, with approximately a quarter of active ALJs being at least 65.

  The only explanation we have heard in support of these liberalizations is that ALJs come

to their Federal careers later than other employees. It would appear (from average age and years

of service statistics) that ALJs do enter Government service at about age 40, compared with age

31 for Federal employees generally.  However, to the extent that ALJs do not earn a full

retirement benefit, it is because they have entered Federal service after a professional legal career

in the private sector or state or local government during which they had the opportunity to make

provision for their retirement. We see no recruitment or retention reasons to enhance the pension

formula to effectively compensate ALJs for deferring entry into Federal jobs. Thus, we believe

AALJ000104

that the existing retirement provisions applicable to ALJs are appropriate, and that no need has been demonstrated for modifications at this time.

SUMMARY

We have made much progress on the issues relating to competitive recruitment and believe matters are close to being finalized.  There is no retention problem.  In the area of pay, while further evaluation of the level of duties and responsibilities assigned to ALJs is necessary, any access to higher pay levels must be accompanied by the development of robust performance management systems.  In our view, no justification for changing the current, competitive retirement structure for ALJs has been demonstrated.

In short, the overwhelming objective evidence is that we currently have no difficulty in either recruiting or retaining a capable ALJ workforce.

This concludes my statement.  I will be glad to answer any questions you may have.

10

# Principles for the Validation and Use of Personnel Selection Procedures

## Fourth Edition

## Society for Industrial and Organizational Psychology, Inc.

## 2003

AALJ000106

This document is an official policy statement of the Society for Industrial and Organizational Psychology (Division 14 of the American Psychological Association) and was approved as policy of the American Psychological Association (APA) by the APA Council of Representatives in August 2003. Copies are available from the Society Administrative Office. To order, please visit the SIOP Web site at www.siop.org.

**Society for Industrial Organizational Psychology**
**520 Ordway Avenue**
**Bowling Green OH 43402**
**419-353-0032**
**www.siop.org**

© 2003  by  the Society for Industrial and Organizational Psychology, Inc.  All rights reserved.  No part of this document may be reproduced without written permission of the publisher.

# Committees

## Ad Hoc Committee on the Revision of the
### *Principles for the Validation and Use of Personnel Selection Procedures*

Marcia M. Andberg, Ph.D.
Marcia Andberg Associates

Steven H. Brown, Ph.D.
LIMRA, Inc.

Wayne J. Camara, Ph.D.
The College Board

Wanda J. Campbell, Ph.D.
Edison Electric Institute

Donna L. Denning, Ph.D.
City of Los Angeles

P. Richard Jeanneret, Ph.D., Chair
Jeanneret and Associates, Inc.

Jerard F. Kehoe, Ph.D.
Selection & Assessment Consulting

James L. Outtz, Ph.D.
Outtz and Associates

Paul R. Sackett, Ph.D.
University of Minnesota

Mary L. Tenopyr, Ph.D.
Consultant

Nancy T. Tippins, Ph.D.
Personnel Research Associates

Sheldon Zedeck, Ph.D.
University of California at Berkeley

## Advisory Panel on the Revision of the
### *Principles for the Validation and Use of Personnel Selection Procedure*

Herman Aguinis, Ph.D.
University of Colorado at Denver

Winfred Arthur, Jr., Ph.D.
Texas A & M University

Philip Bobko, Ph.D.
Gettysburg College

John C. Callender, Ph.D.
The Procter & Gamble Company

Fritz Drasgow, Ph.D.
University of Illinois

Joyce C. Hogan, Ph.D.
Hogan Assessment Systems

Leaetta M. Hough, Ph.D.
The Dunnette Group, Ltd.

Frank J. Landy, Ph.D.
SHL Landy Jacobs, Inc.

Kenneth Pearlman, Ph.D.
Consultant

Robert A. Ramos, Ph.D.
Ramos & Associates

Ann Marie Ryan, Ph.D.
Michigan State University

Frank L. Schmidt, Ph.D.
University of Iowa

Neal W. Schmitt, Ph.D.
Michigan State University

# Table of Contents

Committees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iii
Foreword . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .viii
Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1
  Statement of Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1
    Principles as Guidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
  Selection Procedures Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
Overview of the Validation Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
  Sources of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
    Evidence Based on the Relationship Between Scores on Predictors
    and Other Variables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
    Content-Related Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    Evidence Based on the Internal Structure of the Test . . . . . . . . . . . .6
    Evidence Based on Response Processes . . . . . . . . . . . . . . . . . . . . . . .6
    Evidence Based on Consequences of Personnel Decisions . . . . . . .7
  Planning the Validation Effort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
    Existing Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
    Proposed Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
    Requirements of Sound Inference . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
    Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
  Analysis of Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
    Purposes for Conducting an Analysis of Work . . . . . . . . . . . . . . . .10
    Level of Detail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
Sources of Validity Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
  Evidence of Validity Based on Relationships with Measures of Other
  Variables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
  Criterion-Related Evidence of Validity . . . . . . . . . . . . . . . . . . . . . . . . .13
    Feasibility of a Criterion-Related Validation Study . . . . . . . . . . . .14
    Design and Conduct of Criterion-Related Studies . . . . . . . . . . . . .14
    Criterion Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
    Choice of Predictor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
    Choice of Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
    Data Analysis for Criterion-Related Validity . . . . . . . . . . . . . . . . .18
  Evidence for Validity Based on Content . . . . . . . . . . . . . . . . . . . . . . . .21
    Feasibility of a Content-Based Validation Study . . . . . . . . . . . . . .21
    Design and Conduct of Content-Based Strategies . . . . . . . . . . . . .22
    Defining the Content Domain . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
    Choosing the Selection Procedure . . . . . . . . . . . . . . . . . . . . . . . . .23
    Procedural Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
    Evaluating Content-Related Evidence . . . . . . . . . . . . . . . . . . . . . .25
  Evidence of Validity Based on Internal Structure . . . . . . . . . . . . . . . .25

Generalizing Validity Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
    Transportability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
    Synthetic Validity/Job Component Validity . . . . . . . . . . . . . . . . . . .27
    Meta-Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
Fairness and Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
    Fairness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
    Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
        Predictive Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
        Measurement Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
Operational Considerations in Personnel Selection . . . . . . . . . . . . . . . . .35
    Initiating a Validation Effort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
        Defining the Organization's Needs, Objectives, and Constraints .35
        Communicating the Validation Plan . . . . . . . . . . . . . . . . . . . . . .37
    Understanding Work and Worker Requirements . . . . . . . . . . . . . . . .38
        Strategies for Analyzing the Work Domain and Defining Worker
        Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
        Considerations in Specifying the Sampling Plan . . . . . . . . . . . .38
        Documentation of the Results . . . . . . . . . . . . . . . . . . . . . . . . . . .38
    Selecting Assessment Procedures for the Validation Effort . . . . . . .38
        Review of Research Literature . . . . . . . . . . . . . . . . . . . . . . . . . . .39
        Psychometric Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . .39
        Administration and Scoring Considerations . . . . . . . . . . . . . . . .39
        Format and Medium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
        Acceptability to the Candidate . . . . . . . . . . . . . . . . . . . . . . . . . . .40
        Alternate Forms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
    Selecting the Validation Strategy . . . . . . . . . . . . . . . . . . . . . . . . . . .41
        Fit to Objectives, Constraints, and Selection Procedures . . . . . .41
        Individual Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42
    Selecting Criterion Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42
        Performance-Oriented Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . .42
        Other Indices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42
        Relevance and Psychometric Considerations . . . . . . . . . . . . . . .43
    Data Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
        Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
        Pilot Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44
        Match Between Data Collection and Implementation Expectations
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44
        Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44
        Quality Control and Security . . . . . . . . . . . . . . . . . . . . . . . . . . . .44
    Data Analyses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45
        Data Accuracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45
        Missing Data/Outliers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45
        Descriptive Statistics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

Appropriate Analyses .................................45
Differential Prediction .................................45
Combining Selection Procedures Into an Assessment Battery ...46
Multiple Hurdles Versus Compensatory Models .............46
Cutoff Scores Versus Rank Orders .........................46
Bands ...........................................48
Norms ...........................................48
Communicating the Effectiveness of Selection Procedures ......48
Appropriate Use of Selection Procedures .......................49
Combining Selection Procedures ...........................49
Using Selection Procedures for Other Purposes .............49
Recommendations ...........................................50
Technical Validation Report .................................50
Identifying Information .................................50
Statement of Purpose .................................50
Analysis of Work .................................50
Search for Alternative Selection Procedures .................50
Selection Procedures .................................51
Relationship to Work Requirements .........................51
Criterion Measures (When Applicable) .....................51
Research Sample .................................51
Results .........................................52
Scoring and Transformation of Raw Scores .................52
Normative Information .................................52
Recommendations .................................52
Caution Regarding Interpretations .........................53
References .........................................53
Administration Guide .................................53
Introduction and Overview .................................54
Contact Information .................................54
Selection Procedures .................................54
Applicability .........................................54
Administrators .........................................55
Information Provided to Candidates .........................55
Guidelines for Administration of Selection Procedures ........55
Administration Environment .............................56
Scoring Instructions and Interpretation Guidelines ...........56
Test Score Databases .................................56
Reporting and Using Selection Procedure Scores .............56
Candidate Feedback .................................57
Nonstandard Administrations (See Also Candidates With Disabilities) .................................57
Reassessing Candidates .................................57

Corrective Reassessment ............................58
Security of the Selection Procedure ......................58
References ......................................58
Other Circumstances Regarding the Validation Effort and Use of Selection Procedures ........................................59
Influence of Changes in Organizational Demands ............59
Review of Validation and Need for Updating the Validation Effort ................................................59
Candidates With Disabilities ..............................59
Responsibilities of the Selection Procedure Developers, Researchers, and Users ........................................60
References ............................................62
Glossary of Terms ......................................66
Index ................................................73

# Foreword

It is with great pride that the Society for Industrial and Organizational Psychology (SIOP) puts forth the fourth edition of the *Principles for the Validation and Use of Personnel Selection Procedures.* In 2000, Nancy Tippins, who was then president of the Society, charged a task force with revising the *Principles.* There were two primary goals for the revision: to update the *Principles* to be consistent with the current body of research; and to make the *Principles* consistent with the recently revised *Standards for Educational and Psychological Testing.*

Over a 2-year period, the Task Force met to revise the document, to receive commentary from an Advisory Panel on early drafts, and to receive commentary from the membership of the Society on subsequent drafts. The Task Force, chaired by Richard Jeanneret and composed of Marcia Andberg, Steven Brown, Wayne Camara, Wanda Campbell, Donna Denning, Jerard Kehoe, James Outtz, Paul Sackett, Mary Tenopyr, Nancy Tippins, and Sheldon Zedeck, put in many hours to ensure that this document reflects the state of current research and expert opinion on the validation and use of personnel selection procedures. The Society is indebted to the Task Force and to the many members who provided commentary.

> Nancy Tippins, President 2000–2001
> William Macey, President, 2001–2002
> Ann Marie Ryan, President 2002–2003
> Michael Burke, President 2003–2004

# Introduction

## *Statement of Purpose*

The purpose of the *Principles for the Validation and Use of Personnel Selection Procedures* (hereafter, the *Principles*) is to specify established scientific findings and generally accepted professional practice in the field of personnel selection psychology in the choice, development, evaluation, and use of personnel selection procedures designed to measure constructs related to work behavior with a focus on the accuracy of the inferences that underlie employment decisions. This document is the fourth edition of the *Principles,* which is the official statement of the Society for Industrial and Organizational Psychology (Division 14 of the American Psychological Association and an organizational affiliate of the American Psychological Society) concerning validation and personnel selection. The revision is stimulated by theoretical and research developments since the previous edition of the *Principles* (SIOP, 1987) and by the publication of the *Standards for Educational and Psychological Testing* in 1999 by the American Educational Research Association (AERA), American Psychological Association (APA), and the National Council on Measurement in Education (NCME) (hereafter, the *Standards*). The *Principles* cover many aspects of validation and personnel selection; however, other professional documents (e.g., *Guidelines on Multicultural Education, Training, Research, Practice, and Organizational Change for Psychologists)* may also provide guidance in particular situations.

The *Principles* is intended to be consistent with the *Standards*. This revision brings the *Principles* up-to-date with regard to current scientific knowledge, and further guides sound practice in the use of personnel selection procedures. The *Principles* should be taken in its entirety rather than considered as a list of separately enumerated principles.

Federal, state, and local statutes, regulations, and case law regarding employment decisions exist. The *Principles* is not intended to interpret these statutes, regulations, and case law, but can inform decision making related to them.

This document provides:

1. principles regarding the conduct of selection and validation research**;**

2. principles regarding the application and use of selection procedures**;**

3. information for those responsible for authorizing or implementing validation efforts**;** and

4. information for those who evaluate the adequacy and appropriateness of selection procedures.

The *Principles* is intended to address the needs of persons involved in personnel selection. The *Principles* is to a large degree a technical document, but it is also an informational document.

### *Principles as Guidance*

It is important to recognize that this document constitutes pronouncements that guide, support, or recommend, but do not mandate, specific approaches or actions. This document is intended to be aspirational and to facilitate and assist the validation and use of selection procedures. It is not intended to be mandatory, exhaustive, or definitive, and may not be applicable to every situation. Sound practice requires professional judgment to determine the relevance and importance of the *Principles* in any particular situation. The *Principles* is not intended to mandate specific procedures independent of the professional judgment of those with expertise in the relevant area. In addition, this document is not intended to provide advice on complying with local, state, or federal laws that might be applicable to a specific situation.

The *Principles* expresses expectations toward which the members of this Society and other researchers and practitioners should strive. Evidence for the validity of the inferences from a given selection procedure may be weakened to the extent that the expectations associated with professionally accepted practice, and consequently the *Principles*, are not met. However, circumstances in any individual validation effort or application affect the relevance of a specific principle or the feasibility of its implementation. Complete satisfaction of the *Principles* in a given situation may not be necessary or attainable.

The *Principles* is intended to represent the consensus of professional knowledge and practice as it exists today; however, personnel selection research and development is an evolving field in which techniques and decision-making models are subject to change. Acceptable procedures other than those discussed in this edition of the *Principles* may be developed in the future. In certain instances, references are cited that provide support for the principles, but these citations are selective rather than exhaustive. Both researchers and practitioners are expected to maintain an appropriate level of awareness of research developments relevant to the field of personnel selection.

The *Principles* is not intended:

1. to be a substitute for adequate training in validation procedures;
2. to be exhaustive (although it covers the major aspects of selection procedure validation and use);
3. to be a technical translation of existing or future regulations;
4. to freeze the field to prescribed practices and so limit creative endeavors; or
5. to provide an enumerated list of separate principles.

### *Selection Procedures Defined*

Selection procedures refer to any procedure used singly or in combination to make a personnel decision including, but not limited to, paper-and-pencil tests, computer-administered tests, performance tests, work samples, inventories (e.g., personality, interest), projective techniques, polygraph examinations, individual assessments, assessment center evaluations, biographical data forms or scored application blanks, interviews, educational requirements, experience requirements, reference checks, background investigations, physical requirements (e.g., height or weight), physical ability tests, appraisals of job performance, computer-based test interpretations, and estimates of advancement potential. These selection procedures include methods of measurement that can be used to assess a variety of individual characteristics that underlie personnel decision making.

The terms "selection procedure," "test," "predictor," and "assessment" are used interchangeably throughout this document. Personnel decisions are employment-related decisions to hire, train, place, certify, compensate, promote, terminate, transfer, and/or take other actions that affect employment status.

# Overview of the Validation Process

The essential principle in the evaluation of any selection procedure is that evidence be accumulated to support an inference of job relatedness. Selection procedures are demonstrated to be job related when evidence supports the accuracy of inferences made from scores on, or evaluations derived from, those procedures with regard to some important aspect of work behavior (e.g., quality or quantity of job performance, performance in training, advancement, tenure, termination, or other organizationally pertinent behavior). Although this document focuses on individual performance, group and organizational performance may also be relevant criteria.

Any claim of validity made for a selection procedure should be documented with appropriate research evidence built on the principles discussed in this document. Promotional literature or testimonial statements should not be used as evidence of validity.

The *Principles* embraces the *Standards*' definition of validity as "the degree to which accumulated evidence and theory support specific interpretations of test scores entailed by proposed uses of a test" (AERA et al., 1999, p. 184). Validity is the most important consideration in developing and evaluating selection procedures. Because validation involves the accumulation of evidence to provide a sound scientific basis for the proposed score interpretations, it is the interpretations of these scores required by the proposed uses that are evaluated, not the selection procedure itself.

The *Standards* notes that validation begins with "an explicit statement of the proposed interpretation of test scores, along with a rationale for the relevance of the interpretation to the proposed use. The proposed interpretation refers to the constructs or concepts the test is intended to measure" (AERA et al., 1999, p. 9). Examples of such constructs or concepts include arithmetic proficiency, managerial performance, ability to design a Web page, oral presentation skills, conscientiousness, and ability to trouble-shoot technical problems with equipment on an assembly line. A clear description of the construct or conceptual framework that delineates the knowledge, skills, abilities, processes, and characteristics to be assessed should be developed.

In the early 1950s, three different aspects of test validity were discussed—content, criterion related, and construct. Since that time, the conceptualization of validity evidence has undergone some modification, moving from three separate aspects of validity evidence to the current *Standards*' view of validity as a unitary concept with different sources of evidence contributing to an understanding of the inferences that can be drawn from a selection procedure. Nearly all information about a selection procedure, and inferences about the resulting scores, contributes to an understanding of its validity. Evidence concerning content relevance, criterion relatedness, and construct meaning is subsumed within this definition of validity.

The validity of any inference can be determined through a variety of different strategies for gathering evidence. The *Standards* notes that while different strategies for gathering evidence may be used, the primary inference in employment contexts is that a score on a selection procedure predicts subsequent work behavior. Even when the validation strategy used does not involve empirical predictor-criterion linkages, such as when a user relies on test content to provide validation evidence, there is still an implied link between the test score and a criterion. Therefore, even when different strategies are employed for gathering validation evidence, the inference to be supported is that scores on a selection procedure can be used to predict subsequent work behavior or outcomes. Professional judgment should guide the decisions regarding the sources of evidence that can best support the intended interpretation and use.

The quality of validation evidence is of primary importance. In addition, where contradictory evidence exists, comparisons of the weight of evidence supporting specific inferences to the weight of evidence opposing such inferences are desirable.

The *Standards* discusses five sources of evidence that can be used in evaluating a proposed interpretation of selection procedure test scores for a particular use: (a) relationships between predictor scores and other variables, such as test-criterion relationships, (b) content, (c) internal structure of the test, (d) response processes, and (e) consequences of testing. Given that validity is a unitary concept, such categorizations refer to various sources of evidence rather than distinct types of validity. It is not the case that each of these five sources is an alternative approach to establishing job relatedness. Rather, each provides information that may be highly relevant to some proposed interpretations of scores, and less relevant, or even irrelevant to others.

## Sources of Evidence

### Evidence Based on the Relationship Between Scores on Predictors and Other Variables

This form of evidence is based on the empirical relationship of predictor scores to external variables. Two general strategies for assembling empirical evidence apply. The first strategy involves examining the relationship between scores on two or more selection procedures measuring the same construct hypothesized to underlie the predictor measure. Evidence that two measures are highly related and consistent with the underlying construct can provide convergent evidence in support of the proposed interpretation of test scores as representing a candidate's standing on the construct of interest. Similarly, evidence that test scores relate differently to other distinct constructs can contribute to discriminant evidence of validity. Note that convergent and discriminant evidence does not in and of itself establish job

relatedness, which requires evidence linking selection procedure scores to work-relevant behavior.

A second strategy typically involves relating a test or other selection procedure to a criterion. This strategy has historically encompassed two study designs: predictive and concurrent. A predictive study examines how accurately test scores predict future performance. In a concurrent study, predictor and criterion data are collected during a relatively simultaneous time frame although the objective remains to predict performance.

### Content-Related Evidence

Test content includes the questions, tasks, format, and wording of questions, response formats, and guidelines regarding administration and scoring of the test. Evidence based on test content may include logical or empirical analyses that compare the adequacy of the match between test content and work content, worker requirements, or outcomes of the job.

### Evidence Based on the Internal Structure of the Test

Studies that examine the internal structure of a test and the relationship among its items or tasks (e.g., work samples) can provide additional evidence of how test scores relate to specific aspects of the construct to be measured. Such evidence typically includes information concerning the relationships among items and the degree to which they represent the appropriate construct or content domain. For example, evidence of a high degree of item homogeneity is appropriate when a single dimension or singular construct is to be measured, but if the conceptual framework requires a more complex structure, overall consistency among items may not provide appropriate evidence of the internal structure of the test. When a multidimensional factor structure is proposed, evidence supporting inferences concerning the validity of score interpretations for the subcomponents in the predictor may be appropriate.

### Evidence Based on Response Processes

In employment contexts, evidence based on response processes is necessary when claims are made that scores can be interpreted as reflecting a particular response process on the part of the examinee. For example, if a claim is made that a work sample measures use of proper techniques for resolving customer service problems, then simply assessing whether the problem is resolved is not enough. Evidence based on both cognitive and physical response processes may provide additional evidence of validity. Examining the processes used by individuals in responding to performance tasks or test questions can provide such evidence. Often evidence regarding individual responses can be gathered by (a) questioning test takers about their response strategies, (b) analyzing examinee response times on computerized assess-

ments, or (c) conducting experimental studies where the response set is manipulated. Observations of how individuals engage in performance tasks can also illustrate the extent to which the task is eliciting behavior related to the intended construct as opposed to behavior more related to irrelevant constructs. However, in many employment contexts such evidence is irrelevant to the proposed use, as is the case where the only claim made is that the scores on the selection procedure are predictive of a particular work outcome.

### *Evidence Based on Consequences of Personnel Decisions*

In recent years, one school of thought has advocated incorporating examination of  consequences of the use of predictors in the determination of validity. This perspective views unintended negative consequences as weakening the validity argument.  Although evidence of negative consequences may influence policy or practice decisions concerning the use of predictors, these *Principles* and the *Standards* take the view that such evidence is relevant to inferences about validity only if the negative consequences can be attributed to the measurement properties of the selection procedure itself.

Subgroup differences resulting from the use of selection procedures are often viewed as a negative consequence of employment selection.  Group differences in predictor scores and selection rates are relevant to an organization and its employment decisions, yet such differences alone do not detract from the validity of the intended test interpretations.  If the group difference can be traced to a source of bias or contamination in the test, then the negative consequences do threaten the validity of the interpretations.  Alternatively, if the group difference on the selection procedure is consistent with differences between the groups in the work behavior or performance predicted by the procedure, the finding of group differences could actually support the validity argument. In this case, negative consequences from test use constitute a policy issue for the user, rather than indicate negative evidence concerning the validity of the selection procedure.

A different example of negative consequences is also helpful.  An organization that introduces an integrity test to screen applicants may assume that this selection procedure provides an adequate safeguard against employee theft and will discontinue use of other theft-deterrent methods (e.g., video surveillance).  In such an instance, employee theft might actually increase after the integrity test is introduced and other organizational procedures are eliminated.  Thus, the decisions subsequent to the introduction of the test may have had an unanticipated, negative consequence on the organization. Such consequences may lead to policy or practice decisions to reduce the negative impact.  However, such consequences do not threaten the validity of inferences that can be drawn from the integrity tests, as the consequences are not a function of the test itself.

## Planning the Validation Effort

Before a validation effort is planned, the proposed uses of the selection procedures being considered must be based on an understanding of the work performed, and the needs and rights of the organization and its present and prospective employees. These proposed uses should be consistent with professional, ethical, and legal responsibilities. Validation begins with a clear statement of the proposed uses as well as the intended interpretations and outcomes and should be designed to determine how well the proposed uses will be achieved.

Selection procedures used in the overall selection process should be supported by validity evidence. When a selection decision is based on multiple components combined into a composite, evidence for the final decision has primary importance. The validation effort should accumulate evidence that generalizes to the selection procedure and work behavior in the operational setting. The design of this effort may take many forms such as single local studies, consortium studies, meta-analyses, transportability studies, or synthetic validity/job component studies. More than one source of evidence or validation strategy may be valuable in any one validation effort.

In planning a validation effort for personnel decisions, three sources of evidence are most likely to be relevant: relationships to measures of other variables, content-related evidence, and internal structure evidence. Under some circumstances, evidence based on response processes and evidence based on consequences may be important to consider. The decision to pursue one or more of these sources of evidence is based on many considerations including proposed uses, types of desired selection procedures, availability and relevance of existing information and resources, and strength and relevance of an existing professional knowledge base. Where the proposed uses rely on complex, novel, or unique conclusions, multiple lines of converging evidence may be important.

The design of the validation effort is the result of professional judgment balancing considerations that affect the strength of the intended validity inference with practical limitations. Important considerations include (a) existing evidence, (b) design features required by the proposed uses, (c) design features necessary to satisfy the general requirements of sound inference, and (d) feasibility of particular design features.

### Existing Evidence

An important consideration in many validation efforts is whether sufficient validity evidence already exists to support the proposed uses. The availability and relevance of existing evidence and the potential information value of new evidence should be carefully weighed in designing the validation effort. All validity conclusions are generalizations from the results in the validation setting to selection procedures and work behavior in the oper-

ational setting. The information value of existing and possible new evidence is based on the many factors that affect the strength of this generalization.

Existing evidence provides information value where it establishes statistical dependability and supports the generalization from the validation setting(s) to the operational settings. Where such evidence has been accumulated, it may provide a sufficient rationale for inferring validity in the operational setting and may support a decision not to gather additional evidence. Such inferences depend on evidence of validity rather than mere claims of validity. Advances in meta-analysis methods and a growing knowledge base of meta-analysis results have established considerable validation evidence for cognitive ability measures, and evidence is accruing for noncognitive measures such as personality and physical abilities. However, existing evidence alone may not be sufficient to support inferences of validity in a given situation.

Validity conclusions based on existing evidence may be strengthened by evidence from more than one method especially where the validity inference depends heavily on some underlying or theoretical explanatory concept or construct. In such cases, different methods may not support the same conclusions about the underlying explanatory concepts or constructs. For example, factor analyses of test scores may not replicate factor analyses of ratings of the same attributes. In these situations, convergent and discriminant evidence across multiple methods may be important.

### Proposed Uses

In designing a validation effort, whether based on existing evidence, new evidence, or both, primary consideration should be given to the design features necessary to support the proposed uses. Examples of such features include the work to be targeted (e.g., one job title or a family of related work), the relevant candidate pool (e.g., experienced or nonexperienced candidates), the uniqueness of the operational setting (e.g., one homogeneous organization or many different organizations), and relevant criterion measures (e.g., productivity or turnover).

### Requirements of Sound Inference

Primary consideration should also be given to the general requirements of sound validity inferences including measurement reliability and validity, representative samples, appropriate analysis techniques, and controls over plausible confounding factors. People who provide information in the validation effort should be knowledgeable and qualified for the tasks they are asked to perform and content they are asked to contribute.

## Feasibility

Validation planning must consider the feasibility of the design requirements necessary to support an inference of validity. Validation efforts may be limited by time, resource availability, sample size, or other organization constraints including cost. In some situations these limits may narrow the scope of appropriate generalizations, but in other situations they may cause design flaws leading to inaccurate generalizations. While validation efforts with a narrow focus may have value, poorly executed validation efforts may lead the employer to reject beneficial selection procedures or accept invalid ones. Misleading, poorly designed validation efforts should not be undertaken.

## Analysis of Work

Historically, selection procedures were developed for specific jobs or job families. This often remains the case today, and traditional job analysis methods are still relevant and appropriate in those situations. However, organizations that experience rapid changes in the external environment, the nature of work, or processes for accomplishing work may find that traditional jobs no longer exist. In such cases, considering the competencies or broad requirements for a wider range or type of work activity may be more appropriate. Competency models are often used by organizations for many different purposes (Schippmann et al., 2000). When they are intended to support the underlying validity or use of a selection procedure, these *Principles* apply. The term "analysis of work" is used throughout this document and subsumes information that traditionally has been collected through job analysis methods as well as other information about the work, worker, organization, and work environment. The focus for conducting an analysis of work may include different dimensions or characteristics of work including work complexity, work environment, work context, work tasks, behaviors and activities performed, or worker requirements (e.g., knowledge, skills, abilities, and other personal characteristics [KSAOs]).

## Purposes for Conducting an Analysis of Work

There are two major purposes for conducting an analysis of work. One purpose is to develop selection procedures. Part of this process is an analysis of work that identifies worker requirements including a description of the general level of ability, skill, knowledge, or other characteristics needed. Such an analysis of work would determine the characteristics workers need to be successful in a specific work setting, or the degree to which the work requirements are similar to requirements for work performed elsewhere. The other purpose is to develop or identify criterion measures by assembling the information needed to understand the work performed, the setting in which the work is accomplished, and the organization's goals.

There is no single approach that is the preferred method for the analysis of work. The analyses used in a specific study of work are a function of the nature of work, current information about the work, the organizational setting, the workers themselves, and the purpose of the study. Understanding the organization's requirements or objectives is important when selecting an appropriate method for conducting an analysis of work. The choice of method and the identification of the information to be gathered by that method should include the relevant research literature.

### Level of Detail

The level of detail required of an analysis of work is directly related to its intended use and the availability of information about the work. A less detailed analysis may be sufficient when there is already information descriptive of the work. A less detailed analysis may be appropriate when prior research about the job requirements allows the generation of sound hypotheses concerning the predictors or criteria across job families or organizations. When a detailed analysis of work is not required, the researcher should compile reasonable evidence establishing that the job(s) in question are similar in terms of work behavior and/or required knowledge, skills, abilities, and/or other characteristics, or falls into a group of jobs for which validity can be generalized. Situations that require a more detailed analysis of work may include those in which there is little existing work information available and the organization intends to develop predictors of specific job knowledge.

Any methods used to obtain information about work or workers should have reasonable psychometric characteristics and should be understood by the participants. Lack of consensus about the information contained in the analysis of work should be noted and considered further. Current job descriptions or other documents may or may not serve the immediate research purpose. Such information needs to be evaluated to determine its relevance and usefulness.

In some instances, an analysis of work may be the basis for assigning individuals to or selecting individuals for future jobs that do not exist at present. In other instances, an analysis of work may be used for transitioning workers from current to future work behaviors and activities. In both instances, the future work behaviors and activities, as well as the worker requirements may differ markedly from those that exist at present. Similarly, the work environment in which an organization operates also may change over time. For example, technology has permitted many individuals to work from virtual offices and replaced many functions that were previously conducted by individuals. Further, the global environment has expanded geographical boundaries and markets for many organizations. Procedures similar to those used to analyze current work requirements may be applicable for conducting an analysis of work in environments of rapid

change.  However, other approaches that may be more responsive to the complexities of the emerging work environments are more appropriate (Peterson, Mumford, Borman, Jeanneret, & Fleishman, 1999; Schneider & Konz, 1989).  The central point in such instances is the need to obtain reliable and relevant job information that addresses anticipated behaviors, activities, or KSAOs.

If there is reason to question whether people with similar job titles or work families are doing similar work, or if there is a problem of grouping jobs with similar complexity, attributes, behaviors, activities, or worker KSAOs, inclusion of multiple perspectives and incumbents in an analysis of work may be necessary.  Even when incumbents are in positions with similar job titles or work families, studying multiple incumbents may be necessary to understand differences in work complexity, work context, work environment, job behaviors, or worker KSAOs as a function of shift, location, variations in how work is performed, and other factors that may create differences in similar job titles or worker families.

# Sources of Validity Evidence

Inferences made from the results of a selection procedure to the performance of subsequent work behavior or outcomes need to be based on evidence that supports those inferences. Three sources of evidence will be described: namely, evidence of validity based on relationships with measures of other variables, evidence based on content, and evidence based on the internal structure of the selection procedure. The generalization of validity evidence accumulated from existing research to the current employment situation is discussed in the "Generalizing Validity Evidence" section.

## *Evidence of Validity Based on Relationships with Measures of Other Variables*

The *Principles* and the *Standards* view a construct as the concept a selection procedure is intended to measure. At times the construct is not fully understood or well articulated. However, relationships among variables reflect their underlying constructs. For example, a predictor generally cannot correlate with a criterion unless to some extent one or more of the same constructs underlie both variables. Consequently, validation efforts based on constructs apply to all investigations of validity.

Principles for using a criterion-related strategy to accumulate validity evidence in employment settings are elaborated below. While not explicitly discussed, the following principles also apply to research using variables other than job performance criteria (e.g., convergent and discriminant evidence). Some theory or rationale should guide the selection of these other variables as well as the interpretation of the study results.

## *Criterion-Related Evidence of Validity*

Personnel selection procedures are used to predict future performance or other work behavior. Evidence for criterion-related validity typically consists of a demonstration of a relationship (via statistical significance testing or establishing confidence intervals) between the results of a selection procedure (predictor) and one or more measures of work-relevant behavior or work outcomes (criteria). The choice of predictors and criteria should be based on an understanding of the objectives for test use, job information, and existing knowledge regarding test validity.

A standardized procedure is one that presents and uses consistent directions and procedures for administration, scoring, and interpretation. Standardized predictors and criterion measures are preferred. The discussion in this section, however, applies to all predictors and criteria, standardized or unstandardized.

### Feasibility of a Criterion-Related Validation Study

The availability of appropriate criterion measures, the representativeness of the research sample, and the adequacy of statistical power are very important in determining the feasibility of conducting a criterion-related study. Depending on their magnitude, deficiencies in any of these considerations can significantly weaken a criterion-related validation study.

A relevant, reliable, and uncontaminated criterion measure(s) must be obtained or developed. Of these characteristics, the most important is relevance. A relevant criterion is one that reflects the relative standing of employees with respect to important work behavior(s) or outcome measure(s). If such a criterion measure does not exist or cannot be developed, use of a criterion-related validation strategy is not feasible.

A competent criterion-related validation study should be based on a sample that is reasonably representative of the work and candidate pool. Differences between the sample used for validation and a candidate pool on a given variable merit attention when credible research evidence exists demonstrating that the variable affects validity.

A number of factors related to statistical power can influence the feasibility of a criterion-related study. Among these factors are the degree (and type) of range restriction in the predictor or the criterion, reliability of the criterion, and statistical power. Sample size, the statistic computed, the probability level chosen for the confidence interval, and the size of the predictor-criterion relationship determine the confidence interval around the validity estimate. In practice, these threats and factors occur in varying levels that, in combination, affect power and the precision of estimation. Therefore, statistical power and precision of estimation should be carefully considered before undertaking a criterion-related validity study, and if a study is conducted, the report should include information relevant to power estimation.

### Design and Conduct of Criterion-Related Studies

If a criterion-related strategy is feasible, attention is then directed to the design and conduct of the study. A variety of designs can be identified. The traditional classification of predictive and concurrent criterion-related validity evidence is based on the presence or absence of a time lapse between the collection of predictor and criterion data. The employment status of the sample (incumbents or applicants) also may differentiate the designs. In predictive designs, data on the selection procedure are typically collected at or about the time individuals are selected. After a specified period of time (for survival criteria) or after employees' relative performance levels have stabilized (for performance criteria), criterion data are collected. In concurrent designs, the predictor and criterion data are collected, usually on incumbents, at approximately the same time.

There are, however, other differences between and within predictive and concurrent designs that can affect the interpretation of the results of criterion-related validation studies. Designs may differ in the time of predictor data collection relative to a selection decision or the time at which employees start in a job—before, simultaneously, shortly after, or after a substantial time period in the job. Designs may differ with respect to the basis for the selection decision for participants in the research sample; they may have been selected using the predictor under study, an "existing" in-use predictor, a random procedure, or some combination of these. Designs also may differ with respect to the population sampled. For example, the design may use an applicant population or a population of recently hired employees, recent employees not yet fully trained, or employees with the full range of individual differences in experience.

The effect of the predictive or concurrent nature of the design may depend upon the predictor construct. For tests of cognitive abilities, estimates of validity obtained from predictive and concurrent designs may be expected to be comparable (Barrett, Phillips, & Alexander, 1981; Bemis, 1968; Pearlman, Schmidt, & Hunter, 1980). Findings regarding the comparability of predictive and concurrent designs cannot be generalized automatically to all situations and to other types of predictors and criteria.

Occasionally, a selection procedure is designed for predicting higher-level work than that for which candidates are initially selected. Such higher-level work may be considered a target job or work in a criterion-related study if a substantial number of individuals who remain employed and available for advancement progress to the higher level within a reasonable period of time. Where employees do not advance to the higher level in sufficient numbers, assessment of candidates for such work still may be acceptable if the validity study is conducted using criteria that reflect performance at both the level of work that the candidate will be hired to perform and the higher level. The same logic may apply to situations in which people are rotated among jobs.

In some organizations, work changes so rapidly or is so fluid that validation with regard to performance in one or more "target" job(s) is impossible; successful performance is more closely related to abilities that contribute broadly to organizational effectiveness. In such instances, the researcher may accumulate evidence in support of the relationship between predictor constructs (e.g., flexibility, adaptability, team orientation, learning speed, and capacity) and organization-wide criteria (such as working effectively under very tight deadlines).

### Criterion Development

In general, if criteria are chosen to represent work-related activities, behaviors or outcomes, the results of an analysis of work are helpful in criterion construction. If the goal of a given study is the prediction of organizational criteria such as tenure, absenteeism, or other types of organization-wide criteria, an in-depth analysis is usually not necessary, though an understanding of the work and its context is beneficial. Some considerations in criterion development follow.

Criteria should be chosen on the basis of work relevance, freedom from contamination, and reliability rather than availability. This implies that the purposes of the validation study are (a) clearly stated, (b) supportive of the organization's needs and purposes, and (c) acceptable in the social and legal context of the organization. The researcher should not use criterion measures that are unrelated to the purposes of the study to achieve the appearance of broad coverage.

*Criterion relevance*. Criteria should represent important organizational, team, and individual outcomes such as work-related behaviors, outputs, attitudes, or performance in training, as indicated by a review of information about the work. Criteria need not be all-inclusive, but there should be clear rationale linking the criteria to the proposed uses of the selection procedure. Criteria can be measures of overall or task-specific work performance, work behaviors, or work outcomes. Depending upon the work being studied and the purposes of the validation study, various criteria such as a standard work sample, behavioral and performance ratings, success in work-relevant training, turnover, contextual performance/organizational citizenship, or rate of advancement may be appropriate. Regardless of the measure used as a criterion, it is necessary to ensure its relevance to work.

*Criterion contamination*. A criterion measure is contaminated to the extent that it includes extraneous, systematic variance. Examples of possible contaminating factors include differences in the quality of machinery, unequal sales territories, raters' knowledge of predictor scores, job tenure, shift, location of the job, and attitudes of raters. While avoiding completely (or even knowing) all sources of contamination is impossible, efforts should be made to minimize their effects. For instance, standardizing the administration of the criterion measure minimizes one source of possible contamination. Measurement of some contaminating variables might enable the researcher to control statistically for them; in other cases, special diligence in the construction of the measurement procedure and in its use may be all that can be done.

*Criterion deficiency*. A criterion measure is deficient to the extent that it excludes relevant, systematic variance. For example, a criterion measure intended as a measure of overall work performance would be deficient if it did not include work behaviors or outcomes critical to job performance.

*Criterion bias*.  Criterion bias is systematic error resulting from criterion contamination or deficiency that differentially affects the criterion performance of different subgroups.  The presence or absence of criterion bias cannot be detected from knowledge of criterion scores alone.  A difference in criterion scores of older and younger employees or day and night shift workers could reflect bias in raters or differences in equipment or conditions, or the difference might reflect genuine differences in performance.  The possibility of criterion bias must be anticipated. The researcher should protect against bias insofar as is feasible and use professional judgment when evaluating the data.

*Criterion reliability*.  When estimated by appropriate measures, criterion measures should exhibit reliability.  For examples of appropriate and inappropriate uses of a variety of reliability estimates see Hunter and Schmidt (1996).  Criterion reliability places a ceiling on validity estimates.  Thus, the effect of criterion unreliability is to underestimate criterion-related validity in the population of interest.

*Ratings as criteria*.  Among the most commonly used and generally appropriate measures of performance are ratings.  If raters (supervisors, peers, self, clients, or others) are expected to evaluate several different aspects of performance, the development of rating factors is ordinarily guided by an analysis of the work.  Further, raters should be sufficiently familiar with the relevant demands of the work as well as the individual to be rated to effectively evaluate performance and should be trained in the observation and evaluation of work performance.   Research suggests that performance ratings collected for research purposes can be preferable for use in validation studies to those routinely collected for administrative use (Jawahar & Williams, 1997).

### Choice of Predictor

Many factors, including professional judgment and the proposed use of the selection procedure, influence the choice of the predictor(s).

*Selecting predictors*.  Variables chosen as predictors should have an empirical, logical, or theoretical foundation.  The rationale for a choice of predictor(s) should be specified.  A predictor is more likely to provide evidence of validity if there is good reason or theory to suppose that a relationship exists between it and the behavior it is designed to predict.  A clear understanding of the work, the research literature, or the logic of predictor development provides this rationale.  This principle is not intended to rule out the application of serendipitous findings, but such findings, especially if based on small research samples, should be verified through replication with an independent sample.

Preliminary choices among predictors should be based on the researcher's scientific knowledge without regard for personal bias or preju-

dice. Therefore, the researcher's choice of specific predictors should be based on theory and the findings of relevant research rather than personal interest or mere familiarity.

*Predictor contamination*. As with criteria, a predictor measure is contaminated to the extent that it includes extraneous, systematic variance. A number of factors can contribute to predictor contamination including unstandardized administrative procedures and irrelevant content. Some procedures, such as unstructured interviews, may be more susceptible than others to predictor contamination. Efforts should be made to minimize predictor contamination.

*Predictors and selection decision strategies*. Outcomes of decision strategies should be recognized as predictors. Decision makers who interpret and act upon predictor data interject something of themselves into the interpretive or decision-making process. Judgments or decisions thus may become at least an additional predictor, or, in some instances, the only predictor. For example, if the decision strategy uses judgment to combine multiple predictors (e.g., tests, reference checks, interview results) into a final selection decision, the actual predictor is the judgment reached by the person who weights and summarizes all the information. Ideally, it is this judgment that should be the focus of the validation effort. If this is not feasible, support for the judgment should be based on validity evidence for the specific components.

*Predictor reliability*. Predictor reliability, like criterion reliability, should be estimated whenever feasible. Predictor reliability should be estimated through appropriate methods and should be sufficiently high to warrant use. Predictor, like criterion, reliability places a ceiling on any validity estimate.

### Choice of Participants

Samples should be chosen with the intent to generalize to the selection situations of interest. The impact of characteristics such as demographics, motivation, ability, and experience on predictor-criterion relationships, and hence on this generalization, is an empirical question. No variable should be assumed to moderate validity coefficients in the absence of explicit evidence for such an effect.

### Data Analysis for Criterion-Related Validity

The quality of the validation study depends as much on the appropriateness of the data analysis as on the data collected during the research. Researchers need to ensure that the statistics used are appropriate. Moreover, as with the choice of criterion or predictor variables, the researcher should not choose a data analysis method simply because the computer package for it is readily available. Researchers who delegate data analyses to others retain responsibility for ensuring the suitability and accuracy of the analyses.

***Strength of the predictor-criterion relationship.*** The analysis should provide information about effect sizes and the statistical significance or confidence associated with predictor-criterion relationships. Effect size estimates and confidence intervals can be useful in making professional judgments about the strength of predictor-criterion relationships (Schmidt, 1996). Other approaches such as expectancy tables are also useful in many situations, particularly if the assumptions of a correlational analysis are not met.

Research on the power of criterion-related validation studies and meta-analytic research suggests that achieving adequate power while simultaneously controlling Type I error rates can be problematic in a local validation study and may require sample sizes that are difficult to obtain. Researchers should give at least equal attention to the risks of Type II error.

Reports of any analysis should provide information about the nature of the predictor-criterion relationship and how it might be used in prediction. The information should include number of cases, measures of central tendency, characteristics of distributions, and variability for both predictor and criterion variables, as well as the interrelationships among all variables studied.

***Adjustments to validity estimates.*** Researchers should obtain as unbiased an estimate as possible of the validity of the predictor in the population in which it is used. Observed validity coefficients may underestimate the predictor-criterion relationship due to the effects of range restriction and unreliability in the predictors or criteria. When range restriction causes underestimation of the validity coefficient, a suitable bivariate or multivariate adjustment should be made when the necessary information is available. Adjustment of the validity coefficient for criterion unreliability should be made if an appropriate estimate of criterion reliability can be obtained. Researchers should make sure that reliability estimates used in making corrections are appropriate to avoid under- or overestimating validity coefficients. For example, in a study utilizing a criterion-related strategy in which the criteria are performance ratings, differences between raters and differences across time may be considered in estimating criterion reliability because internal consistency estimates, by themselves, may be inadequate.

When adjustments are made, both unadjusted and adjusted validity coefficients should be reported. Researchers should be aware that the usual tests of statistical significance do not apply to adjusted coefficients such as those adjusted for restriction of range and/or criterion unreliability (Bobko & Riecke, 1980; Raju & Brand, in press; Raju, Burke, Normand, & Langlois, 1991). The adjusted coefficient is generally the best point estimate of the population validity coefficient; confidence intervals around it should be computed. No adjustment of a validity coefficient for unreliability of the predictor should be made or reported unless it is clearly stated that the coefficient is theoretical and cannot be interpreted as reflecting the actual operational validity of the selection procedure.

***Combining predictors and criteria***.  Where predictors are used in combination, researchers should consider and document the method of combination. Predictors can be combined using weights derived from a multiple regression analysis (or another appropriate multivariate technique), unit weights, unequal weights that approximate regression weights, weights that are determined from work-analytic procedures, or weights based on professional judgment.  Generally, after cross-validation, the more complex weighting procedures offer no or only a slight improvement over simple weighting techniques (Aamodt & Kimbrough, 1985).  When combining scores, care must be taken to ensure that differences in the variability of different predictors do not lead to over- or underweighting of one or more predictors.

Selection procedures that have linear relationships with work performance can be combined for use in either a linear manner (e.g., by summing scores on different selection procedures) or in a configural manner (e.g., by using multiple cutoffs).  The researcher should be aware of the administrative, legal, and other implications of each choice.  When configural selection rules are used, a clear rationale for their use should be provided (e.g., meeting larger organizational goals or needs, administrative convenience, or reduced testing costs).

Similarly, if the researcher combines scores from several criteria into a composite score, there should be a rationale to support the rules of combination and the rules of combination should be described.  Usually, it is better to assign unit or equal weights to the several criterion components than to attempt to develop precise empirical weights.  When measures are combined, researchers should recognize that effective weights (i.e., the contributions of the various components to the variance of the composite) are a function of a variable's standard deviation and are unlikely to be the same as the nominal weights.

***Cross-validation***.  Researchers should guard against overestimates of validity resulting from capitalization on chance.  Especially when the research sample is small, estimates of the validity of a composite battery developed on the basis of a regression equation should be adjusted using the appropriate shrinkage formula or be cross-validated on another sample.  The assignment of either rational or unit weights to predictors does not result in shrinkage in the usual sense.  Where a smaller number of predictors is selected for use based on sample validity coefficients from a larger number included in the study, shrinkage formulas can be used only if the larger number is entered into the formula as the number of predictors, though this will produce a slightly conservative estimate of the cross-validated multiple correlation.

***Documenting and interpreting validation analyses***.  The results obtained using a criterion-related strategy should be interpreted against the background of the relevant research literature.  Cumulative research knowledge plays an important role in any validation effort.  A large body of research

regarding relationships between many predictors and work performance currently exists (Schmidt & Hunter, 1998).

An extremely large sample or replication is required to give full credence to unusual findings. Such findings include, but are not limited to, suppressor or moderator effects, nonlinear regression, and benefits of configural scoring. *Post hoc* hypotheses in multivariate studies and differential weightings of highly correlated predictors are particularly suspect and should be replicated before they are accepted and results implemented.

### Evidence for Validity Based on Content

Evidence for validity based on content typically consists of a demonstration of a strong linkage between the content of the selection procedure and important work behaviors, activities, worker requirements, or outcomes on the job. This linkage also supports construct interpretation. When the selection procedure is designed explicitly as a sample of important elements in the work domain, the validation study should provide evidence that the selection procedure samples the important work behaviors, activities, and/or worker KSAOs necessary for performance on the job, in job training, or on specified aspects of either. This provides the rationale for the generalization of the results from the validation study to prediction of work behaviors (Goldstein, Zedeck, & Schneider, 1993).

The content-based selection procedures discussed here are those designed as representative samples of the most important work behaviors, activities, and/or worker KSAOs drawn from the work domain and defined by the analysis of work. The content of the selection procedure includes the questions, tasks, themes, format, wording, and meaning of items, response formats, and guidelines regarding the administration and scoring of the selection procedure. The following provides guidance for the development or choice of procedures based primarily on content.

### Feasibility of a Content-Based Validation Study

A number of issues may affect the feasibility of a content-based validation study and should be evaluated before beginning such a study. Among these issues are the stability of the work and the worker requirements, the interference of irrelevant content, the availability of qualified and unbiased subject matter experts, and cost and time constraints.

The researcher should consider whether the work and the worker requirements are reasonably stable. When feasible, a content-based selection procedure should remove or minimize content that is irrelevant to the domain sampled. Virtually any content-based procedure includes some elements that are not part of the work domain (e.g., standardization of the selection procedure or use of response formats that are not part of the job content, such as multiple choice formats or written responses when the job does not require writing).

The success of the content-based validation study is closely related to the qualifications of the subject matter experts (SMEs). SMEs define the work domain and participate in the analysis of work by identifying the important work behaviors, activities, and worker KSAOs. The experts should have thorough knowledge of the work behaviors and activities, responsibilities of the job incumbents, and the KSAOs prerequisite to effective performance on the job. The SMEs should include persons who are fully knowledgeable about relevant organizational characteristics such as shift, location, type of equipment used, and so forth. A method for translating subject matter expert judgments into the selection procedure should be selected or developed and documented. If SME ratings are used to evaluate the match of the content-based procedure to the work and worker requirements, procedures and criteria for rating each aspect should be standardized and delineated.

Cost and time constraints can affect the feasibility of some content-based procedures. In some situations, designing and implementing a simulation that replicates the work setting or type of work may be too costly. In others, developing and assessing the reliability of the procedure may take too long because samples are too small or the behavior is not easily measured using this strategy.

### Design and Conduct of Content-Based Strategies

The content-based validation study specifically demonstrates that the content of the selection procedure represents an adequate sample of the important work behaviors, activities, and/or worker KSAOs defined by the analysis of work. This involves choosing subject matter experts, defining the content to be included in the selection procedure, developing the selection procedure, establishing the guidelines for administration and scoring, and evaluating the effectiveness of the validation effort.

### Defining the Content Domain

The characterization of the work domain should be based on accurate and thorough information about the work including analysis of work behaviors and activities, responsibilities of the job incumbents, and/or the KSAOs prerequisite to effective performance on the job. In addition, definition of the content to be included in the domain is based on an understanding of the work, and may consider organizational needs, labor markets, and other factors that are relevant to personnel specifications and relevant to the organization's purposes. The domain need not include everything that is done on the job. The researcher should indicate what important work behaviors, activities, and worker KSAOs are included in the domain, describe how the content of the work domain is linked to the selection procedure, and explain why certain parts of the domain were or were not included in the selection procedure.

The fact that the construct assessed by a selection procedure is labeled an ability does not *per se* preclude the reliance on a content-oriented strategy. When selection procedure content is linked to job content, content-oriented strategies are useful. When selection procedure content is less clearly linked to job content, other sources of validity evidence take precedence.

The selection procedure content should be based on an analysis of work that specifies whether the employee is expected to have all the important work behaviors, activities, and/or KSAOs before selection into the job or whether basic or advanced training will be provided after selection. If the intended purpose of the selection procedure is to hire or promote individuals into jobs for which no advanced training is provided, the researcher should define the selection procedure in terms of the work behaviors, activities, and/or KSAOs an employee is expected to have before placement on the job. If the intent of the content-based procedure is to select individuals for a training program, the work behaviors, activities, and/or worker KSAOs would be those needed to succeed in a training program. Because the intended purpose is to hire or promote individuals who have the prerequisite work behaviors, activities, and/or KSAOs to learn the work as well as to perform the work, the selection procedure should be based on an analysis of work that defines the balance between the work behaviors, activities, and/or KSAOs the applicant is expected to have before placement on the job and the amount of training the organization will provide. For example, the fact that an employee will be taught to interpret company technical manuals may mean that the job applicant should be evaluated for reading ability. A selection procedure that assesses the individual's ability to read at a level required for understanding the technical manuals would likely be predictive of work performance.

A content-based selection procedure may also include evidence of specific prior training, experience, or achievement. This evidence is judged on the basis of the relationship between the content of the experience and the content of the work requiring that experience. To justify such relationships, more than a superficial resemblance between the content of the experience variables and the content of the work is required. For example, course titles and job titles may not give an adequate indication of the content of the course or the job or the level of proficiency an applicant has developed in some important area. What should be evaluated is the similarity between the behaviors, activities, processes performed, or the KSAOs required by the work.

### Choosing the Selection Procedure

The development or choice of a selection procedure usually is restricted to important or frequent behaviors and activities or to prerequisite KSAOs. The researcher should have adequate coverage of work behaviors and activities and/or worker requirements from this restricted domain to provide sufficient evidence to support the validity of the inference. The fidelity of the

selection procedure content to important work behaviors forms the basis for the inference.

*Sampling the content domain*. The process of constructing or choosing the selection procedure requires sampling the work content domain. Not every element of the work domain needs to be assessed. Rather, a sample of the work behaviors, activities, and worker KSAOs can provide a good estimate of the predicted work performance. Sampling should have a rationale based on the professional judgment of the researcher and an analysis of work that details important work behaviors and activities, important components of the work context, and KSAOs needed to perform the work. Random sampling of the content of the work domain is usually not feasible or appropriate. The rationale underlying the sampling should be documented.

*Describing the level of specificity*. In defining the work content domain, the degree of specificity needed in a work analysis and a selection procedure should be described in advance. The more a selection procedure has fidelity to exact job components, the more likely it is that the content-based evidence will be demonstrated. However, when the work changes and fidelity drops, the selection procedure is less likely to remain appropriate. Thus, considering the extent to which the work is likely to change is important. If changes are likely to be frequent, the researcher may wish to develop a selection procedure that has less specificity. For example, in developing a selection procedure for the job of word processor, the procedure may exclude content such as "demonstrates proficiency with a particular word processing program" and instead include content that is less specific, such as "demonstrates proficiency with word processing principles and techniques."

The degree to which the results of validation studies can be generalized depends in part on the specificity of the selection procedure and its applicability across settings, time, and jobs. While general measures may be more resilient to work changes and more transferable to other, similar work, they also may be subject to more scrutiny because the correspondence between the measure and the work content is less detailed.

### Procedural Considerations

The researcher needs to establish the guidelines for administering and scoring the content-based procedure. Typically, defining the administration and scoring guidelines for a paper-based procedure that measures job-related knowledge or cognitive skills is relatively uncomplicated. On the other hand, including a work behavior or activity in the content-based selection procedure may introduce administration and scoring challenges, which should be evaluated in advance. Generally, the more closely a selection procedure replicates a work behavior, the more accurate the content-based inference. Yet, the more closely a selection procedure replicates a work behavior, the more difficult the procedure may be to administer and score.

For example, troubleshooting multistep computer problems may be an important part of a technical support person's work. It may be difficult, however, to develop and score a multistep troubleshooting simulation or work sample, because examinees may not use the same steps or strategy when attempting to solve the problem. A lower fidelity alternative such as single-step problems could be used so that important aspects of the work domain are still included in the selection procedure. In all cases, the researcher should ensure that the procedures are measuring skills and knowledge that are important in the work rather than irrelevant content.

### Evaluating Content-Related Evidence

Evidence for validity based on content rests on demonstrating that the selection procedure adequately samples and is linked to the important work behaviors, activities, and/or worker KSAOs defined by the analysis of work. The documented methods used in developing the selection procedure constitute the primary evidence for the inference that scores from the selection procedure can be generalized to the work behaviors and can be interpreted in terms of predicted work performance. The sufficiency of the match between selection procedure and work domain is a matter of professional judgment based on evidence collected in the validation effort (Goldstein et al., 1993).

Reliability of performance on content-based selection procedures should be determined when feasible. If ratings from more than one rater are used to evaluate performance on a simulation or work sample, the researcher should evaluate inter-rater agreement in operational use.

### Evidence of Validity Based on Internal Structure

Information about the internal structure of any selection procedure can also support validation arguments. Internal structure evidence alone is not sufficient evidence to establish the usefulness of a selection procedure in predicting future work performance. However, internal structure is important in planning the development of a selection procedure. The specific analyses that are relevant depend on the conceptual framework of the selection procedure, which in turn is typically established by the proposed use of the procedure.

When evidence of validity is based on internal structure, the researcher may consider the relationships among items, components of the selection procedures, or scales measuring constructs. Inclusion of items in a selection procedure should be based primarily on their relevance to a construct or content domain and secondarily on their intercorrelations. Well-constructed components or scales that have near-zero correlations with other components or scales, or a total score, should not necessarily be eliminated. For example, if the selection procedure purposely contains components relevant to different construct or content domains (e.g., a selection battery composed

of a reading test, an in-basket, and an interview), the scores on these components may not be highly correlated.

However, if the conceptual framework posits a single dimension or construct, one should strive for a high level of homogeneity among the components, which can be evaluated in terms of various internal consistency estimates of reliability. If the intent of the conceptual framework requires a more complex internal structure, overall internal consistency might not be an appropriate measure. For example, the internal consistency reliability estimate for a performance rating form involving several supposedly unrelated scales might only represent halo effect.

When scoring involves a high level of judgment on the part of those doing the scoring, indices of inter-rater or scorer consistency, such as generalizability coefficients or measures of inter-rater agreement, may be more appropriate than internal consistency estimates.

# Generalizing Validity Evidence

At times, sufficient accumulated validity evidence is available for a selection procedure to justify its use in a new situation without conducting a local validation research study. In these instances, use of the selection procedure may be based on demonstration of the generalized validity inferences from that selection procedure, coupled with a compelling argument for its applicability to the current situation. Although neither mutually exclusive nor exhaustive, several strategies for generalizing validity evidence have been delineated: (a) transportability, (b) synthetic validity/job component validity, and (c) meta-analytic validity generalization.

## *Transportability*

One approach to generalizing the validity of inferences from scores on a selection procedure involves the use of a specific selection procedure in a new situation based on results of a validation research study conducted elsewhere. This is referred to as demonstrating the "transportability" of validity evidence for the selection procedure. When proposing to "transport" use of a procedure, a careful review of the original validation study is warranted to ensure acceptability of the technical soundness of that study and to determine its relevance to the new situation. Key points for consideration when establishing the appropriateness of transportability are, most prominently, job comparability in terms of content or requirements, as well as, possibly, similarity of job context and candidate group.

## *Synthetic Validity/Job Component Validity*

A second approach to establishing generalized of the validity of inferences based on scores from a selection procedure is referred to as synthetic validity or job component validity. (While some researchers distinguish these terms, others do not, and in either case several variations on each exist.) A defining feature of synthetic validity/job component validity is the justification of the use of a selection procedure based upon the demonstrated validity of inferences from scores on the selection procedure with respect to one or more domains of work (job components). Thus, establishing synthetic validity/job component validity requires documentation of the relationship between the selection procedure and one or more specific domains of work (job components) within a single job or across different jobs. If the relationship between the selection procedure and the job component(s) is established, then the validity of the selection procedure for that job component may be generalizable to other situations in which the job components are comparable.

The validity of a selection procedure may be established with respect to different domains (components) of work, then "synthesized" (combined) for use based on the domains (or components) of work relevant for a given job

or job family. In some instances, this may involve conducting a research study designed to demonstrate evidence for the generalized validity of inferences from scores on a set of selection procedures, and then using various subsets of these procedures for selection into both jobs or job families in the original study as well as into other jobs or job families. In other cases, it may involve generalizing the validity of inferences based on scores on selection procedures examined in one or more research studies conducted elsewhere to the new situation. In both cases, detailed analysis of the work is required for use of this strategy of generalizing validity evidence.

### *Meta-Analysis*

Meta-analysis is a third procedure and strategy that can be used to determine the degree to which predictor-criterion relationships are specific to the situations in which the validity data have been gathered or are generalizable to other situations, as well as to determine the sources of cross-situation variability (Aguinis & Pierce, 1998). Meta-analysis requires the accumulation of findings from a number of validity studies to determine the best estimates of the predictor-criterion relationship for the kinds of work domains and settings included in the studies.

While transportability and synthetic validity/job component validity efforts may be based on an original study or studies that establish the validity of inferences based on scores from the selection procedure through a content-based and/or a criterion-related strategy, meta-analysis is a strategy that only can be applied in cases in which the original studies relied upon criterion-related evidence of validity. The question to be answered using a meta-analytic strategy is whether the valid inferences about work behavior or job performance can be drawn from predictor scores across given jobs or job families in different settings. (Note that the focus here is on using meta-analysis to examine predictor-criterion relationships. Meta-analysis also can be used to examine other issues, such as convergence among instruments intended to measure the same construct.)

Meta-analysis is the basis for the technique that is often referred to as "validity generalization." In general, research has shown much of the variation in observed differences in obtained validity coefficients in different situations can be attributed to sampling error and other statistical artifacts (Ackerman & Humphreys, 1990; Barrick & Mount, 1991; Callender & Osburn, 1980; 1981; Hartigan & Wigdor, 1989; Hunter & Hunter, 1984; Schmidt, Hunter, & Pearlman, 1981). These findings are particularly well-established for cognitive ability tests; additional recent research results also are accruing that indicate the generalizability of predictor-criterion relationships for noncognitive constructs in employment settings.

Professional judgment in interpreting and applying the results of meta-analytic research is important. Researchers should consider the meta-ana-

lytic methods used and their underlying assumptions, the tenability of the assumptions, and artifacts that may influence the results (Bobko & Stone-Romero, 1998; Raju, Anselmi, Goodman, & Thomas, 1998; Raju et al., 1991; Raju, Pappas, & Williams, 1989). In evaluating meta-analytic evidence, the researcher should be concerned with potential moderators to the extent that such moderators would affect conclusions about the presence and generalizability of validity. In such cases, researchers should consider both statistical power to detect such moderators and/or the precision of estimation with respect to such moderators. In addition, the researcher should consider the probabilities of both Type I and Type II decision errors (Oswald & Johnson, 1998; Sackett, Harris, & Orr, 1986).

Reports that contribute to the meta-analytic research results should be clearly identified and available. Researchers should consult the relevant literature to ensure that the meta-analytic strategies used are sound and have been properly applied, that the appropriate procedures for estimating predictor-criterion relationships on the basis of cumulative evidence have been followed, that the conditions for the application of meta-analytic results have been met, and that the application of meta-analytic conclusions is appropriate for the work and settings studied. The rules by which the researchers categorized the work and jobs studied, the selection procedures used, the definitions of what the selection procedure is measuring, the job performance criteria used, and other study characteristics that were hypothesized to impact the study results should be fully reported. The quality of the individual research studies and their impact, if any, on the meta-analytic conclusions and their use also should be informed by good professional judgment (Guion, 1998; Law, Schmidt, & Hunter, 1994a, 1994b).

Note that sole reliance upon available cumulative evidence may not be sufficient to meet specific employer operational needs such as for the placement of employees or for the optimal combination of procedures. Consequently, additional studies and data may be required to meet these specific needs. If such studies are not feasible in an organization, researchers and employers may engage in cooperative studies.

Meta-analytic methods for demonstrating generalized validity are still evolving. Researchers should be aware of continuing research and critiques that may provide further refinement of the techniques as well as a broader range of predictor-criterion relationships to which meta-analysis has been applied.

Generalizing validity evidence from meta-analytic results is often more useful than a single study. However, if important conditions in the operational setting are not represented in the meta-analysis (e.g., the local setting involves a managerial job and the meta-analytic data base is limited to entry-level jobs), a local individual study may be more accurate than the average predictor-criterion relationship reported in a meta-analytic study. A competently conducted study, with a large sample using the same test, for the same

kind of work activities, may be more accurate, informative, and useful than a cumulation of small validation studies that are not representative of the setting to which one wants to generalize validity.

Reliance on meta-analytic results is more straightforward when they are organized around a construct or set of constructs. When different predictors (as well as different criteria) intended to measure the same construct are combined in a meta-analysis, findings are meaningful to the extent that there is evidence that they do indeed reflect the same construct (e.g., convergent validity evidence). If, for example, meta-analytic evidence relies on data from five highly correlated, published measures of a predictor construct, these findings cannot be assumed to generalize to other measures using the same construct label without evidence that those other measures indeed reflect the same construct.

When studies are cumulated on the basis of common methods (e.g., interviews, biodata) instead of constructs, a different set of interpretational difficulties arise. Generalization is straightforward when, for example, an empirical biodata scale has been developed for a specific occupation, multiple validity studies have been conducted using that scale in that occupation, and the intent is to generalize to another setting that employs individuals in that same occupation. However, researchers may have difficulty when they attempt to generalize about a method in general, rather than about a specific application of the method. Because methods such as the interview can be designed to assess widely varying constructs (from job knowledge to integrity), generalizing from cumulative findings is only possible if the features of the method that result in positive method-criterion relationships are clearly understood, if the content of the procedures and meaning of the scores are relevant for the intended purpose, and if generalization is limited to other applications of the method that include those features. Consider the cumulation of validity findings from various interview methods, where in the population of settings in which interviews are used, the interview development process, content, and scoring vary (e.g., some knowledge-focused and some value-focused; some structured and some unstructured). Now consider a setting in which these features have not been coded, and thus it is unclear whether these features vary in the sample of studies available for meta-analysis. Generalizing from a meta-analysis of such data to a new similarly unspecified interview, to a different interview method, or to a different or new situation, is not warranted. For example, it may be the case that all studies in the database involve knowledge-focused interviews, and consistency in validity across knowledge-focused interviews offers no grounds for inferring that validity will generalize to value-focused interviews. In contrast, a cumulative database on interviews where content, structure, and scoring are coded could support generalization to an interview meeting the same specifications.

# Fairness and Bias

## *Fairness*

Fairness is a social rather than a psychometric concept. Its definition depends on what one considers to be fair. Fairness has no single meaning and, therefore, no single definition, whether statistical, psychometric, or social. The *Standards* notes four possible meanings of "fairness."

The first meaning views fairness as requiring equal group outcomes (e.g., equal passing rates for subgroups of interest). The *Standards* rejects this definition, noting that it has been almost entirely repudiated in the professional testing literature. It notes that while group differences should trigger heightened scrutiny for possible sources of bias (i.e., a systematic error that differentially affects the performance of different groups of test takers), outcome differences in and of themselves do not indicate bias. It further notes that there is broad agreement that examinees with equal standing on the construct of interest should, on average, earn the same score regardless of group membership.

The second meaning views fairness in terms of the equitable treatment of all examinees. Equitable treatment in terms of testing conditions, access to practice materials, performance feedback, retest opportunities, and other features of test administration, including providing reasonable accommodation for test takers with disabilities when appropriate, are important aspects of fairness under this perspective. There is consensus on a need for equitable treatment in test administration (although not necessarily on what constitutes equitable treatment).

The third meaning views fairness as requiring that examinees have a comparable opportunity to learn the subject matter covered by the test. However, the *Standards* notes that this perspective is most prevalent in the domain of educational achievement testing and that opportunity to learn ordinarily plays no role in determining the fairness of employee selection procedures. One exception would be settings where the organization using the tests purposely limits access to information needed to perform well on the tests on the basis of group membership. In such cases, while the test itself may be unbiased in its coverage of job content, the use of the test would be viewed as unfair under this perspective.

The fourth meaning views fairness as a lack of predictive bias. This perspective views predictor use as fair if a common regression line can be used to describe the predictor-criterion relationship for all subgroups of interest; subgroup differences in regression slopes or intercepts signal predictive bias. There is broad scientific agreement on this definition of predictive bias, but there is no similar broad agreement that the lack of predictive bias can be equated with fairness. For example, a selection system might exhibit no predictive bias by race or gender, but still be viewed as unfair if equitable treatment (e.g., access to practice materials) was not provided to all examinees.

Thus, there are multiple perspectives on fairness. There is agreement that issues of equitable treatment, predictive bias, and scrutiny for possible bias when subgroup differences are observed, are important concerns in personnel selection; there is not, however, agreement that the term "fairness" can be uniquely defined in terms of any of these issues.

***Bias***

The *Standards* notes that bias refers to any construct-irrelevant source of variance that results in systematically higher or lower scores for identifiable groups of examinees. The effect of such irrelevant sources of variance on scores on a given variable is referred to as measurement bias. The effects of such sources of variance on predictor-criterion relationships, such that slope or intercepts of the regression line relating the predictor to the criterion are different for one group than for another, is referred to as predictive bias. The *Standards* notes that, in the employment context, evidence of bias or lack of bias generally relies on the analysis of predictive bias. Both forms of bias are discussed below.

### *Predictive Bias*

While fairness has no single accepted meaning, there is agreement as to the meaning of predictive bias. Predictive bias is found when for a given subgroup, consistent nonzero errors of prediction are made for members of the subgroup (Cleary, 1968; Humphreys, 1952). (Another term used to describe this phenomenon is differential prediction. The term "differential prediction" is sometimes used in the classification and placement literature to refer to differences in predicted performance when an individual is classified into one condition rather than into another; this usage should not be confused with the use of the term here to refer to predictive bias.) Although other definitions of bias have been introduced, such models have been critiqued and found wanting on grounds such as lack of internal consistency (Petersen & Novick, 1976).

Testing for predictive bias involves using moderated multiple regression, where the criterion measure is regressed on the predictor score, subgroup membership, and an interaction term between the two. Slope and/or intercept differences between subgroups indicate predictive bias (Gulliksen & Wilks, 1950; Lautenschlager & Mendoza, 1986; Nunnally & Bernstein, 1994).

Predictive bias has been examined extensively in the cognitive ability domain. For White–African American and White–Hispanic comparisons, slope differences are rarely found; while intercept differences are not uncommon, they typically take the form of overprediction of minority group performance (Bartlett, Bobko, Mosier, & Hannan, 1978; Hunter, Schmidt, & Rauschenberger, 1984; Schmidt, Pearlman, & Hunter, 1980). In some other domains, there has been little to no published research on predictive bias,

though work in the personality domain is now beginning to appear. Saad and Sackett (2002) report findings parallel to those in the ability domain in examining predictive bias by gender using personality measures (i.e., little evidence of slope differences and intercept differences in the form of over-prediction of female performance). Given the limited research to date, broad conclusions about the prevalence of predictive bias for many constructs are premature at this time.

Several important technical concerns with the analysis of predictive bias are noted here. The first is that an analysis of predictive bias requires an unbiased criterion. Confidence in the criterion measure is a prerequisite for an analysis of predictive bias. It is important to note, though, that while researchers should exercise great care in the development and collection of criterion data, investigations of criterion bias are limited by the lack of a true score against which criterion measures can be compared. The second is the issue of statistical power to detect slope and intercept differences. Small total or subgroup sample sizes, unequal subgroup sample sizes, range restriction, and predictor unreliability are factors contributing to low power (Aguinis, 1995; Aguinis & Stone-Romero, 1997). A third is the assumption of homogeneity of error variances (Aguinis, Peterson, & Pierce, 1999); alternative statistical tests may be preferable when this assumption is violated (Alexander & DeShon, 1994; DeShon & Alexander, 1996; Oswald, Saad, & Sackett, 2000).

Some perspectives view the analysis of predictive bias as an activity contingent on a finding of mean subgroup differences. In fact, however, subgroup differences and predictive bias can exist independently of one another. Thus, whether or not subgroup differences on the predictor are found, predictive bias analysis should be undertaken when there are compelling reasons to question whether a predictor and a criterion are related in a comparable fashion for specific subgroups, given the availability of appropriate data. In domains where relevant research exists, generalized evidence can be appropriate for examining predictive bias.

### Measurement Bias

Measurement bias, namely, sources of irrelevant variance that result in systematically higher or lower scores for members of particular groups, is a potential concern for all variables, both predictors and criteria. Determining whether measurement bias is present is often difficult, as this requires comparing an observed score to a true score. In many domains, such as performance appraisal, such a standard for comparison is generally unavailable.

An approach to examining measurement bias in the domain of multi-item tests is to perform a differential item functioning (DIF) analysis. DIF refers to analyses that identify items for which members of different subgroups with identical total test scores (or identical estimated true scores in

item response theory [IRT] models) have differing item performance. Such analyses are uncommon in the employment domain. First, they require data on large research samples prior to operational use, as DIF analyses are often part of the predictor development process. Second, empirical research in domains where DIF analyses are common has rarely found sizable and replicable DIF effects (Sackett, Schmitt, Ellingson, & Kabin, 2001). Third, such analyses require unidimensional tests, and many employment tests are not factorially pure unidimensional tests, and the unidimensionality assumption is often untested in DIF research (Hunter & Schmidt, 2000). Fourth, for cognitive tests it is common to find roughly equal numbers of differentially functioning items favoring each subgroup, resulting in no systematic bias at the test level (Hunter & Schmidt, 2000). As a result of these factors, DIF findings should be viewed with caution. DIF analysis is not likely to become a routine or expected part of the test development and validation process in employment settings; however, researchers may choose to explore DIF when data sets appropriate for such analysis are available.

Linked to the idea of measurement bias in terms of conducting analysis at the item level is the concept of an item sensitivity review, in which items are reviewed by individuals with diverse perspectives for language or content that might have differing meaning for members of various subgroups and language that could be demeaning or offensive to members of various subgroups. Instructions to candidates and to scorers or assessors also may be reviewed in a similar manner. The value of such analysis will vary by test content, and the need for and use of such information is a matter of researcher judgment in a given situation.

# Operational Considerations in Personnel Selection

This section of the *Principles* describes operational issues associated with the development or choice of a selection procedure, the conduct or accumulation of research to support the validity inferences made, documentation of the research effort in technical reports and administration manuals, and subsequent implementation and use. The need for sound professional judgment based on the extant scientific literature and the researcher's own experience will be required at every step of the process. In addition, all aspects of the research described in the *Principles* should be performed in compliance with the ethical standards of the American Psychological Association as endorsed by SIOP.

Topics are introduced in an order that generally corresponds to the temporal progression of the validation effort. For example, the section on understanding work and worker requirements precedes decisions regarding the selection procedure. In other cases, the placement is based on the logical relationship among the topics. Therefore, the order in which steps are taken in practice is ultimately a matter of professional and scientific judgment based on the given situation. It is recognized that in some instances a selection procedure may be implemented at the same time the validation process is underway.

## *Initiating a Validation Effort*

The researcher works collaboratively with representatives of the organization to define its needs and objectives, identify organizational constraints, plan the research, and communicate with major stakeholders regarding aspects of the process that will involve or influence them.

### *Defining the Organization's Needs, Objectives, and Constraints*

Researchers use their expertise and experience to assist the organization in refining its goals and objectives. Different departments of the organization may have different and sometimes competing and conflicting objectives. For instance, one department may prefer rigorous selection standards even though they create hardships for the staffing department responsible for recruiting qualified applicants. As another example, one organization may need a large number of entry-level workers where there is minimal opportunity to move upward. In another organization, the focus may be on hiring a few individuals with the capacity to move upward in a relatively short period of time. In all situations, the researcher and the organization's representatives should factor in the desires of the various stakeholders and determine the relative weights to be given to each point of view.

The researcher provides accurate information regarding the benefits and limitations of various strategies in meeting the organization's goals based on

past experience and the extant scientific research. The researcher is encouraged to work with all departments (e.g., human resources, labor relations, legal) that may have an effect on or be affected by the selection procedure and stakeholders (e.g., internal or external individuals and groups such as labor organizations, advocacy groups, customers).

***Climate and culture***.  Researchers face the challenge of ensuring high quality selection procedures in the context of the organization's history and current environment regarding employment-related strategies and practices as well as the cultural setting in which it operates.  Organizations operate in complex environments that sometimes place extreme and conflicting pressures on the management team.  Researchers must  consider  the attitudes and commitments of organization leaders and employees who are faced with intense competition, mergers, and other corporate events that may influence the relative importance of selection research in their view.  Researchers also may need to take into account the legal and labor environment when deciding on validation approaches or selection instruments.  In addition, global selection systems should take into consideration locally accepted practices.

***Workforce size and availability***.  The number of individuals who currently perform the work and their similarity to the applicant population can be important considerations when designing the validation strategy.  The number of workers may shape the validation strategy pursued (e.g., validity generalization, content-oriented strategy) as well as affect the feasibility and method for pilot testing procedures.

Even when the number of workers is sufficient, their availability and willingness to participate in a validation study may be limited.  For example, organizational needs may require that a core group of workers be present on the job at all times; labor organizations may influence the number and type of persons willing to participate in the research; and workers who have experienced organizational restructuring may be skeptical about the purpose of the research and its effect on their own positions.

Large discrepancies in the capabilities of incumbents and the available applicant pool also present challenges, particularly in establishing norms and setting cutoff scores.  For example, organizations that have a more capable work force than applicant pool may find cutoff scores based on the performance of incumbents on the selection procedure inappropriate for applicants. Similarly, organizations seeking to upgrade the skills of their current workforce may need other sources of information for setting cutoff scores.

***Sources of information***.  Sources of information needed for the validation and implementation efforts include, but are not limited to, the workers themselves, managers, supervisors, trainers, customers, archival records, databases, and research reports internal and external to the organization. Based on the complexity of the work, the climate, and organizational constraints, some sources of information may be preferred over others.  In some

situations, the preferred source of information may not be available. Depending on the organizational constraints, alternatives to the researcher's preferred source of information may be required. Alternative sources also may be used to supplement information gathered from the preferred source.

*Acceptability of selection procedures*. Most organizations want selection procedures that are predictive, easy to use, cost effective, and legally defensible. However, there are often additional considerations. For example, an organization's past experiences with respect to certain types of selection procedures may influence its decisions. Selection procedures that have been challenged in the past may not be acceptable to organizations, particularly if the organization was not successful in defending them. In addition, selection procedures that are viewed as controversial by individuals, labor organizations, or other stakeholders may not be acceptable.

Some organizations find certain types of selection procedure questions unacceptable. For example, some biodata and personality inventory items (e.g., childhood experiences, personal interests) may be viewed as an invasion of privacy, even if they can be shown to be related to the criterion measures or the requirements of the job.

Some organizations prefer selection procedures that provide information regarding the strengths and developmental needs of the test taker. Procedures that measure constructs that can be learned (e.g., keyboarding or word processing) may be preferred over procedures that elicit information concerning previous life experiences or stable personality traits. Procedures that appear more relevant or face valid to the organization may be more acceptable to the stakeholders than other procedures that relate to a less obvious construct regardless of any empirical evidence of validity. However, face validity is not an acceptable substitute for other forms of validity evidence as treated in the *Principles*. Although acceptability is important, it is just one of many factors to consider when selecting or designing a selection procedure. Nevertheless, the researcher should explain to decision makers issues underlying selection procedure acceptability as part of the initial planning effort.

### Communicating the Validation Plan

Both management and workers need to understand in general terms the purpose of the research, the plan for conducting the research, and their respective roles in the development and validation of the selection procedure. The researcher must use professional judgment in determining the appropriate information to provide and the communication format and style that will be most effective.

Researchers encourage organizations to consider the effects of participation in the validation effort on employees, departments, and business units. Typically, organizations decide that data from validation studies will be kept confidential and not used for subsequent employment-related decisions.

### *Understanding Work and Worker Requirements*

Historically, selection procedures were developed for specific jobs or job families. This remains the case in many situations. However, industries that experience rapid technological development or institute other strategies for accomplishing work may find that traditional jobs no longer exist. In such cases, considering important job requirements for a wider range or type of work activity may be more appropriate.

### *Strategies for Analyzing the Work Domain and Defining Worker Requirements*

The approach, method, and analyses used in a specific study of work is a function of the nature of the work itself, those who perform the work, and the organizational setting in which the work is accomplished. There is no single strategy that must be carried out, and multiple strategies may be appropriate.

There are situations where the importance or relevance of a construct is self-evident and does not require extensive work analysis. For example, absenteeism and turnover and their underlying constructs may be relevant to all work activities in an organization. Therefore, demonstration of their relevance is not typically necessary.

### *Considerations in Specifying the Sampling Plan*

The sampling plan for data collection should take into account the number of workers and their work locations, their characteristics (e.g., amount of experience, training, proficiency, etc.), shift or other work cycles, and other variables that might influence the work analysis.

### *Documentation of the Results*

The methodology, data collection methods, analyses, results, and implications for the validation effort should be documented. Frequently, this documentation will include a description of the major work activities, important worker requirements and their relationships to selection procedure content, and scoring when appropriate. The documentation should provide sufficient detail for another researcher to replicate the work analysis process. The documentation should also help the researcher understand the role of the work analysis as the foundation for any validation efforts.

### *Selecting Assessment Procedures for the Validation Effort*

The researcher exercises professional judgment to determine those selection procedures that should be included in the validation effort. This judgment takes into consideration the organizational needs as well as the issues discussed in this section.

### Review of Research Literature

Researchers should become familiar with research related to the organization's objectives. The research literature is used to inform choices about selection procedures and the validation strategy to be employed.

### Psychometric Considerations

When selecting one or more predictors, a number of psychometric characteristics of each instrument should be considered. Some of the more important psychometric considerations include reliability, evidence supporting the validity of the intended inferences, and differences among subgroups.

When choosing components of a selection battery, the researcher should consider the overall contribution of each component, its relative contribution, and potential construct redundancy and decide how much construct redundancy is desirable given the instruments and the situation.

### Administration and Scoring Considerations

There are practical considerations regarding the consistent administration and scoring of a selection procedure. For example, the researcher must ensure that administration and scoring tasks can be completed consistently across all locations and administrators. To the extent that the selection procedure (e.g., work samples) requires subjective judgments in scoring, issues of rater training and inter-rater reliability become especially important. If standardized conditions are violated in the administration or scoring of a selection procedure, the generalizability of findings may be compromised.

### Format and Medium

Format refers to the design of response requirements for selection procedure items (e.g., multiple-choice, essay). The choice of format may be influenced by the resources available to administer and score the selection procedure. For example, objectively scored items with established correct responses may be administered and scored in less time than selection procedures that require the individual to respond in more complex ways or that use individually judged responses.

Medium refers to the method of delivery of the selection procedure content. For example, a measure of cognitive ability could be presented via paper-and-pencil, computer, video, or orally.

There are advantages and disadvantages in selecting or adapting existing selection procedures from one medium to another. Computer-administered procedures may reduce the demands on administrators and enhance standardization. Computer-administered tests also provide opportunities to measure constructs that do not lend themselves to testing by paper-and-pencil (e.g., use of spreadsheets and database management**).** Research has found that carefully developed computerized versions of cognitive ability

power tests assess the same construct as the paper-and-pencil versions (Mead & Drasgow, 1993).

Changing the medium may also change the construct being measured. For example, converting a paper-and-pencil situational judgment test to a video where the situations will be acted out will reduce the reading component of the test. Also, adapting speeded tests of cognitive ability to a computerized version has been found to alter the construct being measured (Mead & Drasgow, 1993).

A number of considerations are important when evaluating the format and medium options. Cost and efficiency of operation may be the primary concern to the organization. In addition, security, standardization of testing conditions, candidate authentication, and accessibility of testing opportunities are all important considerations. Developers of selection systems should be cognizant that format and medium can affect mean score differences among subgroups (Hough, Oswald, & Ployhart, 2001).

### *Acceptability to the Candidate*

In addition to the organization's needs and objectives, researchers also need to consider the acceptability of the selection procedure to candidates. A number of factors influence candidates' reactions to a selection procedure, including individual characteristics (e.g., work experiences, demographics, and cultural backgrounds), the role of the individual (e.g., applicant, incumbent, manager), the extent to which the content of the selection procedure resembles the work, the individual's capability with respect to the constructs measured, and the perceived passing or selection rate. Generally, the greater the similarity between the selection procedure and the work performed, the greater the acceptability to candidates, management, and other stakeholders. However, selection procedures that closely resemble the work may be perceived as obsolete when the work changes.

Some selection procedures may appear less face valid than other procedures. For example, the value of information collected on biodata forms and personality inventories in predicting job performance may not be obvious to many. Communications regarding the selection procedure, the constructs measured, and the role of incumbents and managers in developing the procedure may improve understanding and acceptance of a selection procedure.

There are situations where some candidates refuse to participate in certain types of selection procedures. It may be useful to consider whether desirable candidates remove themselves from consideration because of the selection procedure. In addition, recruiters sometimes resist or attempt to circumvent the use of selection procedures because it increases the need for additional candidates. Therefore, researchers should consider approaches designed to minimize any negative perception of a selection procedure.

### *Alternate Forms*

Alternate forms of a selection procedure may be needed to reduce practice effects and enhance security. Alternate forms may allow the organization to continue assessment after a security breach; however, researchers may provide information to organizations to help them balance these advantages with the increased costs for development and validation of alternate forms. If alternate forms (including adaptive tests) are developed, care must be taken to ensure that candidate scores are comparable across forms. If alternate forms are used, establishing the equivalence of scores on the different forms is usually necessary. The statistical procedures used in equating studies typically take into account the size and relevant characteristics of the samples, the use of an anchor test or linking test items, and the feasibility of determining equating functions within subgroups.

### *Selecting the Validation Strategy*

Once researchers have worked with the organization to define its objectives for developing a selection procedure, understand the requirements of the work, and reach agreement on the type of selection procedure, researchers must decide what validation strategy or strategies will be pursued to accumulate evidence to support the intended inference. In addition, the strategy selected must be feasible in the organizational context and meet the project goals within the constraints imposed by the situation.

### *Fit to Objectives, Constraints, and Selection Procedures*

In choosing an initial validation strategy, the researcher should consider the fit of the strategy to the organization's objectives and constraints, as well as its fit to the selection procedures planned and the criterion measures. Three examples are provided below to describe possible ways in which validation strategies may be matched to organizational objectives and constraints. In the first scenario, an organization wanting to assemble validity evidence for a small population position may rely upon a validity generalization strategy because extensive cumulative evidence exists for the predictor-criterion relationship in similar situations. In contrast, another organization facing a similar problem that wants to extend a selection procedure from one business unit to another may use a transportability study to establish the validity of the employee selection procedure in another business unit with the same job. Neither option may be available when a position is unique to the organization. Thus, in the third situation, the organization may rely on a content-based validity strategy.

### Individual Assessments

Individual assessment refers to one-on-one evaluations on the basis of a wide range of cognitive and noncognitive measures that are integrated by the assessor, often resulting in a recommendation rather than a selection decision or prediction of a specific level of job performance (Jeanneret & Silzer, 1998). The assessor should have a rationale for the determination and use of the selection procedures. In such instances, the validity of the assessor's clinical judgments is most important to the evaluation of the assessment process. If there are multiple assessors, the consistency of their assessment findings can be valuable to understanding validity and making accurate judgments about the relevant KSAOs. Validation research studies of clinical judgments are clearly an exception rather than the rule (Ryan & Sackett, 1998). However, both validity generalization and content-oriented validation strategies may be appropriate. For example, there may be a wide range of generalizable evidence that has been accumulated by a test publisher or the assessing psychologist demonstrating that a personality scale (e.g., conscientiousness) is predictive of successful managerial performance. Therefore, such a selection procedure would be appropriate for use in an executive assessment protocol. An example of a content-oriented validation approach would be demonstrating the relationship of an in-basket selection procedure that measures planning capability to the planning requirements of an executive position.

### Selecting Criterion Measures

When the source of validity evidence is based on the relationships between predictor scores and other variables (criteria), the nature of the criteria is determined by the proposed uses of the selection procedures and outcomes from the analysis of work and worker requirements. Professional judgment should be exercised in selecting the most appropriate criteria given known organizational constraints and climate.

### Performance-Oriented Criteria

Criteria that are representative of work activities, behaviors, or outcomes usually focus on the job performance of incumbents. Supervisory ratings are the most frequently used criteria, and often they are designed specifically for use in the research study. Other performance information also may be useful (e.g., training program scores, sales, error rates, and productivity indices). Consideration should be given to psychometric factors for all criteria whenever feasible.

### Other Indices

Depending on the objective of the validation effort, indices other than those directly related to task performance may be most appropriate. Exam-

ples include absenteeism, turnover, and other organizational citizenship behaviors. Again, the researcher should be cautious about deficiencies or contaminating factors in such indices.

### *Relevance and Psychometric Considerations*

Criteria are typically expected to represent some construct (often work performance), and the quality of that representation should be established. For example, the fidelity of a work sample used as a criterion should be documented on the basis of the work analysis. Supervisory ratings should be defined and scaled in terms of relevant work activities or situations. All criteria should be representative of important work behaviors, outcomes, or relevant organizational expectations regarding individual employee behavior or team performance.

Criteria should be reliable, and the determination of that reliability may be influenced by the study parameters and organizational constraints. For example, while it may be desirable to have two raters independently evaluate the performance of an employee to determine the inter-rater reliability of the ratings, the work situation and supervisory relationships may preclude such an effort (e.g., there may not be two supervisors knowledgeable about an employee's work). In any circumstance, the researcher should determine what reliability estimates are calculated, how they are obtained, and what levels of reliability are acceptable.

## *Data Collection*

Collection of both predictor and criterion data in a validation study requires careful planning and organizing to ensure complete and accurate data. The standardized conditions under which the validation research is conducted are normally replicated to the extent possible during actual use of the selection procedure. In order to collect accurate and complete information, the test user should consider the following activities.

### *Communications*

Relevant information about the data collection effort should be communicated to all those affected by the effort including management, those who take the test for research purposes, persons who provide criterion data, and those who will use the test. Appropriate communications will facilitate the data collection and encourage all involved to provide accurate and complete information. The kind of information shared depends on the needs of the organization and the individuals involved. For example, participants in the validation research will want to know how their test results will be used and who will have access to the results. Supervisors who provide criterion ratings and others who provide archival criterion data will want to know the logistics of data collection, ultimate use, and provisions for confidentiality.

End users, such as the staffing organization or the client organization employing individuals who were screened with the selection procedures, should have an overview of the study. When feasible, anticipated uses of job analysis, test, and criterion data should be shared with those who generated it.

### Pilot Testing

The researcher should determine the extent to which pilot testing is necessary or useful. Previous experience with specific selection procedures may reduce or eliminate this need. Availability of test takers and opportunities to conduct pilot testing may be influenced by various organizational constraints.

### Match Between Data Collection and Implementation Expectations

Selection procedures should be administered in the same way that they will be administered in actual use. For example, if interviewers are provided face-to-face training in the validation study, similar training should be provided in actual use. Instructions and answers to candidate questions should be as similar as possible during validation and implementation.

### Confidentiality

Confidentiality is an ethical responsibility of the researcher. It is also a major concern to all those involved in the research. Those who provide is information, performance ratings, or content validity linkages may be more willing to provide accurate information if they are assured of the confidentiality of their individual contributions. Participants in validation research studies should be given confidentiality unless there are persuasive reasons to proceed otherwise.

The researcher should carefully decide what level of anonymity or confidentiality can be established and maintain it throughout the study. The researcher provides the maximum confidentiality feasible in the collection and storage of data, recognizing that identifying information of some type is often required to link data collected at different times or by different individuals. Web-based data collection presents additional confidentiality challenges.

### Quality Control and Security

The test user should employ data collection techniques that are designed to enhance the accuracy and security of the data and test materials. Public disclosure of the content and scoring of most selection procedures should be recognized as a potentially serious threat to their reliability, validity, and subsequent use. All data should be retained at a level of security that permits access only for those with a need to know.

## Data Analyses

A wide variety of data may be collected and analyzed throughout the course of a validation study. The responsibilities and supervision of the people who conduct data analyses should be commensurate with their capabilities and relevant experience.

### Data Accuracy

All data should be checked for accuracy. Checks for data accuracy typically include verification that scores are within the possible ranges and that no apparent falsification of responses occurred.

### Missing Data/Outliers

Often, one or more data points are missing, and/or outliers exist in the data set. Because these circumstances are typically unique to the validation effort underway, establishing hard-and-fast rules is not possible. Instead, the researcher must examine each situation on its own merits and follow a strategy based on professional judgment. Researchers should document the rationale for treating missing data and/or outliers so their work can be replicated. If imputation techniques are used to estimate missing data, such techniques and their underlying assumptions should be documented clearly.

### Descriptive Statistics

Most data analyses will begin with descriptive statistics that present analyses of frequencies, central tendencies, and variances. Such descriptions should be provided for the total group and for relevant subgroups if they are large enough to yield reasonably reliable statistics.

### Appropriate Analyses

Data analyses should be appropriate for the method or strategy undertaken. Data are frequently collected as part of the analysis of work and during the validation effort itself. Data analytic methods used also should be appropriate for the nature of the data (e.g., nominal, ordinal, interval, ratio), sample sizes, and other considerations that will lead to correct inferences regarding the data sets.

### Differential Prediction

Organizations vary in their goals, and competing interests within the organization are not unusual. Efforts to reduce differences for one subgroup may increase differences for another. Given the difficulty in reconciling different interests in the case of substantial over- or underprediction, researchers oftentimes consider the effects of the prediction errors and their relationship to organizational goals.

A finding of predictive bias does not necessarily prevent the operational use of a selection procedure. For example, if the study is based upon an extremely large sample, a finding of a small but statistically significant differential prediction may have little practical effect. In general, the finding of concern would be evidence of substantial underprediction of performance in the subgroup of interest. Such a finding would generally preclude operational use of the predictor and would likely lead to additional research and considerations of modifying or replacing the selection procedure.

Absent a finding of substantial underprediction, a reasonable course of action for some organizations would be to recommend uniform operational use of the predictor for all groups. However, a large amount of overprediction may also lead to a consideration of alternate selection procedures.

### Combining Selection Procedures Into an Assessment Battery

The researcher must exercise professional judgment regarding the outcomes of the validation effort to determine those predictors that should be included in the final selection procedure and the method of combination (including predictor weighting) that will meet the goals of the organization. The algorithm for combining the selection procedures and the rationale for the algorithm should be described. When combining predictors, the validity of the inferences resulting from the composite is of primary importance.

### Multiple Hurdles Versus Compensatory Models

Taking into account the purpose of the assessment and the outcomes of the validity study, the researcher must decide whether candidates are required to score above a specific level on each of several assessments (multiple hurdles) or achieve a specific total score across all assessments (compensatory model). There are no absolutes regarding which model should be implemented, and at times a hurdle may be most appropriate for one predictor, while a compensatory model may be best for other predictors within the overall selection procedure. The rationale and supporting evidence should be presented for the model recommended for assessment scoring and interpretation. Researchers should be aware that the method of combining test scores might affect the overall reliability of the entire selection process and the subgroup passing rates (Sackett & Roth, 1996).

### Cutoff Scores Versus Rank Orders

Two frequently implemented selection decision strategies are selection based on a cutoff score or selection of candidates in a top-down order. There is no single method for establishing cutoff scores. If based on valid predictors demonstrating linearity or monotonicity throughout the range of prediction, cutoff scores may be set as high or as low as needed to meet the requirements of the organization. Additionally, given monotonicity, selecting the

top scorers in top-down order maximizes estimated performance on the criterion measure if there is an appropriate amount of variance in the predictor. Where there is an indication of nonmonotonicity, this finding should be taken into consideration in determining how to use selection procedure scores.

Given the unitary concept of validity and the underlying premise (based on empirical evidence) that inferences regarding predictors of a cognitive nature and performance criteria are linear (Coward & Sackett, 1990), cognitively based selection techniques developed by content-oriented procedures and differentiating adequately within the range of interest can usually be assumed to have a linear relationship to job behavior. Such content-oriented procedures support rank ordering and setting the cutoff score as high or as low as necessary. Research has not yet established whether this same set of premises holds true for other types of predictors (e.g., personality inventories, interest inventories, indices of values).

Professional judgment is necessary in setting any cutoff score and typically is based on a rationale that may include such factors as estimated cost-benefit ratio, number of vacancies and selection ratio, expectancy of success versus failure, the consequences of failure on the job, performance and diversity goals of the organization, or judgments as to the knowledge, skill, ability, or other characteristics required by the work. When cutoff scores are used as a basis for rejecting applicants, the researcher should document their rationale or justification.

Cutoff scores are different from critical scores in that a cutoff score defines a point on a selection procedure score distribution below which candidates are rejected, while a critical score defines a specified point on a distribution of selection procedure scores above which candidates are considered successful. Critical scores are criterion referenced and may be useful for implementing a certain type of selection procedure (e.g., certification exam), but are not appropriate when no absolute minimum on the selection procedure score distribution can be discerned (e.g., cognitive ability or aptitude test).

When researchers make recommendations concerning the use of a rank ordering method or a cutoff score, the recommendation often takes into account the labor market, the consequences of errors in prediction, the level of a KSAO represented by a chosen cutoff score, the utility of the selection procedure, resources needed to monitor and maintain a list of qualified candidates, and other relevant factors. The goals of the organization may favor a particular alternative. For example, some organizations decide to use a cutoff score rather than rank ordering to increase workforce diversity, recognizing that a reduction also may occur in job performance and utility. Whatever the decision, the researcher should document the rationale for it.

### Bands

Bands are ranges of selection procedure scores in which candidates are treated alike. The implementation of a banding procedure makes use of cut scores, and there are a variety of methods for determining bands (Cascio, Outtz, Zedeck, & Goldstein, 1991; Campion et al., 2001).

Bands may be created for a variety of administrative or organizational purposes; they also may be formed to take into account the imprecision of selection procedure scores and their inferences. However, because bands group candidates who have different selection procedure scores, predictions of expected criterion outcomes are less precise. Thus, banding will necessarily yield lower expected criterion outcomes and selection utility (with regard to the criterion outcomes predicted by the selection procedure) than will top-down, rank order selection. On the other hand, the lowered expected criterion outcomes and selection utility may be balanced by benefits such as administrative ease and the possibility of increased workforce diversity, depending on how within-band selection decisions are made. If a banding procedure is implemented, the basis for its development and the decision rules to be followed in its administration should be clearly documented.

### Norms

Normative information relevant to the applicant pool and the incumbent population should be presented when appropriate. The normative group should be described in terms of its relevant demographic and occupational characteristics and presented for subgroups with adequate sample sizes. The time frame in which the normative results were established should be stated.

### Communicating the Effectiveness of Selection Procedures

Two potentially effective methods for communicating the effectiveness of selection procedures are expectancy analyses and utility estimates.

***Expectancies and practical value.*** Expectancy charts may assist in understanding the relationship between a selection procedure score and work performance. Further, information in the Taylor-Russell Tables (Taylor & Russell, 1939) identifies what proportions of hired candidates will be successful under different combinations of test validity (expressed as correlation coefficients), selection ratios, and percentages of current employees that are satisfactory performers.

***Utility.*** Projected productivity gains or utility estimates for each employee and the organization due to use of the selection procedure may be relevant in assessing its practical value. Utility estimates also may be used to compare the relative value of alternative selection procedures. The literature regarding the impact of selection tests on employee productivity has provided several means to estimate utility (Brogden, 1949; Cascio, 2000**;** Cronbach & Gleser, 1965; Hunter, Schmidt, & Judiesch, 1990; Naylor & Shine,

1965; Raju, Burke, & Normand, 1990; Schmidt, Hunter, McKenzie, & Muldrow, 1979). Some of these express utility in terms of reductions in some outcome of interest (e.g., reduction in accidents, reduction in person-hours needed to accomplish a body of work). Others express utility in dollar terms, with the dollar value obtained via a regression equation incorporating a number of parameters, such as the increment in validity over current practices and the dollar value of a standard deviation of performance. Still others express utility in terms of percentage increases in output due to improved selection. The values for terms in these models are often estimated with some uncertainty, and thus the result is a projection of gains to be realized if all of the model assumptions hold true. Often researchers do not conduct follow-up studies to determine whether projected gains are, in fact, realized. Under such circumstances, the results of utility analyses should be identified as estimates based on a set of assumptions, and minimal and maximal point estimates of utility should be presented when appropriate to reflect the uncertainty in estimating various parameters in the utility model.

## *Appropriate Use of Selection Procedures*

Inferences from selection procedure scores are validated for use in a prescribed manner for specific purposes. To the extent that a use deviates from either the prescribed procedures or the intended purpose, the inference of validity for the selection procedure is likely to be affected.

### *Combining Selection Procedures*

Personnel decisions are often made on the basis of information from a combination of selection procedures. The individual components as well as the combination should be based upon evidence of validity. Changes in the components or the mix of components typically require the accumulation of additional evidence to support the validity of inferences for the altered procedure. When a multiple hurdle approach is employed, the original validation data may be relied on for those components that remain intact. However, the effectiveness of the selection procedure as a whole may be reduced as a result of the introduction of a predictor of unknown quality.

When a compensatory approach is used, the addition or deletion of a selection procedure component can fundamentally change the inferences that may be supported. Under these circumstances, the original validation evidence may not be sufficient when there are alterations to the selection procedures that are not supported by a follow-up validation effort.

### *Using Selection Procedures for Other Purposes*

The selection procedure should be used only for the purposes for which there is validity evidence. For example, diagnostic use of a selection procedure that has not been validated in a way to yield such information should be avoided. Likewise, the use of a selection procedure designed for an educa-

tional environment cannot be justified for the purpose of predicting success in employment settings unless the education tasks and the work performed in the validation research or their underlying requirements are closely related, or unless the relevant research literature supports this generalization.

## *Recommendations*

The recommendations based on the results of a validation effort should be consistent with the objectives of the research, the data analyses performed, and the researcher's professional judgment and ethical responsibilities. The recommended use should be consistent with the procedures used in, and the outcomes from, the validation research including the validity evidence for each selection procedure or composite score and the integration of information from multiple sources. In addition, the researcher typically considers the cost, labor market, and performance expectations of the organization, particularly when choosing a strategy to determine who is selected by the procedure. Tight labor markets may necessitate acceptance of a lower score on the selection procedure. Also, the organization's expectations regarding work force diversity may influence the use of test information for that organization.

## *Technical Validation Report*

Reports of validation efforts should include enough detail to enable a researcher competent in personnel selection to know what was done, to draw independent conclusions in evaluating the research, and to replicate the study. The reports must accurately portray the findings, as well as the interpretations of and decisions based on the results. Research findings that may qualify the conclusions or the generalizability of results should be reported. The following information should be included:

### Identifying Information

The report should include the author(s), dates of the study, and other information that would permit another researcher to understand who conducted the original research.

### Statement of Purpose

The purpose of the validation research should be stated in the report.

### Analysis of Work

The report should contain a description of the analysis of work, including procedures employed, the participants in the process, data analyses, and results.

### Search for Alternative Selection Procedures

The researcher should document any search for selection procedures (including alternate combinations of these procedures) that are substantially equally valid and reduce subgroup differences.

### Selection Procedures

Names, editions, and forms of selection procedures purchased from publishers should be provided as well as descriptions and, if appropriate, sample items. When proprietary tests are developed, the researcher should include a description of the items, the construct(s) that are measured, and sample items, if appropriate. Typically, copies of tests or scoring procedures should not be included in technical reports or administration manuals in order to protect the confidentiality of operational items. The rationale for the use of each procedure and basic descriptive statistics, including appropriate reliability estimates for the sample in the research study when feasible, also should be included. If raters are an integral part of the selection procedure (as in some work samples), the reliability of their ratings should be determined and documented.

### Relationship to Work Requirements

The report should provide a description of the methods used by the researcher to determine that the selection procedure is significantly related to a criterion measure or representative of a job content domain. Establishing the relationship of a selection procedure to job content is particularly important when conducting a job content validation study.

### Criterion Measures (When Applicable)

A description of the criterion measures, the rationale for their use, the data collection procedures, and a discussion of their relevance, reliability, possible deficiency, freedom from contamination, and freedom from or control of bias should be provided in detail.

### Research Sample

The sampling procedure and the characteristics of the research sample relative to the interpretation of the results should be described. The description should include a definition of the population that the sample is designed to represent, sampling biases that may detract from the representativeness of the sample, and the significance of any deviations from representativeness for the interpretation of the results. Data regarding restriction in the range of scores on predictors or criterion measures are especially important. When a transportability study is conducted to support the use of a particular selection procedure, the relationship between the original validation research sample and the population for which the use of the selection procedure is proposed should be included in the technical report.

### Results

All summary statistics that relate to the conclusions drawn by the researcher and the recommendations for use should be included. Tables should present complete data, not just significant or positive results. The sample size, means, standard deviations, and intercorrelations of variables measured and other information useful to the interpretation of the results should be presented and clearly labeled. Both uncorrected and corrected values should be presented when corrections are made for statistical artifacts such as restriction of range or unreliability of the criterion.

### Scoring and Transformation of Raw Scores

Methods used to score items and tasks should be fully described. When performance tasks, work samples, or other methods requiring some element of judgment are used, a description of the type of rater training conducted and scoring criteria should be provided.

Derived scales used for reporting scores and their rationale should be described in detail in the research report or administration manual. Whether using derived scores or locally produced labels (such as "qualified," "marginal," or "unqualified"), the researcher should clearly describe the logical and psychometric foundations.

### Normative Information

Parameters for normative data provide researchers and users with information that guides relevant interpretations. Such parameters often include demographic and occupational characteristics of the normative sample, time frame of the data collection, and status of test takers (e.g., applicants, incumbents, college students).

When normative information is presented, it should include measures of central tendency and variability and should clearly describe the normative data (e.g., percentiles, standard scores). Norm tables usually report the percent passing at specific scores and may be useful in determining the effects of a cutoff score. Expectancy tables indicate the proportion of a specific sample of candidates who reach a specified level of success and are often used to guide implementation decisions.

### Recommendations

The recommendations for implementation and the rationale supporting them (e.g., the use of rank ordering, score bands, or cutoff scores, and the means of combining information in making personnel decisions) should be provided. Because implementation rules like those applied to cutoff scores sometimes do change, subsequent modifications should be documented and placed in an addendum to the research report or administration manual.

### Caution Regarding Interpretations

Research reports and/or administration manuals should help readers make appropriate interpretations of data and should warn them against common misuses of information.

### References

There should be complete references for all published literature and available technical reports cited in the report. Technical reports completed for private organizations are often considered proprietary and confidential, and the researcher cannot violate the limitations imposed by the organization. Consequently, some technical reports that may have been used by the researcher are not generally available.

## Administration Guide

The term "test administrator" refers to those individuals responsible for day-to-day activities such as scheduling testing sessions, administering the selection procedure, scoring the procedure, maintaining the databases, and reporting scores or results.

An administration guide should document completely the information needed to administer the selection procedure, score it, and interpret the score. When the selection procedure is computer-based or in a format other than paper-and-pencil, the administration guide should also include detailed instructions on the special conditions of administration. While this document is sometimes a part of a technical report, it is often separate so that confidential information in the validity study is protected and administrators are provided with only the information needed to administer the selection procedure. In other situations, the test user will write parts of the administration guide since the researcher may not know the organization's specific policies or the details of its implementation strategies. In deciding whether two separate documents are needed, the researcher should consider access to each document, the sensitivity of information to be included, the purpose of each document, and the intended audience.

Administration guides developed by a publisher are often supplemented with addenda that cover local decisions made by the user organization. Consequently, not all the information listed below will be found in every administration guide from a publisher. However, the researcher in the user organization should try to provide answers or guidance for the issues raised.

The information developed for users or examinees should be accurate and complete for its purposes and should not be misleading. Communications regarding selection procedures should be stated as clearly and accurately as possible so that readers know how to carry out their responsibilities competently. The writing style of all informational material should be writ-

ten to meet the needs of the likely audience. Normally, the following information should be included in an administration guide.

### *Introduction and Overview*

This section of the report should inform the reader of the purpose of the assessment procedure and provide an overview of the research that supports the use of the procedure. The introduction should explain why the organization uses formal, validated selection procedures, the benefits of professionally developed selection procedures, the importance of security, and the organization's expectations regarding the consistency of their use. Care must be taken in preparing such documents to avoid giving the reader an impression that an assessment program is more useful than is really the case.

### *Contact Information*

The administration guide should provide information about whom to contact if there are questions or unanticipated problems associated with the selection procedure.

### *Selection Procedures*

The selection procedure should be thoroughly described. Names, editions, and forms of published procedures as well as information for ordering materials and ensuring their security should be provided. Although entire tests are not usually included in administration guides for security reasons, sample items are helpful. When proprietary tests are developed, the researcher should include a description of the items, the construct(s) that are measured, and sample items.

### *Applicability*

The description of the selection procedure should indicate to whom the procedure is applicable (e.g., candidates for "x" job) and state any exceptions (e.g., exemptions for job incumbents) to test requirements. It may also be useful to indicate that use of a selection procedure is based on one or more validation efforts that focused on specific jobs/job requirements and that these efforts define the boundaries of any test applications. If the organization has rules about when tests are administered, these rules must be clearly stated in the administration guide used by the organization. For example, some organizations only administer a selection procedure when there is a job vacancy. Other organizations may administer selection procedures periodically in order to build pools of qualified candidates.

### Administrators

The administration guide should state the necessary qualifications of administrators and the training required to administer selection procedures in general, as well as the specific selection procedure described in the administration guide. Administrators should receive training in the administration of selection procedures. Administrators must understand that failure to follow standardized protocol may render the research results and operational scores irrelevant to some degree. The researcher must be both insistent and persuasive to gain understanding with regard to both the nature of and the need for standardized administration of tests or other procedures. Periodic retraining may be needed to reinforce the administration rules. Observational checks or other quality control mechanisms should be built into the test administration system to ensure accurate and consistent administration.

### Information Provided to Candidates

Many organizations use test brochures or test orientation materials to inform candidates about the employee selection process. Some organizations also provide informational sessions prior to the administration of a selection procedure. When appropriate, the researcher should consider providing candidates with clearly written, uniform information about the selection procedure such as the purpose, administrative procedures, completion strategies, time management, feedback, confidentiality, process for requesting accommodation for disability, and other relevant user policies. Whenever possible, both the content and the process for orienting candidates should be standardized. The administration guide should describe these materials and provide information on how the administrator may obtain them. The rules for distribution should be explicitly stated in order to facilitate consistent treatment of candidates.

### Guidelines for Administration of Selection Procedures

The researcher should use the administration guide as an opportunity to convey the organization's requirements for selection procedure administration. In addition to detailed instructions regarding the actual administration of the selection procedure, the administration guide often includes rules and tips for providing an appropriate testing environment as well as ensuring the candidate's identity.

For security reasons, the identity of all candidates should be confirmed prior to administration. Administrators should monitor the administration to control possible disruptions, protect the security of test materials, and prevent collaborative efforts by candidates. The security provisions, like other aspects of the *Principles,* apply equally to computer and Internet-administered sessions.

### Administration Environment

There are a number of factors that potentially affect test administration: appropriate workspace, adequate lighting, and a quiet, comfortable setting, free of distractions. The researcher should consider these conditions and their potential effects on test performance. At a minimum, selection procedure administration should be in an environment that is responsive to candidates' concerns about the selection procedures and maintains their dignity.

### Scoring Instructions and Interpretation Guidelines

The researcher should provide the selection procedure administrator or user with details on how the selection procedure is to be scored and how results should be interpreted. The administration guide should help readers make appropriate interpretations of data and warn them against common misuses of information.

Processes that will ensure accuracy in scoring, checking, and recording results should be used. This principle applies to the researcher and to any agent to whom this responsibility has been delegated. The responsibility cannot be abrogated by purchasing services from an outside scoring service. Quality control checks should be implemented to ensure accurate scoring and recording.

Instructions for scoring by the user should be presented in the administration guide in detail to reduce clerical errors in scoring and to increase the reliability of any judgments required. Distinctions among constructs should be described to support the accuracy of scoring judgments. Scoring keys should not be included in technical reports or administration manuals and should be made available only to persons who score or scale responses.

If Computer-Based Test Interpretation (CBTI) is used to process responses to a selection procedure, the researcher should provide detailed instructions on how the CBTI is to be used in decision making.

### Test Score Databases

Organizations should decide what records of assessment administrations and scores are to be maintained and should provide detailed information (or reference detailed information) regarding record keeping and databases. In addition, policies on the retention of records (e.g., duration, security, accessibility, etc.) and the use of archival data over time should be established and communicated. Raw scores should be kept because data reported in derived scales may limit further research. Databases should be maintained for sufficient time periods to support periodic audits of the selection process.

### Reporting and Using Selection Procedure Scores

The researcher must communicate how selection procedure scores are to be reported and used. Results should be reported in language likely to be

interpreted correctly by persons who receive them. The administration guide should also indicate who has access to selection procedure scores.

Administrators should be cautioned about using selection procedure information for uses other than those intended. For example, although selection procedure data may have some validity in determining later retention decisions, more potentially relevant measures such as performance ratings may be available. Furthermore, if the pattern of selection procedure scores is used to make differential job assignments, evidence is required demonstrating that the scores are linked to, or predictive of, different performance levels in the various assignments of job groupings.

### Candidate Feedback

In addition to reporting selection procedure scores to others within the organization, the researcher should include information on how to provide feedback to candidates, if such feedback is feasible or appropriate. Feedback should be provided in clear language that is understandable by candidates receiving the feedback, and should not violate the security of the test or its scoring.

### Nonstandard Administrations (See Also Candidates With Disabilities)

The administration guide should cover nonstandard selection procedure administrations. Such administrations encompass not only accommodated selection procedure sessions, but also sessions that were disrupted (e.g., power failures, local emergency, and illness of a candidate), involved errors (e.g., questions and answer sheet did not match, timing mistake), or were nonstandard in some other way.

The administration guide should establish a clear process to document and explain any modifications of selection procedures, disruptions in administration, or any other deviation from established procedures in the administration, scoring, or handling of scores. While it is impossible to predict all possible occurrences, the researcher should communicate general principles for how deviations from normal procedures are to be handled.

### Reassessing Candidates

Generally, employers should provide opportunities for reassessment and reconsidering candidates whenever technically and administratively feasible. In some situations, as in one-time examinations, reassessment may not be a viable option. In order to facilitate consistency of treatment, the administration guide should clearly explain whether candidates may be reassessed and how reassessment will take place. In some organizations, specific time intervals must elapse. In others, although difficult to evaluate, significant developmental activities must have occurred prior to reassessment.

### Corrective Reassessment

Users in conjunction with researchers should consider when corrective reassessment is appropriate. Critical errors on the part of the administrator (e.g., timing mistakes, use of nonmatching selection procedure booklet and answer sheet) and extraordinary disturbances (e.g., fire alarm, acutely ill assessee) are usually justifications for reassessment. The administration guide should cover procedures and guidelines for granting corrective reassessment and documenting all requests.

### Security of the Selection Procedure

Selection procedure items that are widely known (through study, coaching, or other means) in an organization are usually less effective in differentiating among candidates on relevant constructs. Maintenance of test security therefore limits the type and amount of feedback provided to candidates. The more detail on candidate responses provided, the greater the security risk. The administration guide should emphasize the importance of safeguarding the content, scoring, and validity of the selection procedure.

Selection procedures usually represent a significant investment on the part of the organization for development and validation. The administration guide should point out the value of the selection procedure itself and the cost of compromised selection procedures in terms of the additional research required and the possibility of a less capable candidate being hired.

Practices for ensuring the security of selection procedure documents (e.g., numbering test booklets and maintaining records of the numbers; keeping used and unused selection procedures in a secure, locked facility; collecting scratch paper after administration sessions) and selection procedure scoring should be communicated.

Selection procedure scores must be kept secure and should be released only to those who have a need to know and who are qualified to interpret them. Special practices may be required to protect confidential materials and selection procedure information that exist in electronic forms. Although security practices may be difficult to apply in the case of employment interviews, the importance of security as a means of preserving their standardization and validity should be considered. Organizations are encouraged to develop policies that specify the length of time that confidential information is retained. When confidential information is destroyed, the user should consider ways of maintaining its security such as having selection personnel supervise the destruction of the documents.

### References

When other useful documents are mentioned, they should be referenced fully. When the documents are internal publications, the means of acquiring those documents should be described.

## Other Circumstances Regarding the Validation Effort and Use of Selection Procedures

### Influence of Changes in Organizational Demands

Because organizations and their work forces are dynamic in nature, changes in organizational functioning may occur and subsequent selection procedure modifications may be necessary. Changing work requirements may lead to adjustments in cutoff scores or the introduction of a new assessment; both would require further study of the existing selection procedure. If advised of such circumstances, the researcher should examine each situation on its own merits and make recommendations regarding the impact of organizational change on the validation and use of any selection procedure.

### Review of Validation and Need for Updating the Validation Effort

Researchers should develop strategies to anticipate that the validity of inferences for a selection procedure used in a particular situation may change over time. Such changes may occur because of changes in the work itself, worker requirements, or work setting. Users (either on their own or with researcher assistance) of a selection procedure should periodically review the operational use of the assessment instrument and the data at hand (including timeliness of normative data if appropriate) to determine if additional research is needed to support the continued use of the selection procedure. When needed, the research should be brought up to date and reported. The technical or administration guides should be revised (or an addendum added) if changes in research data or use of procedures make any statement or instruction incorrect or misleading.

### Candidates With Disabilities

Assessing candidates with disabilities may require special accommodations that deviate from standardized procedures. Accommodations are made to minimize the impact of a known disability that is not relevant to the construct being assessed. For example, an individual's upper extremity motor impairment may affect a score on a measure of cognitive ability although the motor impairment is not related to the individual's cognitive ability. Accommodations may include, but are not limited to, modifications to the environment (e.g., high desks), medium (e.g., Braille, reader), time limit, or content. Combinations of accommodations may be required to make valid inferences regarding the candidate's ability on the construct(s) of interest.

Professional judgment is required on the part of the user and the developer regarding the type or types of accommodations that have the least negative impact on the validity of the inferences made from the selection procedure scores. Empirical research is usually lacking on the effect of given

accommodations on selection procedure performance for candidates with different disabilities or varying magnitudes of the same disability.

### *Responsibilities of the Selection Procedure Developers, Researchers, and Users*

Researchers and individuals charged with approving the accommodation for an organization should be knowledgeable about the availability of modified forms of the selection procedure, psychometric theory, and the likely effect of the disability on selection procedure performance. Users may choose to modify the original selection procedure, develop a modified procedure for candidates with disabilities, or waive the selection procedure altogether and use other information regarding the candidate's job-related knowledge, skills, abilities or other characteristics. While empirical research to demonstrate comparability between the original procedure and the modified procedure may not be feasible in most instances, the individuals developing the modifications should make attempts when possible to limit the modifications, consistent with legal responsibility, to those that allow, insofar as is possible, the comparability of procedures.

*Development and validation*. Although most employers have too few cases for extensive research, the principles set forth in this document in the preparation of modified selection procedures for candidates with disabilities should be followed to the extent possible. Modified procedures should be pilot-tested with candidates whose disabilities resemble those of the target population when possible and feasible. Practical limitations such as small sample size often restrict the ability of the researcher to statistically equate modified versions of the selection procedure to the original form. These considerations also limit efforts to establish the reliability of the scores and the validity of the inferences made from these scores. Nevertheless, the reliability of selection procedure scores and the validity of inferences based on these scores should be determined whenever possible. In the rare case when it is possible, the effects of administration of the original form of the selection procedure to candidates with disabilities also should be explored.

*Documentation and communications regarding accommodations.* Descriptions of the modifications made, the psychometric characteristics of the modified selection procedures, and the performance of candidates with disabilities on the original form of the procedure, if available, should be included in the documentation. In addition, selection procedure users should always document the modifications and conditions under which the procedure was administered and keep that information secure and separate from the assessment data in the organization's records. Legal considerations may prohibit giving decision makers information on whether a candidate's score was earned with a selection procedure accommodation and the nature of the modification. However, users may designate those scores earned with an accommodation in such a way to permit special handling in data analysis.

***Selection procedure modification.***  The test user should take steps to ensure that a candidate's score on the selection procedure accurately reflects the candidate's ability rather than construct-irrelevant disabilities.  One of these steps is a dialog with the candidate with the disability about the accommodations possible.  In some cases, the construct being assessed cannot be differentiated from the disability (e.g., proofreading test taken by a sight-impaired candidate).  Other times, the disability does not affect selection procedure performance and no accommodation is necessary.  Components of a selection procedure battery should be considered separately in determinations of modifications.  To the extent possible, standardized features of administration should be retained in order to maximize comparability among scores.  Approval of prespecified, routine accommodations not expected to affect the psychometric interpretation of the selection procedure scores (e.g., adjusting table height) may be delegated to administrators.

***Maintaining consistency with assessment use in the organization.***  The selection procedures used when assessing candidates with disabilities should resemble as closely as possible the selection procedures used for other candidates.  The selection procedures are developed for the purpose of making selection decisions, not for the purpose of assessing the extent of a candidate's disability.  The addition of a procedure designed to assess the existence or degree of a disability is inappropriate as a selection tool.

# References

Aamodt, M. G., & Kimbrough, W. W. (1985). Comparison of four methods for weighting multiple predictors. *Educational and Psychological Measurement, 45,* 477–482.

Ackerman, P. J., & Humphreys, L. G. (1990). Individual differences theory in industrial and organizational psychology. In M. D. Dunnette & L. M. Hough (Eds.), *Handbook of industrial and organizational psychology* (Vol. 1). Palo Alto, CA: Consulting Psychologists Press.

Aguinis, H. (1995). Statistical power problems with moderated multiple regression in management research. *Journal of Management, 21,* 1141–1158.

Aguinis, H., Petersen, S. A., & Pierce, C. A. (1999). Appraisal of the homogeneity of error variance assumption and alternatives to multiple regression for estimating moderating effects of categorical variables. *Organizational Research Methods, 2,* 315–339.

Aguinis, H., & Pierce, C. A. (1998). Testing moderator variable hypotheses meta-analytically. *Journal of Management*, *24*, 577–592.

Aguinis, H., & Stone-Romero, E. F. (1997). Methodological artifacts in moderated multiple regression and their effects on statistical power. *Journal of Applied Psychology, 82*, 192–206.

Alexander, R. A., & DeShon, R. P. (1994). The effect of error variance heterogeneity on the power of tests for regression slope differences. *Psychological Bulletin*, *115*, 308–314.

American Educational Research Association, American Psychological Association, and National Council for Measurement in Education (1999). *Standards for educational and psychological testing.* Washington, DC: American Educational Research Association.

American Psychological Assocation (2003). Guidelines on multicultural education, training, research, practice, and organizational change for psychologists. *American Psychologist, 58*(5), 337–402.

Barrett, G. V., Phillips, J. S., & Alexander, R. A. (1981). Concurrent and predictive validity designs: A critical reanalysis. *Journal of Applied Psychology, 66,* 1–6.

Barrick, M. R., & Mount, M. K. (1991). The Big Five personality dimensions and job performance: A meta-analysis. *Personnel Psychology*, *44*, 1–26.

Bartlett, C. J., Bobko, P., Mosier, S. B., & Hannan, R. (1978). Testing for fairness with a moderated multiple regression strategy: An alternative to differential analysis. *Personnel Psychology*, *31*, 233–242.

Bemis, S. E. (1968). Occupational validity of the General Aptitude Test Battery. *Journal of Applied Psychology, 52,* 240–249.

Bobko, P., & Riecke, A. (1980). Large sample estimates for standard errors of functions of correlation coefficients. *Applied Psychological Measurement, 4*, 385–398.

Bobko, P., & Stone-Romero, E. (1998). Meta-analysis is another useful research tool but it is not a panacea. In G. Ferris (Ed.), *Research in personnel and human resources management*, Vol. 16, pp. 359–397, Greenwich, CT: JAI Press.

Brogden, H. E. (1949). When testing pays off. *Personnel Psychology, 2,* 171–183.

Callender, J. C., & Osburn, H. G. (1980). Development and testing of a new model of validity generalization. *Journal of Applied Psychology*, *65,* 543–558.

Callender, J. C., & Osburn, H. G. (1981). Testing the constancy of validity with computer-generated sampling distributions of the multiplicative model variance method estimate: Results for petroleum industry validation research. *Journal of Applied Psychology, 66,* 274–281.

Campion, M. A., Outtz, J. L., Zedeck, S., Schmidt, F. L., Kehoe, J. F., Murphy, K. R., & Guion, R. M. (2001). The controversy over score banding in personnel selection: Answers to 10 key questions. *Personnel Psychology, 54*(1)*,* 149–185.

Cascio, W. F. (2000*). Costing human resources: The financial impact of behavior in organizations* (4th ed.). Cincinnati, OH: Southwestern.

Cascio, W. F., Outtz, J., Zedeck, S., & Goldstein, I. L. (1991). Statistical implications of six methods of test score use in personnel selection. *Human Performance*, *4,* 233–264.

Cleary, T. A. (1968). Test bias: Prediction of grades of negro and white students in integrated colleges. *Journal of Educational Measurement, 5,* 115–124.

Coward, W. M., & Sackett, P. R. (1990). Linearity of ability-performance relationships: A reconfirmation. *Journal of Applied Psychology, 75,* 297–300.

Cronbach, L. J., & Gleser, G. C. (1965). *Psychological tests and personnel decisions* (2nd ed.) Urbana: University of Illinois Press.

DeShon, R. P., & Alexander, R. A. (1996). Alternative procedures for testing regression slope homogeneity when group error variances are unequal. *Psychological Methods, 1,* 261–277.

Goldstein, I. L., Zedeck, S., & Schneider, B. (1993). An exploration of the job-analysis-content validity process. In N. Schmitt and W. Borman (Eds.), *Personnel selection in organizations*. San Francisco: Jossey-Bass.

Guion, R. M. (1998). *Assessment, measurement, and prediction for personnel decisions.* Mahwah, NJ: Lawrence Erlbaum.

Gulliksen, H., & Wilks, S. S. (1950). Regression tests for several samples. *Psychometrika, 15,* 91–114.

Hartigan, J. A., & Wigdor, A. K. (Eds.) (1989). *Fairness in employment testing*. Washington, DC: National Academy Press.

Hough, L. M., Oswald, F. L., & Ployhart, R. E. (2001). Determinants, detection, and amelioration of adverse impact in personnel selection procedures: Issues, evidence, and lessons learned. *International Journal of Selection and Assessment*, *9,* 1–42.

Humphreys, L. G. (1952). Individual differences. *Annual Review of Psychology, 3,* 131–150.

Hunter, J. E., & Hunter, R. F. (1984). Validity and utility of alternative predictors of job performance. *Psychological Bulletin, 96,* 72–88.

Hunter, J. E., & Schmidt, F. L. (1996). Measurement error in psychological research: Lessons from 26 research scenarios. *Psychological Methods, 1,* 199–223.

Hunter, J. E., & Schmidt, F. L. (2000). Racial and gender bias in ability and achievement tests: Resolving the apparent paradox. *Psychology, Public Policy, and Law, 6,* 151–158.

Hunter, J. E., Schmidt, F. L., & Judiesch M. K. (1990). Individual differences in output variability as a function of job complexity. *Journal of Applied Psychology, 75,* 28–42.

Hunter, J. E., Schmidt, F. L., & Rauschenberger, J. (1984). Methodological and statistical issues in the study of bias in mental testing. In C. R. Reynolds & R. T. Brown (Eds.), *Perspectives on mental testing.* New York: Plenum.

Jawahar, I. M., & Williams, C. R. (1997). Where all the children are above average: The performance appraisal purpose effect. *Personnel Psychology, 50,* 905–925.

Jeanneret, R., & Silzer, R. (Eds.). (1998). *Individual psychological assessment*. San Francisco: Jossey-Bass.

Lautenschlager, G. J., & Mendoza, J. L. (1986). A step down hierarchical multiple regression analysis for examining hypotheses about test bias in prediction. *Applied Psychological Measurement, 10,* 133–139.

Law, K. S., Schmidt, F. L., & Hunter, J. E. (1994a). Nonlinearity of range corrections in meta-analysis: Test of an improved procedure. *Journal of Applied Psychology, 79,* 425–438.

Law, K. S., Schmidt, F. L., & Hunter, J. E. (1994b). A test of two refinements in procedures in meta-analysis. *Journal of Applied Psychology, 79,* 978–986.

Mead, A. D., & Drasgow, F. (1993). Equivalence of computerized and paper-and-pencil cognitive ability tests: A meta-analysis. *Psychological Bulletin*, *114*, 449–458.

Naylor, J. C., & Shine, L. C. (1965). A table for determining the increase in mean criterion score obtained by using a selection device. *Journal of Industrial Psychology, 3,* 33–42.

Nunnally, J. C., & Bernstein, I. H. (1994). *Psychometric theory* (3rd ed.). New York: McGraw Hill.

Oswald, F. L., & Johnson, J. W. (1998). On the robustness, bias, and stability of statistics from meta-analysis of correlation coefficients: Some initial Monte Carlo findings. *Journal of Applied Psychology, 83,* 164–178.

Oswald, F., Saad, S., & Sackett, P. R. (2000). The homogeneity assumption in differential prediction analysis: Does it really matter? *Journal of Applied Psychology, 85,* 536–541.

Pearlman, K., Schmidt, F. L., & Hunter, J. E. (1980). Validity generalization results for tests used to predict job proficiency and training success in clerical occupations. *Journal of Applied Psychology, 65*, 373–406.

Petersen, N. S., & Novick, M. R. (1976). An evaluation of some models for culture-fair selection. *Journal of Educational Measurement*, *13*, 3–29.

Peterson, N. G., Mumford, M. D., Borman, W. C., Jeanneret, P. R., and Fleishman, E. A. (Eds). (1999). *An occupational information system for the 21st century: The development of O\*Net*. American Psychological Association: Washington, DC.

Raju, N. S., Anselmi, T. V., Goodman, J. S., & Thomas, A. (1998). The effect of correlated artifacts and true validity on the accuracy of parameter estimation in validity generalization. *Personnel Psychology, 51,* 453–465.

Raju, N. S., & Brand, P. A. (in press). Determining the significance of correlations corrected for unreliability and range restriction. *Applied Psychological Measurement.*

Raju, N. S., Burke, M. J., & Normand, J. (1990). A new approach for utility analysis. *Journal of Applied Psychology, 75,* 3–12.

Raju, N. S., Burke, M. J., Normand, J., & Langlois, G. M. (1991). A new meta-analytic approach. *Journal of Applied Psychology, 76,* 432–446.

Raju, N. S., Pappas, S., & Williams, C. P. (1989). An empirical Monte Carlo test of the accuracy of the correlation, covariance, and regression slope models for assessing validity generalization. *Journal of Applied Psychology, 74*, 901–911.

Ryan, A. M., & Sackett, P. R. (1998). Individual assessment: The research base. In R. Jeanneret & R. Silzer (Eds.), *Individual psychological assessment* (pp. 54–87). San Francisco: Jossey-Bass.

Saad, S., and Sackett, P. R. (2002). Examining differential prediction by gender in employment-oriented personality measures. *Journal of Applied Psychology, 87,* 667–674.

Sackett, P. R., Harris, M. M., & Orr, J. M. (1986). On seeking moderator variables in the meta-analysis of correlational data: A Monte Carlo investigation of statistical power and resistance to Type I error. *Journal of Applied Psychology, 71,* 302–310.

Sackett, P. R., & Roth, L. (1996). Multi-stage selection strategies: a Monte Carlo investigation of effects on performance and minority hiring. *Personnel Psychology, 49*, 549–572.

Sackett, P. R., Schmitt, N., Ellingson, J. E., and Kabin, M. B. (2001). High stakes testing in employment, credentialing, and higher education: Prospects in a post-affirmative action world. *American Psychologist, 56*, 302–318.

Schippmann, J. S., Ash, R. A., Battista, M., Carr, L., Eyde, L. D., Hesketh, B., Kehoe, J., Pearlman, K., Prien, E. P., & Sanchez, J. I. (2000). The practice of competency modeling. *Personnel Psychology, 53*, 703–740.

Schmidt, F. L. (1996). Statistical significance testing and cumulative knowledge in psychology: Implications for training of researchers. *Psychological Methods, 1,* 115–129.

Schmidt, F. L., & Hunter, J. E. (1998). The validity and utility of selection methods in personnel psychology: Practical and theoretical implications of 85 years of research findings. *Psychological Bulletin, 124,* 262–274.

Schmidt, F. L., Hunter, J. E., McKenzie, R. C., & Muldrow, T. W. (1979). Impact of valid selection procedures on work-force productivity. *Journal of Applied Psychology, 64,* 609–626.

Schmidt, F. L., Hunter, J. E., & Pearlman, K. (1981). Task differences as moderators of aptitude test validity in selection: A red herring. *Journal of Applied Psychology, 66,* 166–185.

Schmidt, F. L., Pearlman, K., & Hunter, J. E., (1980). The validity and fairness of employment and educational tests for Hispanic Americans: A review and analysis. *Personnel Psychology, 33,* 705–724.

Schneider, B., & Konz, A. (1989). Strategic job analysis. *Human Resources Management, 28*, 51–63.

Society for Industrial and Organizational Psychology, Inc. (1987). *Principles for the validation and use of personnel selection procedures.* (3rd ed.). College Park, MD: Author.

Taylor, H. C., & Russell, J. T. (1939). The relationship of validity coefficients to the practical effectiveness of tests in selection: Discussion and tables. *Journal of Applied Psychology, 23,* 565–578.

# Glossary of Terms

**Ability**   A defined domain of cognitive, perceptual, psychomotor, or physical functioning.

**Accommodation**   A change in the content, format, and/or administration of a selection procedure made to eliminate an irrelevant source of score variance resulting from a test taker's disability.

**Adjusted validity/reliability coefficient**   A validity or reliability coefficient—most often a product-moment correlation—that has been adjusted to offset effects of differences in score variability, criterion variability, or unreliability of test and/or criterion.  See *Restriction of range or variability*.

**Alternate forms**   Two or more versions of a selection procedure that are considered interchangeable in that they measure the same constructs in the same ways, are intended for the same purposes, and are administered using the same directions.  *Alternate forms* is a generic term used to refer to either parallel forms or equivalent forms.  *Parallel forms* have equal raw score means, equal standard deviations, equal error structures, and equal correlations with other measures for any given population.  *Equivalent forms* do not have the statistical similarity of parallel forms, but the dissimilarities in raw score statistics are compensated for in the conversions to derived scores or in form-specific norm tables.

**Analysis of work**   Any method used to gain an understanding of the work behaviors and activities required, or the worker requirements (e.g., knowledge, skills, abilities, and other personal characteristics), and the context or environment in which an organization and individual may operate.

**Assessment**   Any systematic method of obtaining information from tests and other sources; used to draw inferences about characteristics of people.

**Battery**   A set of selection procedures administered as a unit.

**Bias**   In a statistical context, a systematic error in a score.  In discussing fairness, bias refers to variance due to contamination or deficiency that differentially affects the scores of different groups of individuals.

**Compensatory model**   Two or more individual selection procedure component scores (often individual test scores) combined into a composite selection procedure according to some specified formula (including simple summation of scores and unit weighting).  As a consequence of combining scores, some compensation for one or more of the constructs measured may occur due to differential performance on the individual selection procedures (i.e., a higher score on one test compensating for a lower score on another test).

**Composite score**   A score that combines scores from several individual selection procedures according to a specified formula.

**Concurrent validity evidence**   Demonstration of the relationship between job performance and other work outcomes, and scores on selection procedures obtained at approximately the same time.

**Confidence interval**   An interval between two values on a score scale within which, with specified probability, a score or parameter of interest is expected to lie.

**Configural scoring rule (Configural scoring)**   A rule for scoring a set of two or more elements (such as items or subtests) in which the score depends on a particular pattern of responses to the elements.

**Consequence-based evidence**   Evidence that consequences of selection procedure use are consistent with the intended meaning or interpretation of the selection procedure.

**Construct**   A concept or characteristic of individuals inferred from empirical evidence or theory.

**Construct irrelevance**   The extent to which scores on a predictor are influenced by factors that are irrelevant to the construct.  Such extraneous factors distort the meaning of scores from what is implied in the proposed interpretation.

**Contamination**   Systematic variance that is irrelevant to the intended meaning of the measure.

**Content domain**   A body of knowledge and/or set of tasks, activities, or other personal characteristics defined so that given knowledge, activities, or characteristics may be classified as included or excluded.

**Content-based validity evidence**   Demonstration of the extent to which content on a selection procedure is a representative sample of work-related personal characteristics, work performance or other work activities or outcomes.

**Convergent validity evidence**   Evidence of a relationship between measures intended to represent the same construct.

**Correlation**   The degree to which two sets of measures vary together.

**Criterion**   A measure of work performance or behavior, such as productivity, accident rate, absenteeism, tenure, reject rate, training score, and supervisory ratings of job relevant behaviors, tasks or activities.

**Criterion-related validity evidence**   Demonstration of a statistical relationship between scores on a predictor and scores on a criterion measure.

**Criterion relevance**   The extent to which a criterion measure reflects important work performance dimensions or other work outcomes.

**Critical score**   A specified point in a distribution of scores at or above which candidates are considered successful in the selection process.  The critical score differs from cutoff score in that a critical score is by definition criterion referenced (i.e., the critical score is related to a minimally acceptable criterion) and is the same for all applicant groups.

**Cross-validation**   The application of a scoring system or set of weights empirically derived in one sample to a different sample from the same population to investigate the stability of relationships based on the original weights.

**Cutoff score**   A score at or above which applicants are selected for further consideration in the selection process.  The cutoff score may be established on the basis of a number of considerations (e.g., labor market, organizational constraints, normative information).  Cutoff scores are not necessarily criterion referenced, and different organizations may establish different cutoff scores on the same selection procedure based on their needs.

**Derived score**   A score that results from a numerical transformation (e.g., conversion of raw scores to percentile ranks or standard scores) of the original selection procedure score.

**Differential item functioning**   A statistical property of a test item in which different groups of test takers who have the same standing on the construct of measurement have different average item scores or, in some cases, different rates of endorsing various item options.  Also known as DIF.

**Differential prediction**   The case in which use of a common regression equation results in systematic nonzero errors of prediction for subgroups.

**Discriminant validity evidence**   Evidence of a lack of relationship between measures intended to represent different constructs.

**Fairness**   There are multiple perspectives on fairness. There is agreement that issues of equitable treatment, predictive bias, and scrutiny for possible bias when subgroup differences are observed are important concerns in personnel selection; there is not, however, agreement that the term "fairness" can be uniquely defined in terms of any of these issues.

**Generalized evidence of validity**   Evidence of validity that generalizes to setting(s) other than the setting(s) in which the original validation evidence was documented.  Generalized evidence of validity is accumulated through such strategies as transportability, synthetic validity/job component validity, and meta-analysis.

**Internal consistency reliability**   An indicator of the reliability of a score derived from the statistical interrelationships of responses among item responses or scores on different parts of an assessment.

**Internal structure validity evidence**   Demonstration of the degree to which psychometric and statistical relationships among items, scales, or other components within a selection procedure are consistent with the intended meaning of scores on the selection procedure.

**Inter-rater agreement**   The consistency with which two or more judges rate the work or performance of examinees.

**Item**   A statement, question, exercise, or task on a selection procedure for which the test taker is to select or construct a response, or perform a task.

**Item response theory (IRT)**   A mathematical model of the relationship between performance on a test item and the test taker's standing on a scale of the construct of measurement, usually denoted as $\theta$.   In the case of items scored 0/1 (incorrect/correct response) the model describes the relationship between $\theta$ and the item mean score (P) for test takers at level $\theta$, over the range of permissible values of $\theta$.   In most applications, the mathematical function relating P to $\theta$ is assumed to be a logistic function that closely resembles the cumulative normal distribution.

**Job component validity**   See *Synthetic validity evidence.*

**Job description**   A statement of the work behaviors and activities required or the worker requirements (e.g., knowledge, skills, abilities, and other personal characteristics).

**Job Knowledge**   Information (often technical in nature) needed to perform the work required by the job.

**Job relatedness**   The inference that scores on a selection procedure are relevant to performance or other behavior on the job; job relatedness may be demonstrated by appropriate criterion-related validity coefficients or by gathering evidence of the job relevance of the content of the selection instrument, or of the construct measured.

**KSAOs**   Knowledge, skills, abilities, and other personal characteristics required in completing work in the context or environment in which an organization and individual may operate.

**Local evidence**   Evidence (usually related to reliability or validity) collected in a single organization or at a specific location.

**Local study (local setting)**   See *Local evidence.*

**Measurement bias**   See *Bias.*

**Meta-analysis**   A statistical method of research in which the results from several independent studies of comparable phenomena are combined to estimate a parameter or the degree of relationship between variables.

**Moderator variable**   A variable that affects the strength, form, or direction of a predictor-criterion relationship.

**Multiple-hurdle model**   The implementation of a selection process whereby two or more separate procedures must be passed sequentially.

**Normative**   Pertaining to norm groups or the sample on which descriptive statistics (e.g., mean, standard deviation, etc.) or score interpretations (e.g., percentile, expectancy, etc.) are based.

**Norms**   Statistics or tabular data (often raw and percentile scores) that summarize performance of a defined group on a selection procedure.

**Objective**   Pertaining to scores obtained in a way that minimizes bias or error due to different observers or scorers.

**Operational setting**   The specific organization, work context, applicants, and employees to which a selection procedure is applied.

**Personal characteristics**   Traits or dispositions that describe individuals.

**Population**    The universe of cases from which a sample is drawn and to which the sample results may be projected or generalized.

**Power**    The probability that a statistical test will yield statistically significant results if an effect of specified magnitude exists in the population.

**Predictive bias**    The systematic under- or overprediction of criterion performance for people belonging to groups differentiated by characteristics not relevant to criterion performance.

**Predictive validity evidence**    Demonstration of the relationship between selection procedure scores and some future work behavior or work outcomes.

**Predictor**    A measure used to predict criterion performance.

**Predictor-criterion relationship**    The relationship between a predictor and external criteria (e.g., job performance, tenure) or other predictors and measures of the same construct.

**Professional judgment**    Evaluations and decisions that are informed by and representative of the profession's commonly accepted empirical, methodological, and experiential knowledge base.

**Psychometric**    Pertaining to the measurement of psychological characteristics such as aptitudes, personality traits, achievement, skill, and knowledge.

**Reliability**    The degree to which scores for a group of assessees are consistent over one or more potential sources of error (e.g. time, raters, items, conditions of measurement, etc.) in the application of a measurement procedure.

**Reliability estimate**    An indicator that reflects the degree to which scores are free of measurement error.

**Response process**    A component, usually hypothetical, of a cognitive account of some behavior, such as making an item response.

**Restriction of range or variability**    Reduction in the observed score variance of a sample, compared to the variance of an entire population, as a consequence of constraints on the process of sampling.

**Sample**    A selection of a specified number of entities called sampling units (test takers, items, etc.) from a large specified set of possible entities, called the population. A random sample is a selection according to a random process, with the selection of each entity in no way dependent on the selection of other entities. A stratified random sample is a set of random samples, each of a specified size, from several different sets, which are viewed as strata of the population.

**Sampling bias**    The extent to which a sampling process introduces systematic misrepresentation of the intended population.

**Score**    A number describing the assessment of an individual; a generic term applied for convenience to such diverse kinds of measurements as tests, production counts, absence records, course grades, ratings or other selection procedures or criterion measures.

**Selection procedure**   An assessment instrument used to inform a personnel decision such as hiring, promotion or placement.

**Selection procedure (test) user**   The individual(s) or organization that selects, administers, and scores selection procedures (tests) and usually interprets scores that are obtained for a specified purpose in a defined organizational context.

**Shrinkage formula**   An adjustment to the multiple correlation coefficient for the fact that the beta weights in a prediction equation cannot be expected to fit a second sample as well as the original.

**Skill**   Level of proficiency on a specific task or group of tasks.

**Standardization**   (a) In test construction, the development of scoring norms or protocols based on the test performance of a sample of individuals selected to be representative of the candidates who will take the test for some defined use; (b) in selection procedure administration, the uniform administration and scoring of a selection procedure in a manner that is the same for all candidates.

**Standard score**   A derived score resulting in a distribution of scores for a specified population with specified values for the mean and standard deviation. The term is sometimes used to describe a distribution with a mean of 0.0 and a standard deviation of 1.0.

**Statistical power**   See *Power*.

**Statistical significance**   The finding that empirical data are inconsistent with a null hypothesis at some specified probability level.

**Subject matter experts**   Individuals who have thorough knowledge of the work behaviors, activities, or responsibilities of job incumbents and the KSAOs needed for effective performance on the job.

**Synthetic validity evidence**   Generalized evidence of validity based on previous demonstration of the validity of inferences from scores on the selection procedure or battery with respect to one or more domains of work (job components); also referred to as "job component validity evidence."

**Systematic error**   A consistent score component (often observed indirectly), not related to the intended construct of measurement.

**Test**   A measure or procedure in which a sample of an examinee's behavior in a specified domain is obtained, evaluated, and scored using a standardized process.

**Test development**   Process through which a test or other predictor is planned, constructed, evaluated, and modified, including consideration of content, format, administration, scoring, item properties, scaling, and technical quality for its intended purpose.

**Trait**   An enduring characteristic of a person that is common to a number of that person's activities.

**Transportability**   A strategy for generalizing evidence of validity in which demonstration of important similarities between different work set-

tings is used to infer that validation evidence for a selection procedure accumulated in one work setting generalizes to another work setting.

**Type I and Type II errors**   Errors in hypothesis testing; Type I error involves concluding that a significant relationship exists when it does not; Type II error involves concluding that no significant relationship exists when it does.

**Validation**   The process by which evidence of validity is gathered, analyzed, and summarized. (Note: laypersons often misinterpret the term as if it implied giving a stamp of approval; the result of the research might be zero validity.)

**Validity**   The degree to which accumulated evidence and theory support specific interpretations of scores from a selection procedure entailed by the proposed uses of that selection procedure.

**Validity argument**   An explicit scientific rationale for the conclusion that accumulated evidence and theory support the proposed interpretation(s) of selection procedure scores entailed by the proposed uses.

**Validity coefficient**   A measured coefficient reflecting the relationship between a selection procedure and a criterion that provides evidence about the validity of the selection variable.

**Validity evidence**   Any research or theoretical evidence that pertains to the interpretation of predictor scores, or the rationale for the relevance of the interpretations, to the proposed use.

**Validity generalization**   Justification for the use of a selection procedure or battery in a new setting without conducting a local validation research study.  See *Generalized evidence of validity.*

**Variable**   A quantity that may take on any one of a specified set of values

# Index

ability, 3, 4, 9, 10, 15, 18, 23, 28, 32, 33, 39, 40, 47, 59–61

accommodation, 31, 55, 59–61

administration guide, 53–59

administration manual, 35, 51–53, 56

alternate forms, 41

assessment, 3, 6, 15, 38, 41, 42, 46, 54, 56, 59–61
    battery, 46
    individual, 3, 42
    procedures, 38, 54
    *See also* predictor; selection procedures; test

band, 48, 52

battery, 20, 25, 39, 46, 61

bias, 7, 17, 31–34, 46, 51
    predictive, 31–33, 46
    measurement, 32–34
    sampling, 51

biodata, 30, 37, 40

candidates, 5, 9, 14, 15, 27, 34, 40, 41, 44, 46–48, 52, 54–61
    acceptability, 40
    disabilities, 55, 59–61
    feedback, 57
    reassessing, 57

compensatory model, 46

competency models, 10

Computer-Based Test Interpretation (CBTI), 3, 56

compensatory model, 46

computer-based tests, 3, 39, 40, 53, 55, 56

confidence interval, 13, 14, 19

confidentiality, 43, 44, 51, 55

construct, 1, 4–7, 9, 13, 15, 21, 23, 25, 26, 28, 30–33, 37–40, 43, 51, 54, 56, 58, 59, 61
    irrelevance, 32, 61

contamination, 7, 16–18, 51

correlation, 19, 20, 25, 48, 52

criterion, 4–6, 9, 10, 13–20, 28–33, 37, 41–44, 47, 48, 51, 52
    bias, 17, 33
    contamination, 16, 17
    development, 16
    measures, 9, 10, 13, 14, 16, 17, 32, 33, 37, 41, 42, 47, 51
    relevance, 16
    -related strategy, 13, 14, 19, 20, 28
    reliability, 14, 16–19, 43, 51, 52

data, 3, 6, 14, 15, 17, 18, 28–30, 33, 34, 37, 38, 43–45, 49–53, 56, 57, 59, 60
    analysis, 18, 30, 34, 38, 45, 50, 60
    accuracy, 18, 44, 45
    collection, 14, 15, 18, 33, 38, 43–45, 51, 52
    missing, 45
    statistics, 45

derived scales, 52, 56

designs,
    predictive, 6, 14, 15, 17
    concurrent, 6, 14, 15

differential item functioning (DIF), 33, 34

differential prediction, 32, 45, 46

disabilities, 31, 55, 57, 59–61

documentation, 27, 35, 38, 60

effect size, 19

employment decisions, 1, 7

error, 17, 19, 28, 29, 31–33, 42, 45, 47, 56–58
    systematic, 17, 31
    Type I, 19, 29
    Type II, 19, 29
    variance, 33

evidence, 2, 4–9, 11, 13–15, 17, 18, 21, 23–25, 27–30, 32, 33, 37, 39, 41, 42, 46, 47, 49, 50, 57
    consequence-based, 5, 7, 8
    convergent, 5, 8, 9, 13, 30
    discriminant, 5, 9, 13
    internal structure, 5, 6, 8, 13, 25, 26

content-related, 5, 6, 8, 21, 24, 25
    response-based, 6, 8
    relationship-based, 5, 8, 13, 42
    sources of, 4, 5, 8, 13, 23, 42
    *See also* validity evidence
expectancy table, 19, 52
fairness, 31, 32
feasibility, 2, 8, 10, 14, 21, 22, 36, 41
group difference, 7, 31–33, 50
incumbents, 12, 14, 22, 36, 40, 42, 48, 52, 54
intercorrelation, 25, 52
internal consistency reliability, 26
interpretation, proposed, 4, 5
inter-rater, 25, 26, 39, 43
    agreement, 25, 26
interview(er), 3, 18, 26, 30, 44, 58
inventories, 3, 37, 40, 47
item, 6, 21, 25, 33, 34, 37, 39, 41, 51, 52, 54, 58
    sensitivity review, 34
item response theory (IRT), 34
job, 3–6, 8–13, 15, 16, 21–24, 27–31, 37, 38, 40–42, 44, 47, 51, 54, 57, 60
    analysis, 10, 44
    description, 11
    knowledge, 11, 24, 30, 60
    performance, 3, 13, 16, 21, 22, 28, 29, 40, 42, 47
    relatedness, 4, 5, 24, 60
    *See also* work
knowledge, skills, abilities, and other personal characteristics (KSAO), 10–12, 21–25, 42, 47, 60
labor organizations, 36, 37
local study (local setting), 8, 19, 27, 29
measurement bias, *see* bias
meta-analysis, 8, 9, 19, 27–30
modification, 4, 52, 57, 59–61
multiple-hurdle model, 46
negative consequences, 7
norms, 36, 48, 52
normative, 48, 52, 59

objective, 6, 11, 13, 35, 39–42, 50
operational, 8, 9, 19, 25, 29, 34, 35, 46, 51, 55, 59
    setting, 8, 9, 29
    use, 25, 34, 46, 59
organization, 4, 7–11, 15, 16, 20, 22, 23, 29, 31, 35–48, 50, 53–61
    climate, 36, 42
    constraints, 35–37, 41–44
    culture, 36
    needs, 20, 22, 35, 36, 38, 40, 43
outliers, 45
performance,
    group, 4, 7, 17, 31, 32, 43, 46
    individual, 4, 6, 7, 23, 32, 36, 40, 42–44, 60
    organizational, 4
    tasks, 6, 7, 9, 16, 42, 50, 52
personal characteristics, 3, 4, 10, 11, 38, 40, 47, 60
personality inventory, 3, 37, 40, 47
personnel selection, 1, 2, 13, 32, 35, 50
    *See also* selection procedures
pilot testing, 36, 44, 60
population, 15, 17, 19, 30, 36, 41, 48, 51, 60
post hoc hypotheses, 21
power, 14, 19, 29, 33, 40
prediction, 16, 19, 21, 32, 33, 42, 45–47
predictive study designs, 6, 14, 15
predictor, 3, 5–7, 11, 13–21, 28–34, 39, 41–43, 46, 47, 51
    choice/selecting, 13, 17, 18, 39
    consequences, 7
    constructs, 15, 30
    contamination, 18
    -criterion relationship, 5, 13, 14, 18, 19, 28, 29, 31–33, 41
    interpretation of, 6
    reliability, 18, 33
    score, 5, 7, 16, 28, 32, 42, 51
    selection decisions strategies, 15, 18
    *See also* assessment; selection procedure; test

professional judgment, 2, 5, 8, 17, 19, 20, 24, 25, 28, 29, 35, 37, 38, 42, 45–47, 50, 59

psychometric, 11, 31, 39, 42, 43, 52, 60, 61
    considerations, 39, 43

quality control, 44, 55, 56

rank orders, 46–48, 52

rater training, 39, 52

rationale, 4, 9, 13, 16, 17, 20, 21, 24, 42, 45–47, 51, 52

raw score, 52, 56

reassessment, 57, 58

reference(s), 2, 3, 18, 53, 56, 58
    checks, 3, 18

relevance, 2, 4, 8, 11, 14, 16, 25, 27, 38, 43, 51
    inclusion in selection procedure, 25
    of criterion measure, 14, 16

reliability, 9, 14, 16–19, 22, 25, 26, 33, 39, 43, 44, 46, 51, 52, 56, 60
    criterion, 17–19, 43, 51, 52
    estimate, 19, 26, 43, 51
    predictor, 18

response process, 5, 6, 8

restriction of range or variability, 14, 19, 33, 51, 52, *See also* adjusted variability

sample, 3, 6, 9, 10, 14–22, 24, 25, 28–30, 33, 34, 38, 39, 41, 43, 45, 46, 48, 51, 52, 54, 60

sampling plan, 38

score, 3–6, 7, 9, 16, 17, 20, 24–28, 30–34, 36, 39–42, 45–53, 55–61
    critical, 47
    composite, 20, 50
    cutoff, 36, 46, 47, 52, 59
    derived, 52
    raw, 52, 56
    selection procedure, 6, 47–49, 56–61
    standard, 52
    transformation, 52

scoring, 6, 13, 21, 22, 24, 26–28, 30, 38, 39, 44, 46–53, 56–61

configural, 21
    guidelines, 6, 21, 22, 24, 56

security, 40, 41, 44, 54–58

selection battery, 25, 39, 61

selection instrument, 36, 39, 59

selection procedures,
    acceptability of, 37, 40
    alternate forms, 41, 46, 48, 50, 53, 60
    content based, 21–25
    internal structure, 13, 25
    standardized, 13, 21, 59
    (test) user, 5, 7, 43, 44, 52, 53, 55, 56, 58–61
    *See also* assessment; predictor; test

shrinkage formula, 20

skill, 4, 10, 11, 24, 25, 36, 47, 60

specificity, 24

stakeholders, 35–37, 40

standard deviation, 20, 49, 52

standard score, 52

standardization, 21, 39, 40, 58

statistical power, *See* power

statistical significance, 13, 19

subgroup differences, 7, 31, 32, 33, 50

subject matter experts (SME), 21, 22

technical reports, 35, 51, 53, 56

test, *See also* assessment; predictor; selection procedure
    administration, 31, 39, 53–56
        consistency of, 54
        environment, 55, 56
        guide, 53–59
            disabilities, 59–61
            nonstandard, 57
    alternate forms, 41
    cognitive ability, 9, 15, 28, 32, 34, 39, 40, 47, 59
    computer-based, 3, 39, 40, 53, 55, 56
    constructs, 1, 4–7, 9, 13, 15, 21, 23, 25, 26, 28, 30–33, 37–40, 43, 51, 54, 56, 58, 59, 61
    content domain, 6, 22, 24, 25, 51
    content-based, 21–25, 28, 41

content-oriented strategy, 23, 36, 42
-criterion relationship, 5
development, 34
format, 6, 21, 39, 40, 53
integrity, 7
internal structure, 5, 6, 13, 25, 26
paper-and-pencil, 3, 39, 40, 53
performance, 3, 56
personality, 3, 9, 33, 37, 40, 42, 47
physical ability, 3
pilot test, 36, 44, 60
responses, 5–8, 21, 39, 45, 56, 58
test scores, 4–6, 9, 33, 46, 50–53, 56–61
security, 40, 41, 44, 54–58
validity, 4, 13, 48
work domain, 21–22, 24, 25, 28, 38
trait, 37
transportability, 8, 27, 28, 41, 51
user responsibility, 60, 61
utility, 47–49
validation, *See also* validity
analysis, 20, 45
cross-, 20
design, 8–10, 14, 15, 21, 22, 28, 36
effort, 1, 2, 8–10, 13, 18, 20, 22, 25, 35, 37, 38, 42, 45, 46, 49, 50, 54, 59
generalization, 9, 10
planning, 10, 37
process, 4, 34, 35
strategy, 5, 8, 14, 36, 39, 41, 42
study, 14–19, 21, 22, 24, 27, 30, 36, 37, 42–46, 51
validity, *See also* validation
adjusted, 19
discriminant, 5, 9, 13
estimates, 14, 15, 17–20
evidence of, 2, 4, 6, 9, 13, 14, 17, 21, 25, 28, 37, 49
face, 37
generalization, 8, 11, 13, 27–30, 36, 41, 42

generalized evidence of, 27
inferences, 7–10, 23, 27, 28, 35, 39, 46, 49, 59, 60
job component/synthetic, 8, 27, 28 *See also* work
strategy, 5, 8, 14, 36, 39, 41
validity argument, 7
validity coefficient, 18–20, 28
validity evidence, 4, 5, 8, 9, 13–15, 17–19, 21–25, 27–30, 37, 41, 42, 49, 50
criterion-related, 13–15, 17–20, 28
content-based, 21–25, 28, 41
convergent, 9, 13, 30
discriminant, 5, 9, 13
internal structure, 8, 25
variable, 5, 8, 13–14, 16–20, 23, 32, 33, 38, 42, 52
variability, 19–20, 28, 52
variance, 16, 18, 20, 32, 33, 45, 47
work, *See also* job
activities, 10, 30, 38, 42, 43
analysis, 24, 38, 43, 44
analysis of work, 10–12, 16, 21–25, 42, 45, 50
behavior, 1, 4, 5, 7, 8, 11, 13, 14, 16, 21–25, 28, 43
environment, 10–12
outcome, 7, 13, 16
samples, 3, 6, 16, 24, 25, 39, 43, 51, 52
work(er) requirements, 6, 10, 11, 21–23, 35, 38, 41, 42, 51, 59
workforce, 36, 47, 48

## Section C - Create a Job Announcement

The job announcement is one of the most powerful tools in the recruitment process. It provides an important opportunity to make a first impression on potential applicants, and may strongly influence their decision to apply for your position. Therefore, it is important to create an announcement that is clear, concise, and attractive. It should capture interest and make applicants want to apply. You should broadcast a realistic preview of the position and provide a glimpse of the organization and its culture, if possible.

### What to include in a job announcement

You must include the following required items in your job announcement (see 5 U.S.C. 3327 and 3330, 5 CFR Part 330 and Executive Order 13078):

### Required Items for a Job Announcement

- Agency Name
- Announcement Number
- Title of the Position
- Series
- Grade(s) (or equivalent) and Entrance Pay
- Open and Closing Dates (including cut-off dates, if any)
- Duty Location
- Number of Vacancies
- Description of Duties
- Qualification Requirements (Competencies/KSAs required)
  **Reminder**: For positions with minimum education requirements, with limited exceptions, only education from institutions which are accredited or preaccredited/candidate for accreditation may be used to meet those requirements. For further information on the acceptability of higher education for meeting minimum qualification requirements, please refer to www.opm.gov/qualifications. For a list of schools which meet these criteria, please refer to http://www.ed.gov.
- Basis for Rating:
  o  Type of rating procedure either numeric rating or category rating;
  o  Type of assessment(s) to be used,
  o  If using an interview, whether the interview is pass/fail or scored,
  o  If using category rating, description of each quality category,
  o  Whether a drug test is required.
- How to Apply (including point of contact, telephone number and email address, if appropriate
- What to File
- Agency's Definition of "Well-Qualified" (CTAP/ICTAP)
- Information on How to Claim Veterans' Preference
- Equal Employment Opportunity Statement
- Reasonable Accommodation Statement

### Additional items for a job announcement

In addition to the required public notice items, you may include additional items designed to attract job-seekers, such as information covering the following:

- Recruitment/Relocation Incentive Opportunities
- Alternative Work Schedules
- Part-time Employment and Job Sharing Opportunities
- Telework Options
- Employee Benefits:
  - o Insurance (Life, Health, Dental, Vision, Long Term Care)
  - o Flexible Spending Accounts for Health Care and for Dependent Care
  - o Leave (Vacation, Medical, Family, and Leave Sharing)
- Work/Like Programs (e.g., On-site Day Care, Nursing Mothers Program, Child Care Subsidy, Employee Health Programs)
- Transit Subsidy
- Employee Assistance Programs
- Incentive Award Opportunities
- Development and Training Opportunities

**Reasonable accommodation statement**

You must include language in the job announcement stating that reasonable accommodations are made for qualified applicants or employees with disabilities. The statement below complies with Executive Order 13078 and OPM's goal to increase the representation of adults with disabilities in the Federal workforce. You can use this statement or the wording of your choice, so long as you convey the message that your agency provides reasonable accommodation for applicants with disabilities:

> ***This agency provides reasonable accommodation to applicants with disabilities. If you need a reasonable accommodation for any part of the application and hiring process, please notify the agency. The decision on granting reasonable accommodation will be made on a case-by-case basis.***

For more information on OPM's Plan for Employment of People with Disabilities, you can visit our website, www.opm.gov/disability.

## Terminating or Combining Inventories

**When to terminate/combine inventories**

Before you establish a new inventory covering the same positions (as when a new qualification standard or rating schedule is issued), you should either terminate the old inventory or combine it with an equivalent new inventory. You should terminate:

- Old inventories if one examination has a written test and the other does not, unless OPM authorizes another procedure, and

- An existing inventory when it is no longer needed to fill vacancies, or when a case examining approach is better suited to the agency's needs.

**Alternative to termination**

Usually you should terminate the old inventory when qualification requirements or rating schedules change.

- You should allow applicants who may not meet the new requirements to submit new application materials.

- If an eligible applicant's score or eligibility changes under the new examination, you should issue a new notice of results.

**Maintaining a case file**

You should maintain sufficient information in the case file to permit reconstruction of the inventory. The following are examples of information you should include:

- Termination date of the competitor inventory;
- Disposition of the applications on the competitor inventory;
- Date of the last appointment from the inventory; and
- Whether a successor inventory was established.

**Retaining applications for extended consideration**

If you do not establish a new inventory but you expect to fill future vacancies through case examining, you should retain the applications of persons entitled to extended consideration in a separate file for future vacancies.

**Note**: This applies to 10-point preference eligibles (see Special Handling of Preference Eligibles in this section) and individuals who lost certification opportunities or failed to receive bona fide consideration (see Chapter 6, Section E, Priority Consideration).

**Notification of termination**

Whenever you plan to terminate an existing inventory, you should notify all active eligibles in writing if one of the following circumstances occurs:

| IF you use… | THEN you should… |
|---|---|
| A new examination to establish a new inventory | Tell the eligible applicants the open and close dates and the procedures to follow if they wish to apply; or |
| Case examining | Tell competitors how to find out about future announcements. |

**Combining inventories**

When you combine an existing inventory with a new one, you should follow the procedures cited below:

- Merge current eligibles on the existing inventory with the new inventory in the same order as if the list had resulted from one examination;

- Eligible applicants entitled to priority consideration on the old inventory for reasons such as lost consideration or lost certification retain their preferred standing on the combined inventory; and

- Current eligible applicants on the existing inventory remain on the new inventory for the unexpired period of eligibility.

If an eligible is on both the new and old inventories with different scores, enter him/her on the combined inventory with the higher rating. However, eligibles with preferred standing (e.g., erroneous consideration, CTAP/ICTAP, priority referrals) on the old inventory retain their preferred standing on the combined inventory.

**Disposition of records**

Schedule applications for disposal according to the records retention and disposition schedule instructions in Appendix C. Attach terminated register cards or equivalent records to your reconstruction sheet for disposition.

## Reconsideration of Rating

Examining decisions made by your office are subject to reconsideration upon reasonable demonstration that a review is necessary. You must establish a written procedure for the processing of an applicant's request for reconsideration of his or her rating(s). The same procedure may be incorporated into the agency administrative grievance system or alternative dispute resolution system and used for agency-employed applicants who grieve an assigned rating (5 CFR Part 300).

You should make your reconsideration procedure available to applicants who wish to challenge an assigned rating.

**Contents**

Your procedure should incorporate the following elements:

- Any request that might result in a rating change should be made in writing and should indicate why the applicant believes the original decision was not proper;

- The office that made the original decision should conduct the first level of review;

- A staff member other than the person who made the original decision should conduct the review; and

- The response to the request should contain a full explanation of the reasons for the decision, without unduly compromising the rating schedule.

Upon request, the applicant may submit a second level appeal to a designated official within the agency for review. That decision is final. **There is no further appeal to OPM.**

**Rating changes**

If a reconsideration request leads to a rating change, the applicant's record should reflect the new rating. In case examining, the certificate should reflect the new rating *if you have not yet issued the certificate.* Once a certificate is issued, you should not amend it unless the:

- New rating is "ineligible;"

- Eligible was improperly awarded a higher type of veterans' preference (Example: the applicant was awarded 10-point veterans' preference but after reviewing the final documents, the applicant was not entitles to this 10 points preference); or

- Rating error was the result of the rater/examining office (see Chapter 6).

**Note:** Please note that we will not accept job announcements by email unless the template is used.

**Adequate public notice**

The merit principles require that agencies provide adequate public notice of every competitive service vacancy that they are filling. Adequate public notice means that any person who wants to apply for a position will have access to all of the information necessary to apply, and will be given an open and fair opportunity to be hired. Depending on your need for applicants, additional recruitment activities may or may not be necessary.

**Determining an open period for receiving applications**

You are responsible for determining an open period for receiving applications that is of sufficient duration to provide the public with adequate notice of the job announcement. What constitutes an adequate open period may vary depending on your recruitment plan, the nature of the position(s), promotion potential, available labor market, and other considerations. Once you have determined the open period, you should clearly state it in the job announcement.

**Factors in determining length of open period**

You could establish a short notice period when you have only a few jobs to fill and expect a large number of well-qualified applicants. Conversely, you could establish an open continuous notice period when it is difficult to find qualified individuals or when you have many vacancies to fill.

**Defining the open period**

You may define an open period that is based on either a specific date or a specific number of applications to be received.

| IF... | THEN... |
|---|---|
| A closing date is used to define the open period | The job announcement should clearly state whether the timeliness of submissions will be determined by the postmark, or by the date the application is received in the examining office. |
| The open period is defined in terms of a specific number of applications received | <ul><li>you should accept and process all of the applications received by close of business on the day that the specified number is reached; and the job announcement should clearly state</li><li>the number of applications that will be accepted for consideration.</li></ul> |

**Recommended open period**

OPM suggests that you prescribe an open period of at least five business days to ensure that people who want to apply for the position have an adequate opportunity to do so.

If you prescribe an open period of fewer than five business days, you should clearly document your reasons for doing so in the examination case file (for reconstruction purposes). Your reasons should be based on objective factors, such as the number and type(s) of jobs you plan to fill, labor market conditions, and recent experience filling similar positions.

**Closing dates and cut-off dates**

A *closing date* is the date beyond which you will no longer accept applications for the advertised position(s). When applicable, you should ensure that the job announcement clearly informs the applicants of the closing date. (For conditions in which a closing date is used, see *Defining the open period*.)

In addition to the closing date, you may also establish a *cut-off date*. A cut-off date establishes an early consideration period. If a cut-off date is established, you must rate, rank, and refer to the selecting official all applications received by the cut-off date. In addition, you must consider any application received from a 10-point preference eligible who applies after the cut-off date **but** before the date that the certificate is issued (See 5 CFR Part 332). You may consider applications received after the cut-off date only when the initial group is exhausted and/or there are additional vacancies to fill. If a cut-off date is not identified, you should consider all the applications received by the closing date.

**When to use a cut-off date**

You can use cut-off dates to manage the receipt of large numbers of applications over an extended period of time, or if you have an open-continuous job announcement for hard-to-fill positions and an urgent need to fill a position immediately. Cut-off dates may be used in both case examining and competitor inventories (see Chapter 5, Section C). However, you should generally not use them in case examining, except where the job announcement is intended to remain open for an extended period of time and multiple jobs are to be filled.

If you use a cut-off date, you should clearly identify the date in the job announcement. The job announcement should also explain the process that will take place as a result of the cut-off date. For example, you may want to indicate in the job announcement that an initial cut-off date will be used to begin applicant consideration and that applications received after the cut-off date will be considered if needed. Under these circumstances, you can identify daily cut-offs so your agency can issue a certificate as vacancies arise or as qualified applicants are identified without having to wait for the next cut-off date.

**Application receipt procedures**

Your agency headquarters is responsible for establishing policy and procedures for accepting and processing applications from all applicants, including status applicants.

In developing these policies and procedures, your headquarters must comply with all applicable laws and regulations including the following:

- Merit system principles of public notice and open competition (5 U.S.C. § 2301 or Appendix H);
- Merit system principles of efficiency and effectiveness (5 U.S.C. § 2301 or Appendix H);
- Rights of preference eligibles (5 U.S.C. § 2108);
- Rights of surplus or displaced employees (5 CFR Part 330), and
- Eligibility for non-competitive appointments (5 CFR Part 315).

Frequently, agencies solicit applications from both the public and merit promotion applicants simultaneously. Sometimes one job announcement is used to solicit applications for both external and internal competitions. In such a case, the job announcement must clearly specify the filing instructions and conditions for each type of applicant.